## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE, and | * | |
| | * | |
| OKLAHOMA WESLEYAN UNIVERSITY, | * | |
| 2201 Silver Lake Rd. | * | |
| Bartlesville, OK 74006, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| CATHERINE E. LHAMON, in her official | * | |
| capacity as Assistant Secretary for Civil | * | |
| Rights, United States Department of | * | Civil Action No. 1:16-cv-01158-RC |
| Education, Office for Civil Rights, | * | |
| 400 Maryland Avenue SW | * | |
| Washington, DC 20202, and | * | |
| | * | |
| OFFICE FOR CIVIL RIGHTS, | * | |
| U.S. DEPARTMENT OF EDUCATION, | * | |
| 400 Maryland Avenue SW | * | |
| Washington, DC 20202, and | * | |
| | * | |
| JOHN B. KING, JR., in his official capacity as | * | |
| United States Secretary of Education, | * | |
| Office of the Secretary | * | |
| 400 Maryland Avenue SW | * | |
| Washington, DC 20202, and | * | |
| | * | |
| U.S. DEPARTMENT OF EDUCATION, | * | |
| 400 Maryland Avenue SW | * | |
| Washington, DC 20202, | * | |
| | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## **AMENDED COMPLAINT**

Plaintiffs John Doe[1] and Oklahoma Wesleyan University (OKWU), by and through

undersigned counsel, file this amended complaint for violations of the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 706(2)(A), (C) and (D).  In support of this amended complaint,

Plaintiffs state as follows:

## INTRODUCTION

1.      For far too long, the problem of sexual assault on college campuses, like the

problem of sexual assault more generally, did not receive the attention it merited.  Now, hardly a

week goes by where the problem of campus sexual assault does not feature prominently in the

mainstream media.  That is not a bad thing; the war against sexual assault must be waged with

the utmost seriousness.  But "[t]he process of eliminating sexual harassment must go forward

with recognition of the rights of all involved and without the creation of new wrongs."

Starishevsky v. Hofstra Univ., 161 Misc. 2d 137, 138–39, 612 N.Y.S.2d 794, 796 (Sup. Ct.

1994).  That is so for two reasons. It ensures that innocent victims, like Plaintiff John Doe, do not

become the collateral damage of a well-intended but unchecked offensive.  It also protects the

hard-won gains of the present for future generations, lest the pendulum swing back so hard

against perceived abuses that enforcement efforts lose credibility and those gains be lost as

quickly as they were won.

2.      The Department of Education's Office for Civil Rights ("OCR") has been at the

forefront of the effort to tackle the problem of sexual assault on college campuses.  It has

launched a veritable blitzkrieg against what it perceives to be the root causes of sexual assault on

campus.  OCR's efforts in tackling this challenge, however, have been equal parts zeal and

hubris.  Concluding that it, and it alone, knows what is best, and further concluding that its vision

---

[1] "John Doe" is a pseudonym.  Due to the subject matter of this lawsuit, Mr. Doe is proceeding in
a way that will protect his privacy and that of his accuser, who is identified as "Jane Roe."

must be imposed no matter its lawfulness, OCR, on April 4, 2011, bucked a long-standing practice of cooperative consultation with educational institutions, like Plaintiff OKWU, and affected individuals and imposed a dramatically new sexual misconduct investigatory regime upon colleges and universities.  It has also taken the unprecedented step of publicly identifying those schools it is currently investigating for alleged deficiencies in the fight against sexual assault and has added to that list of schools with astonishing speed.  These efforts have left schools scrambling to determine how to abide by OCR's new requirements while simultaneously affording a fair process to the students in their care, both accuser and accused.  A growing number of innocent students have been trampled in the wake of these new requirements, found responsible for serious charges based often on the flimsiest of evidence.  Plaintiff John Doe is among them.

3.      OCR's goal is laudable in the highest degree; its attempt to get there at any cost, disturbing to the same degree.  The sweeping changes that OCR has imposed upon the nation's colleges and universities—in particular, its requirement that they use a "preponderance of the evidence" standard of proof, the lowest such standard known to the American judicial system— exceed any authority delegated to it to enforce Title IX.  And those changes, despite being treated, in both theory and practice, as substantive rules carrying the force of law, were promulgated by OCR without subjecting them to notice and comment by the public.  OCR has taken a "shoot first, ask questions later" approach, and it has managed to empty more than a few magazines before being challenged about whether it is even allowed to do so.  It has also violated three separate provisions of the Administrative Procedure Act ("APA").  Plaintiff John Doe is among the wounded, and Plaintiff OKWU fears its students may one day be, too.  As people do when the tides of the times sweep too broadly, Plaintiffs seek refuge in the courts.

## PARTIES

4.      Plaintiff John Doe is a citizen and resident of the Commonwealth of Virginia.  In the fall of 2012, he enrolled in the J.D. program at the University of Virginia ("UVA").

5.      Plaintiff Oklahoma Wesleyan University is a domestic non-profit corporation incorporated in, and with its principal place of business in, the State of Oklahoma.  It receives federal funding in the form of federal financial aid provided to its students.

6.      Defendant Catherine E. Lhamon is the Assistant Secretary for Civil Rights in the Department of Education's Office for Civil Rights ("OCR").  She is the head of the Office for Civil Rights.  She is sued in her official capacity.

7.      Defendant Office for Civil Rights, United States Department of Education is an office within the United States Department of Education, an agency of the United States.  OCR is responsible for enforcing certain federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education, including Title IX.

8.      Defendant John B. King, Jr. is the United States Secretary of Education.  He is sued in his official capacity.

9.      Defendant United States Department of Education (the "ED") is an agency of the United States.  The ED, through its Office for Civil Rights, is responsible for enforcing certain federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education, including Title IX.

## JURISDICTION AND VENUE

10.     This Court has authority to review final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.  Jurisdiction over actions seeking such review is provided by 28 U.S.C. § 1331.

11.      Venue properly lies in this Court under 28 U.S.C. § 1391(e) because Defendant Office for Civil Rights and Defendant Department of Education are United States agencies headquartered in this District, and because a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

## STATEMENT OF FACTS

12.     Title IX bars sex- and gender-based discrimination in institutions of higher education receiving federal funding.  It states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

13.     Defendant Department of Education is tasked with implementing and enforcing federal statutes pertaining to higher education.  Its Office for Civil Rights is specifically tasked with responsibility for enforcing federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department, including Title IX.  20 U.S.C. § 3413(a).  OCR is one of the largest federal civil rights agencies, with approximately 650 attorneys, investigators and staff.

14.     Title IX empowers departments and agencies that provide federal financial assistance to colleges and universities, whether by way of grant, loan, or most types of contracts, to effect compliance with Title IX "by the termination of or refusal to grant or continue [such]

assistance" when "there has been an express finding on the record, after opportunity for a hearing, of a failure to comply with" Title IX.  20 U.S.C. § 1682.

15.     The overwhelming majority of colleges and universities in the United States receive federal funding in some form, including federal funding from the Department of Education.  The federal government annually gives colleges and universities tens of billions of dollars for research and development and approximately $100 billion in the form of federal student loans.

16.     Withdrawal of Department funding would cripple most schools' ability to operate or would require a drastic reduction in the services and educational opportunities they are able to provide their students.

17.     In fiscal year 2015, Plaintiff OKWU received more than $15 million in federal funding. Without that funding, Plaintiff OKWU would have to limit the educational opportunities it affords its students.

**A.  OCR Guidance on Title IX and Its Implementing Regulations**

18.     On three occasions in the past 20 years, OCR has promulgated substantive rules related to the investigation and adjudication of allegations of sexual misconduct by which colleges and universities must abide in order to comply with Title IX.  On two of those occasions, OCR published notice of its proposed rules and provided an opportunity for comment, as required by 5 U.S.C. § 553.  On the third, it did not, even though those most recent substantive rules effected sweeping new changes on campuses across the country.

The 1997 Sexual Harassment Guidance

19.     On August 16, 1996, the Assistant Secretary for Civil Rights published a notice in the Federal Register regarding the availability of a document entitled, "Sexual Harassment

Guidance: Peer Sexual Harassment" (Peer Guidance) and inviting comments on the document. See 61 FR 42728.

20.     On October 4, 1996, the Assistant Secretary published in the Federal Register a request for comments on a document entitled, "Sexual Harassment Guidance: Harassment of Students by School Employees" (Employee Guidance). See 61 FR 52172.

21.     Both notices stated that the guidance documents reflected longstanding OCR policy and practice and invited comments and recommendations regarding their clarity and completeness.

22.     OCR received approximately 70 comments on the Peer Guidance and 10 comments on the Employee Guidance. 62 FR 12035.

23.     OCR combined the two guidance documents into one and published, as a final document, its "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" on March 13, 1997 ("the 1997 Guidance"). See 62 FR 12034–12046.

24.     The 1997 Guidance contained a lengthy section titled, "Prompt and Equitable Grievance Procedures" that spelled out the requirements that any school must satisfy in its investigation and adjudication of allegations of sexual misconduct. See 62 FR 12044–45. Grievance procedures "must" apply to claims "filed by students against school employees, other students, or third parties," 62 FR 12044, and a school "must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities," 62 FR 12045. Schools may allow for informal mechanisms of resolution, but not in cases of "alleged sexual assaults." Id. Schools have a "duty to respond promptly" even when there is a parallel police investigation, and "because legal standards for criminal conduct are different" than the standard

for determining harassment under Title IX, schools "may not" allow a police investigation to be determinative of whether sexual harassment occurred.  <u>Id.</u>

25.     The 1997 Guidance did not mandate that sexual misconduct investigations take any particular form.  The 1997 Guidance listed six "elements" OCR would use "in evaluating whether a school's grievance procedures are prompt and equitable," but ultimately left schools with the flexibility to shape their policies based on local needs:  "Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."  <u>Id.</u>

26.     None of the six "elements" identified in the 1997 Guidance was the preponderance of the evidence standard, or any evidentiary standard, and the 1997 Guidance does not elsewhere require adoption of any particular evidentiary standard.

<u>The 2001 Revised Sexual Harassment Guidance</u>

27.     On November 2, 2000, OCR published in the Federal Register a notice requesting comment on proposed revised guidance.  <u>See</u> 65 FR 66092–66107.  Although the revised guidance sought only to revise the 1997 Guidance "in *limited respects* in light of recent Supreme Court cases relating to Sexual Harassment in Schools," 65 FR 66092 (emphasis added), OCR nevertheless provided the opportunity for comment on the proposed revised guidance.

28.     In response, OCR received approximately 11 comments representing approximately 15 organizations and individuals.

29.     On January 19, 2001, OCR published a notice regarding the availability of its "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties."  66 FR 5512.  Its section on "Prompt and Equitable Grievance

Procedures" mirrored, almost word for word, that same section from the 1997 Guidance.  Like the 1997 Guidance, it lists the same six elements it will consider in determining whether a school's grievance procedures are prompt and equitable and ultimately leaves schools with the flexibility to conform their procedures to local needs.

30.     Also like the 1997 Guidance, it does not include the preponderance of the evidence standard, or any evidentiary standard, among those six elements, nor does it require any particular evidentiary standard anywhere else.

The 2011 Dear Colleague Letter

31.     On April 4, 2011, OCR published a "Dear Colleague Letter" on sexual harassment ("2011 DCL.").  Though it styled itself a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, see 72 Fed. Reg. 3432, and claimed that it "does not add requirements to applicable law," it acknowledged elsewhere that it "supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence," and in fact added numerous requirements to those contained in the 2001 Guidance.

32.     Despite OCR's claim that the 2011 DCL did "not add requirements to applicable law," multiple new provisions of the 2011 DCL constituted substantive rulemaking that required the 2011 DCL to be subjected to notice and comment rulemaking before its promulgation.

33.     Unlike both the 1997 Guidance and the 2001 Guidance, however, the 2011 DCL was not subjected to notice and comment procedures before it was promulgated.  Instead, OCR asked anyone "interested in commenting on this guidance" to "send an email with your comments to OCR@ed.gov" or mail in a letter.

34.     The 2011 DCL expressly requires, as part of schools' mandated efforts to publish

and implement procedures for the "prompt and equitable resolution" of sexual misconduct

claims, that schools adopt a preponderance of the evidence standard in their investigations of

allegations of sexual misconduct:  "OCR reviews a school's procedures to determine whether the

school is using a preponderance of the evidence standard to evaluate complaints."  The 2011

DCL gives schools no leeway in that regard (with emphases added):

> Thus, in order for a school's grievance procedures to be consistent with Title IX
> standards, the school ***must*** use a preponderance of the evidence standard (*i.e.*, it is
> more likely than not that sexual harassment or violence occurred). The "clear and
> convincing" standard (*i.e.*, it is highly probable or reasonably certain that the
> sexual harassment or violence occurred), currently used by some schools, is a
> higher standard of proof. ***Grievance procedures that use this higher standard are
> inconsistent with the standard of proof established for violations of the civil
> rights laws, and are thus not equitable under Title IX***. Therefore, preponderance
> of the evidence is the appropriate standard for investigating allegations of sexual
> harassment or violence.

35.     The 2011 DCL provided two bases for imposing the preponderance of evidence

standard upon schools.  First, it noted that OCR uses that standard (a) "when it resolves

complaints against recipients," *i.e.*, educational institutions, alleging they have failed to establish

a grievance regime which complies with Title IX, and (b) when it conducts "fund termination

administrative hearings."  The 2011 DCL never explained why the use of that standard to

determine whether schools are adequately complying with federal statutory and regulatory

requirements, and whether they should have their funding cut if they are not, related in any way

to its appropriateness in determining whether an accused student, employee or third party

assaulted or engaged in misconduct against a student.

36.     Second, it noted that the preponderance of the evidence standard is "the standard

of proof established for violations of the civil rights laws."  The 2011 DCL never explained why

this aspect of federal civil rights lawsuits, but no other aspect of civil rights lawsuits (such as the

right to discovery, the right to the protections of the rules of evidence, or the right to cross-examine other parties), had to be transposed into campus sexual misconduct investigations.

37.     The 2011 DCL, in fact, "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing," even though parties to federal civil rights lawsuits have that right.

<u>The 2014 "Questions and Answers on Title IX"</u>

38.     On April 29, 2014, OCR published a document signed by Defendant Lhamon titled, "Questions and Answers on Title IX and Sexual Violence" ("the 2014 Questions").  That document, like the 2011 DCL, styled itself a "significant guidance document" that added no new requirements to applicable law.

39.     The 2014 Questions confirmed, beyond any shadow of a doubt, that OCR understood schools' use of a preponderance of the evidence standard to be mandatory.  In a section titled "Title IX Procedural Requirements," it names preponderance of the evidence as "the evidentiary standard that ***must*** be used . . . in resolving a complaint[.]"  (Emphasis added.)

40.     The 2014 Questions confirm that, in OCR's view, the required use of the preponderance of the evidence standard is grounded in Title IX's requirement that grievance procedures provide for "prompt and equitable resolution" of allegations, stating that "any procedures used for sexual violence complaints, including disciplinary procedures, ***must*** meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), ***including applying the preponderance of the evidence standard of review***."  (Emphases added.)

41.     The 2014 Questions document speaks clearly when it talks of things the 2011 DCL does *not* impose upon schools.   Investigations, for instance, "***may*** include a hearing to

determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation." (Emphasis added.)  A school's flexibility in structuring its investigative process, however, is expressly understood not to include the ability to select an evidentiary standard:

> While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator.  A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions. Specifically:  * * * The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

42.     Like the 2011 DCL, the 2014 Questions mandate that a school, should it delay a Title IX investigation during a parallel criminal investigation, resume its work "once it learns that the police department has completed its evidence gathering stage of the criminal investigation."

**B.  OCR's Unprecedented Actions to Enforce the 2011 DCL**

43.     OCR has taken unprecedented steps to ensure that the mandatory requirements imposed by the 2011 DCL be adopted by schools, even though those requirements were never subjected to notice and comment rulemaking and thus, despite being styled as mandatory, do not carry the force of law.  OCR's enforcement has been so aggressive that the overwhelming majority of schools have adopted even those elements of the 2011 DCL that are not expressly styled as mandatory but for which OCR has expressed a clear preference.

44.     Just days after promulgating the 2014 Questions, OCR took the unprecedented step of publicly identifying those colleges and universities it was then investigating for potential violations of their obligation to comply with Title IX in the implementation of prompt and

equitable sexual misconduct grievance procedures. When OCR's list was first published, there were 55 colleges and universities on that list.

45.     OCR has set an extraordinarily low threshold for adding schools to its very public list. Schools are typically added to the list upon OCR's receipt of just a single complaint, even before the accused school has been given a chance to respond to the allegation.

46.     Not surprisingly, therefore, the number of schools on OCR's list has rapidly grown. By October 2014, the number of colleges and universities on OCR's public list had grown to 85 schools. In January 2015, it had reached 94 schools. In April, it had grown to 106 schools. By June 16, 2016, there were195 postsecondary institutions on that list.

47.     As the 2011 DCL itself acknowledged, some schools at the time the 2011 DCL was promulgated were using evidentiary standards other than "preponderance of the evidence," in apparent compliance with the 2001 Guidance. At least 24 major universities, including Auburn University, Columbia University, Cornell University, Duke University, Tulane University, UVA, and West Virginia University used a "clear and convincing evidence" standard. Princeton University used a similar "clear and persuasive evidence" standard and the New Jersey Institute of Technology used a "reasonable certainty" standard.

48.     Consistent with its dictate that only a preponderance of the evidence standard could allow for the "prompt and equitable resolution" of sexual misconduct claims, OCR has forced numerous schools that did not immediately comply with the 2011 DCL's mandate to replace whatever evidentiary standard they had been using until that time with the preponderance of the evidence standard.

49.     Princeton University, for instance, continued to use a "clear and persuasive evidence" standard after publication of the 2011 DCL. OCR informed Princeton, in a letter

dated November 5, 2014, that its policy "did not provide for an adequate, reliable and impartial investigation" of sexual misconduct claims because, among other things, it "did not use the preponderance of the evidence standard."  In a "Resolution Agreement" accompanying that letter, OCR required Princeton to adopt "the proper standard of review of allegations of sexual misconduct (preponderance of the evidence)."

50.     Similarly, in a letter dated December 30, 2014, OCR informed Harvard Law School (HLS) that the sexual misconduct policy it continued to use after publication of the 2011 DCL "*improperly* used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*."  (Emphases added.)  The letter confirmed elsewhere that "[t]his higher standard of proof was inconsistent with the preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence."  In the "Resolution Agreement" made public with the letter, OCR ordered HLS "to submit to OCR," by January 15, 2015, procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include, among other things, "[a]n explicit statement that the preponderance of the evidence standard will be used for investigating allegations of sexual harassment or violence."

51.     In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that "[t]he grievance procedures used by" Buffalo State "do not specify whether the arbitrator should use the preponderance of the evidence standard in investigating allegations of sexual harassment" and further that Morrisville State College "fail[ed] to . . . use the preponderance of the evidence standard to investigate allegations of sexual harassment."  It ordered the SUNY System to "[r]evise the SUNY System grievance procedures to ensure that

these comply with the ***requirements*** of Title IX; including using the preponderance of the evidence standard to investigate allegations of sexual harassment."  (Emphasis added.)

52.     OCR has also ordered at least two schools to adopt grievance procedures that expressly forbid parties from directly cross-examining each other in sexual misconduct disciplinary hearings, despite the fact that the 2011 DCL states that personal cross-examination is only "strongly discourage[d]."

53.     In a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that "the parties may not personally question or cross-examine each other during a hearing."

54.     Similarly, in a Resolution Agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft, by March 31, 2015, Title IX grievance procedures that stated, "If cross-examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other."

55.     These actions leave no doubt that adoption of the new requirements of the 2011 DCL, including adoption of a preponderance of the evidence standard, is mandatory both in theory and in practice.

**C.  UVA's Adjudication of the Allegations Against Plaintiff Under the 2011 DCL**

56.     Prior to the promulgation of the 2011 DCL, UVA used a "clear and convincing evidence" standard in the adjudication of sexual misconduct claims.  "Clear and convincing evidence," UVA's "Procedures for Cases of Sexual Assault" explained, "means that the claim is highly probable and has produced a firm belief or conviction that the allegations in question are true."  It expressly described the "clear and convincing evidence" standard "as proof that

requires more than a preponderance of the evidence but less than proof beyond a reasonable

doubt."

      57.     Consistent with the 2011 DCL's mandate that schools apply a preponderance of

the evidence standard in sexual misconduct proceedings, UVA adopted a "preponderance of the

evidence" standard for such proceedings in 2011, after promulgation of the 2011 DCL.

      58.     On March 6, 2015, a UVA law student, Jane Roe, filed a sexual misconduct

complaint against Mr. Doe based on an incident that had allegedly taken place on August 23,

2013.

      59.     Ms. Roe alleged that due to alcohol consumption, she could not effectively

consent to sexual activity on August 23, 2013.  Mr. Doe responded that Ms. Roe did not even

appear to be intoxicated that night, much less incapacitated.

      60.     Mr. Doe was slated to graduate in just two months and begin a job in the

Washington, D.C. office of a prominent national law firm.  The investigation and adjudication of

the allegations, however, would last nearly a year.

      61.     Thus, despite having completed all of his coursework by May of 2015, Mr. Doe's

degree was withheld while the investigation progressed, and his offer of employment was

suspended pending receipt of his degree.

      62.     On January 20, 2016, Ms. Roe's claims were adjudicated during a nine-hour

hearing.

      63.     The adjudicator—a retired justice of the Supreme Court of Pennsylvania—called

the matter a "very close" and "very difficult case."  She found Mr. Doe responsible, she said,

because the evidence "slightly" tipped in favor of responsibility, and she was "require[d]" by

"the Office of Civil Rights and the Department of Education" to apply "the weakest standard of

proof" available—preponderance of the evidence—which is satisfied whenever the evidence is "tipped very slightly" in favor of responsibility.

64.     The adjudicator also explained that two other commonly used evidentiary standards—the "clear and convincing" evidence standard and the "reasonable doubt" standard— would "tip the scale much more," thereby indicating that, but for UVA's mandated use of the preponderance standard, Mr. Doe would not have been found responsible.

65.     After explaining why, in her view, the evidence before her "ma[d]e it slightly more likely than not" that Mr. Doe had not properly obtained "effective consent" from Ms. Roe given her intoxication, the adjudicator again emphasized, at the end of her ruling, that the case was a close one.  She stated that its closeness "will be reflected by me in any sanction that I impose."

66.     After consulting with UVA's Title IX coordinator, the adjudicator sanctioned Mr. Doe to four months of counseling and a lifetime ban from all UVA property and activities.  Her decision was memorialized in a letter dated January 27, 2016.  That letter confirmed that "[f]irst and foremost" in her rationale for finding Mr. Doe responsible "is the requirement that I use the preponderance of the evidence standard."

67.     Mr. Doe took the Virginia State Bar exam on July 28-29, 2015, and passed.

68.     In March of 2016, UVA agreed to allow Mr. Doe to complete the counseling element of his sanction on an accelerated basis so that he could appear before the Virginia State Bar's June "character and fitness" board if asked.

69.     On March 30, 2016, UVA Law School awarded Mr. Doe his J.D. degree.

70.     In June of 2016, Mr. Doe appeared before the Virginia State Bar's character and fitness board.  On June 20, he was approved by that board for the practice of law in Virginia.  He was licensed by the Virginia State Bar on July 15, 2016.

71.     Because Mr. Doe was not permitted to practice law until very recently, he has not been able to support himself as an attorney or fully meet his financial obligations.

72.     Because of OCR's actions ordering schools across the country, through its 2011 DCL, to adopt a "preponderance of the evidence" standard in Title IX proceedings, Mr. Doe was found responsible by UVA.  As a direct result, he suffers a lifetime ban from all UVA property and activities and is unjustly labeled as someone who has committed sexual misconduct.  For the rest of his life, he will have to explain this finding to future employers, future friends, family members, and anyone else who asks.

73.     There also remains the possibility that OCR will order UVA to impose additional sanctions on Mr. Doe.  Under the terms of a "Resolution Agreement" dated September 17, 2015, UVA was required to deliver to OCR, by February 1, 2016, virtually all materials related to every report of sexual misconduct it received in academic year 2014-2015, including "witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, documentation regarding interim measures offered and/or provided, any final disposition letters, hearing records, disciplinary records, documentation regarding any appeals, and documentation regarding additional steps taken to stop harassment found to have occurred, prevent[] its recurrence, and remedy its effects on complainants and others, as appropriate."  If, after reviewing those materials, "OCR determines that the University must take any corrective action(s), OCR will provide the University with notice of the corrective action and an

opportunity to discuss the scope of the action."  Those corrective actions could impede, or

destroy altogether, John Doe's ability to practice law.

**D.  OKWU's Ability to Afford Its Students Fundamental Fairness After the 2011 DCL**

74.     Students are not the only ones affected by the 2011 DCL's imposition of a

preponderance of the evidence standard.  Educational institutions, which are directly regulated

by the Education Department, have an interest in selecting evidentiary standards tailored to their

unique characteristics, history, and mission.

75.     Plaintiff OKWU is a small school.  It currently enrolls approximately 1,700

students.

76.     OKWU is also a religious school, whose mission is to model "a way of thought, a

way of life, and a way of faith.  It is a place of serious study, honest questions, and critical

engagement, all in the context of a liberal arts community that honors the Primacy of Jesus

Christ, the Priority of Scripture, the Pursuit of Truth, and the Practice of Wisdom."

77.     OKWU is affiliated with the Wesleyan Church, a Christian denomination with a

unique historical commitment and sensitivity to treating all persons fairly and as persons created

in the image of God, as such commitment is informed by scripture and the historical tradition of

the church.

78.     The Wesleyan Church was formed by abolitionists in 1843, and, in 1848, served

as the host of America's first women's rights convention at Seneca Falls, New York.

79.     Consistent with its religious beliefs, engaging in premarital or extramarital sex, or

drinking alcohol, is a violation of OKWU's codes of conduct for students, faculty, staff, and

administration.

80.     Plaintiff OKWU is not in compliance with the 2011 DCL because, *inter alia*, it does not currently apply a "preponderance of the evidence" standard in sexual misconduct proceedings.

81.     OKWU does not wish to apply the "preponderance of the evidence" standard required by the 2011 DCL in sexual misconduct proceedings.  Yet OKWU is acutely aware of the steps OCR has taken to impose the requirements of the 2011 DCL.  OKWU reasonably fears that it is just a matter of time before OCR threatens it with enforcement action.

82.     To sufficiently protect the rights of both accused students and their accusers, OKWU would like the freedom to make "clear and convincing evidence," rather than "preponderance of the evidence," the burden of proof for sexual misconduct proceedings on its campus.

83.     OKWU would also like the freedom to let both the accuser and the accused cross-examine each other in any such proceedings.

84.     Under OCR's 2001 Guidance, which was promulgated pursuant to the APA's notice and comment requirements, Plaintiff OKWU would be free to select the combination of evidentiary standard and procedural protections that best fit with, among other things, its size, student population, and identity as a religious school with a historical commitment to fundamental fairness.

85.     As noted above, however, OCR has repeatedly cited the 2011 DCL as mandating "preponderance of the evidence" as the burden of proof in sexual misconduct proceedings and also strongly suggested that schools may not permit the parties in such proceedings to cross-examine each other.

86.     OKWU therefore seeks an order vacating OCR's mandated use of the "preponderance of the evidence" standard in sexual misconduct proceedings.

## COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Action Pursuant to Unlawful Procedure, 5 U.S.C. § 706(2)(D)

87.     Plaintiffs incorporate by reference the preceding paragraphs as though they were fully set forth herein.

88.     Promulgation of the 2011 DCL constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.  The 2011 DCL imposed substantive requirements upon regulated entities above and beyond those required by the ED before then.  Under the 2011 DCL, schools receiving federal financial assistance are required, among other things, to use a preponderance of the evidence standard in sexual misconduct disciplinary proceedings and to resume sexual misconduct investigations before any criminal prosecution is completed.

89.     Promulgation of the 2011 DCL without notice and without providing an opportunity for comment ignored procedures required by law.

90.     Plaintiff John Doe, as a student at a school that receives federal financial assistance, falls within the zone of interests of Title IX.

91.     Plaintiff OKWU, as an institution of higher education receiving federal funding, falls within the zone of interests of Title IX.

92.     Therefore, the 2011 DCL is unlawful and should be set aside under 5 U.S.C. § 706(2)(D).

## COUNT II – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
**Action in Excess of Statutory Authority, 5 U.S.C. § 706(2)(C)**

93.     Plaintiffs incorporate by reference the preceding paragraphs as though they were fully set forth herein.

94.     Title IX empowers the Department to ensure that no person, "on the basis of sex," be excluded from participation in, denied the benefits of, or be subjected to any discrimination under any federally funded educational program or activity.

95.     Pursuant to its authority to implement Title IX, the Department enacted 34 C.F.R. § 106.8(b), which requires federally funded schools to adopt and publish grievance procedures providing for "prompt and equitable resolution" of sex discrimination complaints.

96.     The 2011 DCL claims that schools' use of a preponderance of the evidence standard in sexual misconduct disciplinary proceedings is mandated by the requirement that schools implement procedures for the "prompt and equitable resolution" of sexual misconduct claims.

97.     Evidentiary standards are not assigned based on gender or sex.  Evidentiary standards are standards of proof borne by complainants vis-à-vis respondents.  Students of every gender can be, and are, both complainants and respondents in campus sexual misconduct disciplinary proceedings.  No evidentiary standard discriminates on the basis of gender or sex.

98.     Requiring that schools adopt any particular evidentiary standard exceeds the ED's authority to enforce Title IX's statutory mandate that federally funded educational institutions not discriminate on the basis of sex.

99.     Plaintiff John Doe, as a student at a school that receives federal financial assistance, falls within the zone of interests of Title IX.

100.    Plaintiff OKWU, as an institution of higher education receiving federal funding, falls within the zone of interests of Title IX.

101.    Therefore, the 2011 DCL's requirement that schools use a preponderance of the evidence standard in sexual misconduct disciplinary proceedings exceeds the ED's statutory authority and should be set aside under 5 U.S.C. § 706(2)(C).

## COUNT III – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### Arbitrary and Capricious Action, 5 U.S.C. § 706(2)(A)

102.    Plaintiffs incorporate by reference the preceding paragraphs as though they were fully set forth herein.

103.    The 2011 DCL cites two grounds in justifying its imposition of the preponderance of the evidence standard as the only standard appropriate for a "prompt and equitable resolution" of sexual misconduct claims.  Neither ground is rationally related to the imposition of the preponderance of the evidence standard.

104.    The first ground is that OCR also uses a preponderance of the evidence standard "when it resolves complaints against recipients," such as schools, including in determining whether schools are complying with Title IX and in "fund termination administrative hearings." But students are not regulated entities under Title IX, and OCR proceedings against regulated entities bear no conceptual relation to sexual misconduct investigations.  The use of a preponderance of the evidence standard to determine whether a fund recipient has complied with Title IX and its implementing regulations, or whether its Department funding should be terminated, provides no reason to impose a preponderance of the evidence standard to determine whether one student has engaged in sexual misconduct against another.

105.    The second ground is that the preponderance of the evidence standard is the standard used in civil lawsuits that seek to enforce the federal civil rights laws.  But civil lawsuits

enforcing federal civil rights laws differ from campus sexual misconduct proceedings in numerous material ways.  Parties to such proceedings are guaranteed myriad tools with which to defend themselves and/or prove their claims, including the right to the full panoply of discovery tools to gather evidence, the protections of the rules of evidence in the admission of that evidence at trial, and the right to cross-examine other parties and witnesses.

106.    In campus sexual misconduct disciplinary hearings, by contrast, respondents are guaranteed none of these things, including the right to obtain discovery from the complainant or third parties, and the rules of evidence do not apply.

107.    And as a practical matter, some smaller schools do not have the resources to grant parties these procedural protections even if they wanted to, because they would turn campus misconduct proceedings into mini-trials that would be both time-consuming and administratively expensive.

108.    Moreover, the 2011 DCL, by its terms, "strongly discourages" schools from allowing direct cross-examination of one party by another, and OCR, in practice, has ordered at least two schools to adopt Title IX procedures which forbid parties from cross-examining each other.

109.    Respondents in campus sexual misconduct disciplinary proceedings are therefore subjected to the civil trial system's lowest evidentiary standard without the concomitant discovery tools and procedural protections that allow civil defendants to defend themselves in the face of that low standard.

110.    The 2011 DCL offers no explanation why the preponderance of the evidence standard is the only element of civil lawsuits enforcing federal civil rights laws that Title IX's

"prompt and equitable resolution" requirement mandates be transposed to campus sexual misconduct disciplinary proceedings.

111.    Because there are many material differences between civil lawsuits and campus sexual misconduct disciplinary proceedings, it was arbitrary, capricious, and an abuse of discretion—and certainly not "equitable"—for OCR to impose a preponderance of the evidence standard on campus disciplinary sexual misconduct proceedings, particularly while simultaneously discouraging in theory, and forbidding in practice, the parties' right to directly cross-examine each other.

112.    Plaintiff John Doe, as a student at a school that receives federal financial assistance, falls within the zone of interests of Title IX.

113.    Plaintiff OKWU, as an institution of higher education receiving federal funding, falls within the zone of interests of Title IX.

114.    Therefore, the 2011 DCL's requirement that schools use a preponderance of the evidence standard in sexual misconduct disciplinary proceedings is arbitrary, capricious and an abuse of discretion and should be set aside under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

115.    Wherefore, Plaintiffs respectfully request that this Court:

a.    Enter a declaratory judgment that Defendants have violated the APA by failing to notify the public and afford it an opportunity to comment on the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter, and in particular the requirement that schools use a "preponderance of the evidence" standard when investigating allegations of sexual misconduct.

b.  Enter an order vacating the 2011 DCL and enjoining Defendants from requiring schools to abide by any of the mandatory requirements in the 2011 DCL, including, but not limited to, the use of a "preponderance of the evidence" standard, unless and until such requirements have been adopted (1) through notice-and-comment rulemaking, and (2) as part of system where they are neither arbitrary nor capricious and where they do not exceed the Department's statutory authority.

c.  Award Plaintiffs their reasonable costs and expenses, including reasonable attorneys' fees and expert witness fees; and

d.  Grant such further and additional relief as this Court may deem just and proper.

Respectfully submitted,

DATED:  August 15, 2016

_____
Justin Dillon (DC Bar No. 502322)
Christopher C. Muha (DC Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, D.C. 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiffs*