## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE and
OKLAHOMA WESLEYAN UNIVERSITY,

        Plaintiffs,

   v.

CATHERINE E. LHAMON, in her official
capacity as Assistant Secretary for Civil Rights,
United States Department of Education, *et al.*,

        Defendants.

Case No. 1:16-cv-01158 (RC)

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JENNIFER D. RICKETTS
Director
Federal Programs Branch

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

MATTHEW J. BERNS
Trial Attorney (D.C. Bar No. 998094)
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW
Washington, D.C. 20530
Telephone:  (202) 616-8016
Email:  matthew.j.berns@usdoj.gov

September 1, 2016

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    Statutory and Regulatory Background ................................................... 4

    B.    Guidance Documents Issued by the Office for Civil Rights.................................. 7

    C.    Plaintiffs' Claims and Allegations ....................................................... 10

        1.    John Doe ............................................................................... 10

        2.    Oklahoma Wesleyan University ................................................. 11

STANDARD OF REVIEW ............................................................................................ 16

ARGUMENT ............................................................................................................. 17

I.    JOHN DOE LACKS STANDING TO CHALLENGE THE 2011 DEAR
    COLLEAGUE LETTER ....................................................................................... 17

    A.    Doe Must Make a Heightened Showing To Establish Standing........................... 18

    B.    Doe Cannot Establish Standing Because the Relief He Seeks Would
        Not Redress Any of His Purported Injuries ............................................ 20

II.    OKLAHOMA WESLEYAN UNIVERSITY'S CHALLENGE TO THE 2011
    DEAR COLLEAGUE LETTER IS NOT RIPE FOR JUDICIAL REVIEW .................. 28

    A.    OKWU Cannot Establish Constitutional Ripeness.............................................. 29

    B.    OKWU Cannot Establish Prudential Ripeness .................................................... 33

        1.    OKWU's challenge to the 2011 DCL is not fit for review. ...................... 34

        2.    OKWU will suffer no hardship if judicial review is postponed
            more than the five years it already has been ............................................ 37

CONCLUSION .......................................................................................................... 39

# TABLE OF AUTHORITIES[*]

CASES                                                                                         Page(s)

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)............................................................................................4, 28, 34

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012) .....................................................................................28, 36

*Am. Trucking Ass'n v. Fed. Motor Carrier Safety Admin,*
    724 F.3d 243 (D.C. Cir. 2013) ...........................................................................................21

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .............................................................................16, 22, 23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................................16

*Atl. Legal States Found. v. EPA,*
    325 F.3d 281 (D.C. Cir. 2003) .....................................................................................34, 35

*Atl. Urological Assocs. v. Leavitt,*
    549 F. Supp. 2d 20 (D.D.C. 2008) .....................................................................................32

*Bates v. Rumsfeld,*
    271 F. Supp. 2d 54 (D.D.C. 2002) ................................................................................23, 24

*Cannon v. Univ. of Chi.,*
    441 U.S. 677 (1979)..............................................................................................................4

*Chamber of Commerce of U.S. v. Reich,*
    57 F.3d 1099 (D.C. Cir. 1995) ...........................................................................................37

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.,*
    78 F. Supp. 3d 208 (D.D.C. 2015) .....................................................................................19

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)..............................................................................................................21

*\* Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013).....................................................................2, 18, 19, 22, 27

---

[*] Asterisks indicate those cases or authorities on which counsel chiefly relies.

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................... 18, 21

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ........................................................................................ 7, 8

\* *Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*,
  85 F. Supp. 3d 250 (D.D.C. 2015) ......................... 16, 17, 27, 28, 29, 33, 34, 35, 37

\* *Devia v. Nuclear Regulatory Comm'n*,
  492 F.3d 421 (D.C. Cir. 2007) ..................................................... 28, 34, 36, 37

*Food & Water Watch v. EPA*,
  5 F. Supp. 3d 62 (D.D.C. 2013) ............................................................... 37

*Friends of Animals v. Jewell*,
  ___ F.3d ___, 2016 WL 3854010 (D.C. Cir. July 15, 2016) ................................ 18

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) ........................................................................................ 2, 7

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
  185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................... 17

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*,
  402 F.3d 1249 (D.C. Cir. 2005) ............................................................... 17

*Klamath Water Users Ass'n v. FERC*,
  534 F.3d 735 (D.C. Cir. 2008) ............................................................... 19, 25

*La Botz v. Fed. Election Comm'n*,
  61 F. Supp. 3d 21 (D.D.C. 2014) ............................................................... 17

\* *Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 2, 18, 19, 26, 32

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
  153 F. Supp. 3d 319 (D.D.C. 2016) ............................................................... 30

*McInnis-Misenor v. Maine Med. Ctr.*,
  319 F.3d 63 (1st Cir. 2003)) ............................................................... 36

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ............................................................... 32

*Nat'l Ass'n of Home Builders v. Norton*,
  298 F. Supp. 2d 68 (D.D.C. 2003) ............................................................. 38

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003) ................................................................... 28, 33, 37

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) .................................................... 3, 28, 29

*\* Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  366 F.3d 930 (D.C. Cir. 2004) ...................................................... 19, 20, 22

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
  383 F.3d 1047 (D.C. Cir. 2004) ............................................................. 20

*Natural Res. Def. Council, Inc. v. EPA*,
  859 F.2d 166 (D.C. Cir. 1988) ............................................................. 37

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ............................................................... 38

*North Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982) ........................................................................ 5

*Ohio Forestry Ass'n. v. Sierra Club*,
  523 U.S. 726 (1998) ...................................................................... 35

*Pfizer v. Shalala*,
  182 F.3d 975 (D.C. Cir. 1999) ........................................................... 35

*\* Renal Physicians Ass'n v. HHS*,
  489 F.3d 1267 (D.C. Cir. 2007) ................................................. 18, 19, 20, 25

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ...................................................................... 36

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ........................................................................ 18

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ........................................................... 16

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) .................................................................... 18

*Takhar v. Kessler*,
  76 F.3d 995 (9th Cir. 1996) .......................................................................24

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994).....................................................................................2

*Udall v. Tallman*,
  380 U.S. 1 (1965).........................................................................................2

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
  173 F.3d 438 (D.C. Cir. 1999) ...................................................................24

*Urban Health Care Coal. v. Sebelius*,
  853 F. Supp. 2d 101 (D.D.C. 2012) ...........................................................24

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) ..............................................................19, 25

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)....................................................................................27

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. art. III, § 1 ....................................................................................18

U.S. Const. art. III, § 2 ....................................................................................18

Education Amendments Act of 1972,
  Pub. L. No. 92-318, 86 Stat. 235 .................................................................4

5 U.S.C. § 553....................................................................................................2

20 U.S.C. § 1681(a) .......................................................................................2, 4

20 U.S.C. § 1681(a)(3).....................................................................................33

20 U.S.C. § 1682............................................................................................2, 5, 6

20 U.S.C. § 1683............................................................................................6, 38

HEW, *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance: Nondiscrimination on the Basis of Sex*,
  40 Fed. Reg. 24,128 (June 4, 1975).............................................................5

34 C.F.R. § 100.8(a)...........................................................................................6

34 C.F.R. § 100.8(c)...........................................................................................6

34 C.F.R. § 100.9 ...............................................................................................................6

34 C.F.R. § 100.10(a)–(c) .................................................................................................6

34 C.F.R. § 100.10(d) ........................................................................................................6

34 C.F.R. § 100.10(e) ........................................................................................................6

34 C.F.R. § 100.10(g)(1) ...............................................................................................7, 38

34 C.F.R. § 100.10(g)(2) ...............................................................................................6, 38

34 C.F.R. § 100.11 .........................................................................................................6, 38

34 C.F.R. § 100.13(d) ........................................................................................................6

34 C.F.R. pt. 106 ...............................................................................................................5

34 C.F.R. § 106.3(a) ..........................................................................................................5

34 C.F.R. § 106.4(a) ..........................................................................................................5

34 C.F.R. § 106.8(a) ..........................................................................................................5

* 34 C.F.R. § 106.8(b) .........................................................................................2, 6, 7, 8, 21

34 C.F.R. § 106.12 ...........................................................................................................33

34 C.F.R. § 106.31(a) ........................................................................................................5

34 C.F.R. § 106.31(b) ........................................................................................................5

34 C.F.R. § 106.71 .............................................................................................................6

MISCELLANEOUS

FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, STANDARD OF EVIDENCE SURVEY:
    COLLEGES AND UNIVERSITIES RESPOND TO OCR'S NEW MANDATE (Oct. 28, 2011) ..............22

Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, to Everett Piper,
    President, OKWU (Dec. 22, 2014) .........................................................................................33

OCR, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other
    Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) .......................................7, 8

OCR, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees,
    Other Students, or Third Parties* (Jan. 2001) ........................................................................8

## INTRODUCTION

The U.S. Department of Education ("Department"); the Department's Office for Civil Rights ("OCR"); John B. King, Jr., Secretary of Education; and Catherine E. Lhamon, Assistant Secretary for Civil Rights (collectively "Defendants") respectfully move pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the Amended Complaint for lack of subject matter jurisdiction.

Plaintiffs John Doe ("Doe")[1] and Oklahoma Wesleyan University ("OKWU") seek to challenge a Dear Colleague Letter issued by OCR in 2011 to address how Title IX of the Education Amendments of 1972 ("Title IX") and the Department's regulations effectuating Title IX apply to sexual violence. *See* Ex. 1, Letter from Russlynn Ali, Assistant Sec'y for Civil Rights (Apr. 4, 2011) ("2011 DCL"). In particular, Plaintiffs attack OCR's guidance interpreting the Department's regulations to require schools to use a preponderance of the evidence standard when they conduct investigations, including hearings to determine whether an act of student-on-student sexual violence has occurred. *See id.* at 10–11. Plaintiffs also challenge the part of the 2011 DCL that "strongly discourages schools from allowing the parties personally to question or cross-examine each other during a hearing" because "[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating." *Id.* at 12. They ask the Court to declare that OCR's guidance is invalid under the Administrative Procedure Act ("APA") and to conditionally enjoin Defendants from "requiring schools to abide by any of the mandatory requirements of the 2011 DCL, including, but not limited to, the use of a 'preponderance of the evidence' standard." Amended Complaint, ECF No. 16, at ¶ 115 ("Am. Compl.").

---

[1] Defendants do not oppose Doe's Motion to Proceed Under Pseudonym (ECF No. 2).

If Plaintiffs' claims were properly before the Court—and they are not—Defendants would show them to be meritless. Title IX prohibits sex discrimination in Federally funded education programs and activities, 20 U.S.C. § 1681(a), and it authorizes the Department to issue rules, regulations, and orders to "effectuate" that prohibition, *id.* § 1682. A Department regulation issued pursuant to that authority requires schools to establish "procedures providing for prompt and equitable resolution" of sex discrimination complaints. 34 C.F.R. § 106.8(b). Supreme Court precedent establishes that this regulation properly effectuates the statute's nondiscrimination mandate. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998). OCR's interpretation of the "equitable resolution" requirement to entail use of a preponderance of the evidence standard when schools adjudicate complaints of sexual violence is not "plainly erroneous or inconsistent with the regulation," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Udall v. Tallman*, 380 U.S. 1, 16–17 (1965)), and because that interpretation imposes no legal obligations beyond those imposed by the regulation itself, it is not a legislative rule requiring pre-promulgation notice and comment. *See* 5 U.S.C. § 553(d)(2). The guidance regarding cross-examination is likewise procedurally sound, and Plaintiffs do not contest its substantive validity.

The Court has no occasion to address the merits of Plaintiffs' claims, however, because Doe lacks Article III standing and OKWU's claims are not ripe for judicial review.

To establish standing, a plaintiff must identify an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). Doe's case falters mainly because it is not "likely, as opposed to merely speculative," that any injury to Doe from the 2011 DCL "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992). Doe claims that he was harmed by the 2011 DCL when, after a disciplinary hearing

in January 2016, an adjudicator for the University of Virginia ("University" or "UVA") found by

a preponderance of the evidence that Doe committed an act of sexual violence against a fellow

law student. The University allowed Doe to graduate, but banned him from UVA property and

activities and required him to undergo counseling, which he has since completed. A decision in

Doe's favor would change none of that:  holding that OCR violated the APA in issuing the 2011

DCL would not disturb UVA's finding that Doe committed an act of sexual violence or relieve

Doe from the sanctions that UVA deemed appropriate in light of that finding, neither of which

Doe challenges here. And there is no indication that Doe ever will be affected by the challenged

guidance again—if he ever was.

OKWU fares no better because it cannot show that its challenge to the 2011 DCL

satisfies the constitutional and prudential requirements for ripeness. The constitutional ripeness

requirement encompasses the requirements of Article III standing. *See, e.g.*, *Nat'l Treasury

Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996). OKWU cannot

demonstrate constitutional ripeness because it identifies no actual or imminent enforcement

action in which the guidance in the 2011 DCL has been or will be applied to it. Nor is it evident

that the standard-of-proof and cross-examination issues would be focal points in any future

enforcement action against OKWU. The Amended Complaint does not reveal whether OKWU

uses *any* procedures to investigate and adjudicate complaints of student-on-student sexual

violence, while public statements from OKWU and its president indicate that it simply defers to

local law enforcement, rather than investigating complaints and determining what institutional

remedy, if any, is appropriate in the context of OKWU's own obligations to its students under

Title IX. Thus, OKWU's complaints about its obligations under federal law appear traceable not

to the 2011 DCL but to federal requirements that pre-date the 2011 DCL and that OKWU does not challenge.

OKWU's challenge to the 2011 DCL is also prudentially unripe, because the issues are not presently "fit[] . . . for judicial decision" and because postponing judicial review would not cause OKWU "hardship." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Waiting until Defendants initiate and complete any administrative proceedings against OKWU would allow development of a factual record concerning OKWU's handling of complaints of student-on-student sexual violence; permit Defendants to bring their administrative expertise to bear; reduce the likelihood of piecemeal litigation; and make it unnecessary for the Court to address one or more of OKWU's claims. Meanwhile, OKWU cannot show that it will suffer hardship in the absence of immediate judicial review. OKWU itself delayed filing suit for over five years after OCR issued the 2011 DCL, details no harm to itself over the past five-plus years that is attributable to the 2011 DCL, and will not risk significant harm if its claims must await later resolution.

Defendants therefore request that the Court grant their motion and dismiss the Amended Complaint.

## BACKGROUND

### A.    Statutory and Regulatory Background

Title IX states:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Pub. L. No. 92-318, § 901(a), 86 Stat. 235, 373 (codified at 20 U.S.C. § 1681(a)).

Title IX provides two mechanisms for ensuring compliance with its nondiscrimination mandate. First, individuals injured by discriminatory practices can sue recipients of Federal

funds ("recipients") directly. *See Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979). Second, the Department is authorized to issue rules, regulations, and orders to effectuate Title IX, including by initiating proceedings to terminate Federal funding if voluntary compliance cannot be secured, or to enforce compliance by any other means authorized by law. 20 U.S.C. § 1682.

In 1975, the Department's predecessor (the Department of Health, Education, and Welfare ("HEW")) promulgated and President Ford approved regulations to effectuate Title IX. *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance: Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24,128 (June 4, 1975). Those regulations remain in effect today, subject to amendments not relevant here. *See* 34 C.F.R. pt. 106.[2]

Among other things, the regulations incorporate Title IX's nondiscrimination mandate, *id.* § 106.31(a), identify specific actions that constitute discrimination, *id.* § 106.31(b), and require assurances from recipients that their programs and activities comply with regulatory requirements, *id.* § 106.4(a). Recipients found to have discriminated on the basis of sex must "take such remedial action as the Assistant Secretary [for Civil Rights] deems necessary to overcome the effects of such discrimination." *Id.* § 106.3(a).

The regulations also require recipients to establish procedures for investigating and resolving complaints alleging violations of Title IX. Each recipient must "designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities" under the regulations, "including any *investigation of any complaint* communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part." *Id.* § 106.8(a) (emphasis added). In addition, each recipient must "adopt and publish

---

[2] HEW's Title IX functions were transferred to the Department in 1979, leading to recodification of the regulations. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 516 nn.4–5 (1982).

*grievance procedures providing for prompt and equitable resolution of student and employee complaints* alleging any action which would be prohibited by this part." *Id.* § 106.8(b) (emphasis added).

Title IX and the Department's implementing regulations together set forth the procedures for Department enforcement actions. *See* 20 U.S.C. § 1682; 34 C.F.R. § 106.71 (incorporating by reference the procedures applicable under Title VI of the Civil Rights Act of 1964, located at 34 C.F.R. §§ 100.6–.11). Prior to any enforcement action, the Department is required to seek voluntary compliance. *See* 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a), (c). If voluntary compliance cannot be obtained and the Department were to initiate an enforcement action, the Department would provide the recipient with notice and the opportunity for a formal administrative hearing before a hearing examiner. *See* 34 C.F.R. §§ 100.8(c), 100.9. The hearing examiner would either issue an initial decision, from which exceptions could be taken to a reviewing authority (the Secretary or another authority designated by the Secretary, *id.* § 100.13(d)) or certify the record for decision by the reviewing authority. *See id.* § 100.10(a)–(c). Any decision by a hearing examiner or reviewing authority would set forth the decision-maker's findings and identify the particular requirement(s) with which the recipient has failed to comply. *Id.* § 100.10(d). If the Secretary did not serve as the reviewing authority, either the recipient or the Department could request that the Secretary review the decision, or the Secretary could review the decision *sua sponte*. *Id.* § 100.10(e).

Ultimately, if a recipient were aggrieved by a final agency determination of non-compliance, the recipient could seek judicial review, 20 U.S.C. § 1683; 34 C.F.R. § 100.11, and could "at any time" request full restoration of its eligibility, 34 C.F.R. § 100.10(g)(2), based on a showing that the recipient has satisfied the terms and conditions of the Department's final

decision or has brought itself into compliance (and provides reasonable assurance that it will fully comply) with applicable requirements, *id.* § 100.10(g)(1).

### B.   Guidance Documents Issued by the Office for Civil Rights

Since the adoption of the regulations, OCR has issued a number of guidance documents to explain how OCR interprets and applies the statutory and regulatory requirements in its enforcement of Title IX. Several OCR guidance documents have addressed how Title IX and the Department's regulations apply to sexual harassment, which courts have recognized as a form of discrimination proscribed by Title IX. *See, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999); *Gebser*, 524 U.S. at 281.

In 1997, for example, OCR issued a guidance document that provided recipients with information regarding the standards they should use to investigate and resolve allegations of sexual harassment of students. *See* OCR, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("1997 Guidance"). The 1997 Guidance advised that "[s]exual harassment can be a form of sexual discrimination" and that "Title IX requires a recipient of Federal funds to . . . have in place a prompt and equitable procedure for resolving sex discrimination complaints." *Id.* at 12,038; *see also id.* at 12,044 & n.81 (citing 34 C.F.R. § 106.8(b)). "By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures," OCR explained, "a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences." *Id.* at 12,040.

In 2001, OCR replaced the 1997 Guidance with revised guidance to account for intervening Supreme Court decisions, including *Davis*, which established that private individuals may sue for damages under Title IX if recipients are deliberately indifferent to known student-on-student sexual harassment, including sexual assault, that creates a hostile educational

environment. *See* OCR, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* i–ii (Jan. 2001) ("2001 Guidance"), www.ed.gov/ocr/docs/shguide.pdf; *Davis*, 526 U.S. at 638–54. Although their focus was on sexual harassment more broadly, the 1997 Guidance and 2001 Guidance both contemplated that cases of sexual assault would proceed through schools' Title IX grievance procedures. *See* 1997 Guidance, 62 Fed. Reg. at 12,043, 12,045 (specifically addressing schools' responses to allegations of sexual assault); 2001 Guidance at 16, 21 (same).

On April 4, 2011, OCR issued the 2011 DCL to "supplement[] the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence." Ex. 1, at 2.[3] The 2011 DCL explicitly "does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations" under preexisting laws and regulations. *Id.* at 1 n.1.

The 2011 DCL discusses a recipient's duty to respond to reports of sexual harassment, including sexual violence, while recognizing that the specific steps in an investigation and complaint resolution process will vary according to, *inter alia*, the nature of the allegations. *Id.* at 5, 12. It reiterates that the Department's regulations require schools to adopt grievance procedures that provide for prompt and equitable resolution of sex discrimination complaints. *Id.* at 8. And it further explains that OCR interprets the regulatory requirement at 34 C.F.R. § 106.8(b), that schools provide equitable grievance procedures, to include the use of a preponderance of the evidence standard. Ex. 1, at 10–11 & n.26. That policy is consistent with

---

[3] As used in the 2011 DCL, "[s]exual violence . . . refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." Ex. 1, at 1–2.

judicial precedent, *id.*, and with the position that regional offices of OCR took in enforcement actions for years prior to the 2011 DCL.[4]

The 2011 DCL also sets forth certain recommendations that schools may choose to follow. For instance, the 2011 DCL states that "OCR strongly discourages schools from allowing the parties [*i.e.*, the complainant and the alleged perpetrator] personally to question or cross-examine each other" (as opposed to allowing questioning or cross-examination by, for example, a party's attorney or the factfinder). Ex. 1, at 12. The 2011 DCL explains that "[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment." *Id.*

Following requests from schools for additional assistance in complying with their obligations under Title IX and the Department's regulations, OCR in 2014 issued another guidance document to further clarify the 2001 Guidance and the 2011 DCL. *See* Ex. 2, Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014). The 2014 Questions and Answers document reiterates that "any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution . . . , including applying the preponderance of the evidence standard." *Id.* at 14; *see also id.* at 26 ("The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.").

---

[4] *See* Ex. 3.C, Letter from Sheralyn Goldbecker, OCR D.C. Office, to John J. DeGioia, President, Georgetown University at 3 (May 5, 2004) ("[C]omplaints of sexual harassment were resolved using a clear and convincing evidence standard, a higher standard than the preponderance of the evidence standard, which is the appropriate standard under Title IX for sex discrimination complaints, including those alleging sexual harassment."); Ex. 3.A, Letter from Gary D. Jackson, Regional Civil Rights Director, OCR Region X, to Jane Jervis, President, Evergreen State College at 8, 9 (Apr. 4, 1995) (stating that the "evidentiary standard of proof applied to Title IX actions is that of a 'preponderance of the evidence'" and that requiring "'clear and convincing proof'" imposes "a heavier burden of proof than that which is required under Title IX").

The 2014 Questions and Answers document also discusses the policies that schools may adopt regarding cross-examination of witnesses, including the parties. *Id.* at 31. One option, OCR explained, is "to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf." *Id.*

## C.    Plaintiffs' Claims and Allegations

Doe filed the original Complaint in this action on June 16, 2016. *See* Complaint, ECF No. 1 ("Compl."). An Amended Complaint, filed on August 15, 2016, added OKWU as a second plaintiff. *See* Am. Compl.

In the original Complaint, Doe alleged that OCR impermissibly issued the 2011 DCL without providing pre-promulgation notice and an opportunity for public comment; that the Department lacks statutory authority to require recipients to apply any particular standard of proof when they adjudicate complaints of student-on-student sexual violence; and that OCR's choice of the preponderance of the evidence standard was arbitrary and capricious. *See* Compl. ¶¶ 71–95. Doe requested an order declaring that Defendants violated the APA, *id.* ¶ 96(a), vacating the 2011 DCL, *id.* ¶ 96(b), and enjoining Defendants from "requiring schools to abide by any of the mandatory requirements of the 2011 DCL, including, but not limited to, the use of a 'preponderance of the evidence' standard," *id.* The Amended Complaint rests on the same legal theories and seeks the same relief. *See* Am. Compl. ¶¶ 87–115.

### 1.    John Doe

According to the Amended Complaint, Doe is a graduate of the law school at UVA. *Id.* ¶ 69. On March 6, 2015, when Doe was two months shy of graduation, another law student filed a sexual misconduct complaint against him. *Id.* ¶¶ 58, 60. The complainant alleged that Doe had engaged in sexual activity with her at a time when she could not effectively consent due to her consumption of alcohol. *See id.* ¶ 59.

The school investigated and adjudicated the sexual misconduct complaint against Doe, withholding his degree in the interim. *See id.* ¶ 60–61. On January 20, 2016, a nine-hour hearing was held before an adjudicator, who was a retired justice of the Supreme Court of Pennsylvania. *Id.* ¶ 62–63. Applying a preponderance of the evidence standard, *id.* ¶ 63, the adjudicator found it "more likely than not" that Doe had "not properly obtained 'effective consent' from [the complainant] given her intoxication," *id.* ¶ 65.

According to the Amended Complaint, the adjudicator explained that the "closeness" of the case would be reflected in the sanction. *Id.* ¶ 65. "After consulting with UVA's Title IX coordinator, the adjudicator sanctioned [Doe] to four months of counseling and a lifetime ban from all UVA property and activities." *Id.* ¶ 66. Doe has completed the counseling element of his sanction, but he remains subject to a lifetime ban from UVA property and activities. *See id.* ¶ 68, 72. In June 2016, the Virginia State Bar's character and fitness board approved Doe for the practice of law in Virginia, and he was licensed by the Virginia State Bar on July 15, 2016. *Id.* ¶ 70.

Doe alleges, without elaboration, that he is now "labeled as someone who has committed sexual misconduct" and that "[f]or the rest of his life, he will have to explain this finding to future employers, future friends, family members, and anyone else who asks." *Id.* ¶ 72. Doe further suggests that there is some "possibility that OCR will order UVA to impose additional sanctions" on him. *Id.* ¶ 73.

## 2.      Oklahoma Wesleyan University

### a.      *Allegations in the Amended Complaint*

OKWU alleges in the Amended Complaint that it is an institution of higher education, *id.* ¶ 100, that "receives federal funding in the form of federal financial aid provided to its students," *id.* ¶ 5.

OKWU represents that it "is not in compliance with the 2011 DCL." *Id.* ¶ 80. Although the Amended Complaint does not disclose all of the ways in which OKWU deems itself out of compliance with the 2011 DCL, it states that OKWU is not in compliance "because, *inter alia*, it does not currently apply a 'preponderance of the evidence' standard in sexual misconduct proceedings." *Id.*

The Amended Complaint does not describe what procedures, if any, OKWU currently follows when it receives a complaint of student-on-student sexual violence or what procedures OKWU followed prior to the 2011 DCL. *See id.* ¶¶ 74–86. OKWU states that it "would like the freedom to make 'clear and convincing evidence,' rather than 'preponderance of the evidence,' the burden of proof for sexual misconduct proceedings." *Id.* ¶ 82. OKWU does not allege, however, that its current procedures call for use of a clear and convincing evidence standard, or for that matter, that OKWU has *ever* adjudicated a complaint of student-on-student sexual violence using a clear and convincing evidence standard. In fact, OKWU does not allege that it has ever adjudicated *any* complaint of student-on-student sexual violence at all. Similarly, OKWU states that it "would also like the freedom to let both the accuser and the accused cross-examine each other in any [sexual misconduct] proceedings." *Id.* ¶ 83. But, again, OKWU does not identify its current or past practices, or refer to any actual hearing in which it would have applied different rules in the absence of the 2011 DCL.

The Amended Complaint suggests that, in the absence of the 2011 DCL, "OKWU would be free to select the combination of evidentiary standard and procedural protections that best fit with, among other things, its size, student population, and identity as a religious school with a historical commitment to fundamental fairness." *Id.* ¶ 84. With respect to OKWU's "identity as a religious school," the Amended Complaint states that OKWU is affiliated with the Wesleyan

Church, *id.* ¶ 77, and that its code of conduct prohibits engaging in premarital or extramarital sex (whether or not consensual) and drinking alcohol, *id.* ¶ 79.

The Amended Complaint does not indicate that OCR has taken any action against OKWU with respect to the 2011 DCL. Nonetheless, OKWU alleges that it "reasonably fears that it is just a matter of time before OCR threatens it with enforcement action," *id.* ¶ 81, and that "its students may one day" be "wounded" by the 2011 DCL, *id.* ¶ 3.

> b.     *Public Statements Regarding OKWU's Policies and Practices*

OKWU and its president, Dr. Everett Piper, have made a number of public statements about OCR's guidance regarding the investigation and adjudication of complaints of student-on-student sexual violence. These statements, from both before and after OKWU joined the instant lawsuit, illustrate that OKWU's objections to OCR's guidance are not limited to the 2011 DCL's guidance on the standard of proof and cross-examination of complainants. Rather, these statements suggest that OKWU objects to conducting *any* investigation or hearing when presented with a complaint of student-on-student sexual violence.

First, in a May 2016 posting on OKWU's website, Dr. Piper wrote:

> We object to the DOE's denial of the legal rights of our students. All students at OKWU have the constitutional right to avail themselves of the full protection of the law whether they are accused of a criminal act or believe they are its victim. OKWU has always turned over all claims of criminal behavior to the local police and we will continue to do so. To the extent the DOE requires us to convene a kangaroo court that denies our students their due process and legal protections in investigating and adjudicating an allegation of criminal conduct, we will not do so.
>
> . . . .
>
> This is a university, my land. It is not a police state or a kangaroo court.

Everett Piper, President, OKWU, *This Is Not a Police State, It's a University* (May 2, 2016) ("May 2016 Web Post"), http://www.okwu.edu/blog/2016/05/this-is-not-a-police-state-its-a-university.

Second, Dr. Piper echoed these written comments in a May 2016 talk radio interview. Again, Dr. Piper seemed to state that OKWU objects to any requirement that OKWU adjudicate complaints of student-on-student sexual violence—whatever the standard of proof or rules for cross-examination—explaining that the school would instead defer to local law enforcement:

> [T]his Dear Colleague Letter . . . directs us to conduct a kangaroo court in the case of any investigation of sexual harassment. In other words, trusting the local police to investigate the matter, trusting the local law enforcement and the legal systems to adjudicate the matter is not sufficient. The DOE says you must convene a campus court, and it circumvents and contravenes the local law enforcement. And we have said 'no,' we will not deny our students their rights when they've been accused of a crime, or when they claim they're the victim of it, we will not deny them the rights of local law enforcement.

OKWU, *PC [Pat Campbell Show] with Dr. Everett Piper of OKWU on Presidential Race, and Title IX* at 7:45–8:24 (May 7, 2016) ("May 2016 Radio Interview"), http://www.okwu.edu/blog/2016/05/pc-dr-everett-piper-oklahoma-wesleyan-university-presidential-race-title-ix.

Third, the OKWU press release announcing OKWU's decision to join Doe's lawsuit stated: "[A]ll of our students should have the legal right to avail themselves of local law enforcement without their petition being compromised by the intrusion of an OCR-mandated committee of amateurs that contravenes the due process and confidentiality of the legal process." OKWU, *Oklahoma Wesleyan Files Suit Challenging Department of Education* (Aug. 15, 2016) ("August 2016 Press Release"), http://www.okwu.edu/blog/2016/08/oklahoma-wesleyan-files-suit-challenging-department-education.

Fourth, Dr. Piper amplified his prior statements regarding OKWU's objections to adjudicating complaints of student-on-student sexual violence in a talk radio interview days after OKWU joined Doe's lawsuit:

> [DR. PIPER:] The reason for our lawsuit:  the Office for Civil Rights in the Department of Education has issued a Dear Colleague Letter. This letter forces all colleges across the United States to compromise a criminal investigation by requiring us to convene a campus committee of faculty, staff, and students that by definition violates the due process and other corresponding constitutional rights of our students. In other words, a student loses his or her right to privacy and, in some cases, even the right to representation because of this kangaroo court that they're demanding that we convene on our campus. . . .
>
> . . . .
>
> Our cause is due process and the rights of our students to have privacy. Here's the thing, Pat. When we engage in this process, this kangaroo court, what it does is it tells the female student who may be the victim of a sexual crime, that if she makes a claim to my office or anybody in my administration, that we're required by law to drag her before a committee of her peers. In other words, violate her privacy rather than just letting her go to the police and let the police do their investigation in confidence, privately, and with the expertise that they have. We have to drag the student before a committee of faculty, staff, and students who are untrained amateurs and who don't understand how to investigate a criminal claim. Why in the world would a female student feel comfortable doing that. This actually hurts the female who may be the victim of the crime, because she's going to be intimidated into silence.
>
> [HOST:] Hold on. By the way, if you feel that you've been the victim of a crime, aren't you supposed to call the police?
>
> [DR. PIPER:] Well, and that's what we've always done, we've always told a student who feels that they've been victimized by a crime, we will assist you in making a claim at the police office. And then we let the police office do its work. Now, the student can still go to the police, I need to make that clear. But we are required as an institution to compromise that whole process by inserting this kangaroo court of amateurs and peers into the process, where due process is violated and privacy is meaningless. And we're saying, no, we won't do that. We won't compromise the legal process by having this kangaroo court. . . .
>
> [Dr. Piper then explained his understanding of the potential consequences of violating Title IX.] All because I want to let the law enforcement do

– 15 –

their job. All because I want your student to have her civil rights. I want
your student to have her right to due process. I want your student to have
his right to representation. I want to have all of my students' right to
privacy be recognized.

*Dr. Piper on OCR/DOE Lawsuit & Sexual Harassment w/ PC [Pat Campbell]* at 6:20-12:06

(Aug. 19, 2016) ("August 2016 Radio Interview"), http://www.1170kfaq.com/shows/pat-

campbell/pat-campbell-podcast/dr-piper-on-ocrdoe-lawsuit-sexual-harassment-wpc.[5]

## STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of an

action for lack of subject matter jurisdiction. This Court reviews motions to dismiss for lack of

standing and/or ripeness under Rule 12(b)(1). *See Delta Air Lines, Inc. v. Exp.-Imp. Bank of the*

*U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015).

As in the context of a motion to dismiss under Rule 12(b)(6), the Court must "treat the

complaint's factual allegations as true . . . and must grant plaintiff[s] the benefit of all inferences

that can be derived from the facts alleged." *Id.* (alterations in original) (quoting *Sparrow v.*

*United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). Nevertheless, "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions," and "[t]hreadbare recitals of the elements . . . , supported by mere conclusory

statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see, e.g.*, *Arpaio v.*

*Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (applying *Iqbal* to dismissal under Rule 12(b)(1)).

---

[5] Needless to say, Defendants disagree with the foregoing characterizations of federal policy,
which reflect serious misunderstandings of Title IX, the Department's Title IX regulations, and
the 2011 DCL, and fail to recognize that victims of sexual violence have the right to a non-
hostile educational environment whether or not they press criminal charges, whether or not law
enforcement authorities decide to prosecute, and whether or not any criminal prosecution results
in a conviction.

"Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim." *La Botz v. Fed. Election Comm'n.*, 61 F. Supp. 3d 21, 27 (D.D.C. 2014) (citing *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F. Supp. 2d 9, 13 (D.D.C. 2001)). "Finally, unlike with a motion to dismiss under Rule 12(b)(6), the Court 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" *Delta Air Lines*, 85 F. Supp. 3d at 259 (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

## ARGUMENT

### I.  JOHN DOE LACKS STANDING TO CHALLENGE THE 2011 DEAR COLLEAGUE LETTER

Doe alleges that he was found responsible for sexual violence, and barred from UVA property and activities for life, only because UVA used a preponderance of the evidence standard—rather than a clear and convincing evidence standard—to adjudicate the sexual misconduct complaint against him. Instead of suing UVA, Doe attacks the 2011 DCL that, he contends, forced UVA to adopt the preponderance of the evidence standard. *See* Am. Compl. ¶¶ 56–57. Because Doe's purported injuries allegedly flow not from Defendants' regulation of Doe but from Defendants' regulation of UVA—a third party not before the Court—Doe must make a heightened showing to establish Article III standing. He cannot carry his burden. Though Doe alleges that he has suffered various harms, several are insufficient to establish injury in fact and/or are not fairly traceable to the 2011 DCL, and none would be redressed by the equitable relief Doe seeks. Doe therefore lacks standing, and his Complaint should be dismissed for want of subject matter jurisdiction.

**A.      Doe Must Make a Heightened Showing To Establish Standing**

"The judicial Power of the United States," U.S. Const. art. III, § 1, extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. Standing doctrine is "rooted in the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 133 S. Ct. at 1146.

"[T]he irreducible constitutional minimum of standing contains three elements." *Defenders of Wildlife*, 504 U.S. at 560. "First, the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (alterations in original). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43). A plaintiff "must demonstrate standing separately for each form of relief sought" and "for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

"The burden of establishing" the three elements of Article III standing generally "falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, ___ F.3d ___, ___, 2016 WL 3854010, at *2 (D.C. Cir. July 15, 2016) (citing *Defenders of Wildlife*, 504 U.S. at 561). Doe in this case must make a "heightened showing" because he alleges "injury from the government's regulation of a third party." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1273 (D.C. Cir.

– 18 –

2007). The Department regulates recipients of Federal financial assistance—UVA in this case—and it is UVA rather than the Department that is the direct cause of Doe's alleged injuries. As the Supreme Court has explained:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Defenders of Wildlife*, 504 U.S. at 562 (internal citations omitted). Courts therefore are usually "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 133 S. Ct. at 1150; *see, e.g.*, *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 738–40 (D.C. Cir. 2008); *Renal Physicians Ass'n*, 489 F.3d at 1273–79; *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937–45 (D.C. Cir. 2004); *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24–26 (D.C. Cir. 2000).

The D.C. Circuit has identified only "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians Ass'n*, 489 F.3d at 1275; *see also Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940; *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 208, 225 n.17 (D.D.C. 2015). The first category consists of cases "where the challenged government action authorized conduct that would otherwise have been illegal." *Renal Physicians Ass'n*, 489 F.3d at 1275. Doe's challenge to the 2011 DCL plainly falls outside this category. Doe does not

allege that any action by UVA was unlawful or would have been unlawful but for the 2011 DCL.[6]

The second category comprises cases "where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Renal Physicians Ass'n*, 489 F.3d at 1275 (quoting *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941). As developed below, Doe's case does not fit within this category either.

**B.      Doe Cannot Establish Standing Because the Relief He Seeks Would Not Redress Any of His Purported Injuries**

The Amended Complaint can be read to identify several purported injuries that Doe alleges were caused by OCR's issuance of the 2011 DCL. Some of Doe's allegations are insufficient to establish injury in fact and/or causation, but the redressability requirement is fatal to Doe's case. "[T]o establish redressability at the pleading stage," the D.C. Circuit requires "more than a bald allegation." *Renal Physicians Ass'n*, 489 F.3d at 1275. Precedent demands "that the facts alleged be sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Id.* Here, the Complaint includes *no* allegations tending to show that the relief Doe seeks would redress *any* of his alleged injuries. Doe therefore lacks standing.

Before addressing in turn each of the injuries asserted by Doe, Defendants note what else the Complaint does not allege. The Complaint does not allege that Doe's disciplinary proceeding

---

[6] If Plaintiff did argue that schools may not lawfully use a preponderance of the evidence standard, his APA challenge to the 2011 DCL would be barred for the additional reason that he would have an adequate alternative remedy in the form of a suit against UVA. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 383 F.3d 1047, 1047–48 (D.C. Cir. 2004) (en banc) (per curiam statement of seven judges); *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 945–48.

was affected in any way by any part of the 2011 DCL other than its guidance on the standard of proof (the preponderance of the evidence standard). Nor does it allege that UVA changed its pre-2011 policies in response to any other part of the 2011 DCL. Thus, although Doe does not expressly limit the relief he seeks to the 2011 DCL's guidance on the standard of proof, Am. Compl. ¶ 115, Doe lacks standing to challenge any other part of OCR's guidance. *See DaimlerChrysler*, 547 U.S. at 352 (plaintiffs "must demonstrate standing separately for each form of relief sought"); *see, e.g.*, *Am. Trucking Ass'n. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 246–49 (D.C. Cir. 2013) (petitioner could challenge only one part of a rule).

Additionally, Doe does not—and, having graduated, cannot—allege that he will be the respondent in any future disciplinary proceeding at UVA. Doe therefore cannot claim any personal stake in what procedures UVA (or any other school) applies in future disciplinary proceedings, and he cannot demonstrate redressability by showing that a decision in his favor would lead UVA (or any other school) to revise their procedures for adjudicating complaints of sexual violence going forward. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983) (holding that a plaintiff whom police had placed in a chokehold had standing to seek damages but not equitable relief because he had not shown "a real and immediate threat of again being illegally choked").[7] Rather, Doe must establish that a judgment against Defendants would lead

---

[7] Plaintiff could not make that showing in any event. Setting the 2011 DCL aside would not likely lead schools to revise their procedures because schools would remain subject to Title IX and the Department's regulations, including the requirement that they maintain "prompt and equitable" grievance procedures. 34 C.F.R. § 106.8(b). OCR, meanwhile, would remain responsible for enforcing the law, and (depending on the grounds for the Court's decision) could continue to interpret the regulation as requiring a preponderance of the evidence standard—as it did for more than 15 years before the 2011 DCL was issued. *See* Ex. 3. Additionally, schools may decline to modify their policies for reasons other than compliance with the Department's Title IX regulations, including because schools have their own interests in protecting their students from sexual violence and assuring potential complainants that their grievance

UVA to lift the sanctions it imposed on him or to relieve him of some other injury stemming from the finding that Doe more likely than not committed an act of sexual violence against another student. This is particularly so because Doe does not directly challenge UVA's finding or sanctions.

Turning to the discrete injuries alleged in the Complaint, Doe has not carried his burden to establish standing.

First, Doe's allegation that his graduation was delayed, Am. Compl. ¶¶ 60–61, cannot provide the basis for standing. "[B]ecause [Doe] seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is 'certainly impending'; he may not rest on past injury." *Arpaio*, 797 F.3d at 19 (quoting *Clapper*, 133 S. Ct. at 1147). UVA awarded Doe his degree in March 2016. Am. Compl. ¶ 69. Therefore, the ten-month delay is not an ongoing or future injury that could be redressed by declaratory and injunctive relief. Moreover, the delay cannot be attributed to the standard of proof used by UVA, and therefore cannot be attributed to OCR's guidance on the standard of proof. The delay was prompted by the need to investigate and adjudicate the complaint against Doe, not by the particular adjudicatory procedures used. *See id.* ¶ 61 ("Mr. Doe's degree was withheld while the investigation progressed . . . ."). The University could have used a clear and convincing evidence standard and found Doe not

---

procedures are fair. In fact, one survey of nearly 200 top colleges and universities showed that a substantial majority were using a preponderance of the evidence standard prior to the 2011 DCL. *See* FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, STANDARD OF EVIDENCE SURVEY: COLLEGES AND UNIVERSITIES RESPOND TO OCR'S NEW MANDATE app. (Oct. 28, 2011), https://www.thefire.org/pdfs/8d799cc3bcca596e58e0c2998e6b2ce4.pdf?direct. There is thus little likelihood that setting aside the 2011 DCL would lead schools to change their current grievance procedures, let alone revisit past decisions like the one at issue here. *Cf. Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 933, 936–45 (holding that college wrestling coaches and athletes lacked standing to challenge a Dear Colleague Letter in which OCR clarified its interpretation of Title IX and the Department's regulations because a decision in the plaintiffs' favor would not likely result in schools restoring or preserving wrestling programs).

responsible for sexual misconduct, but he still would not have graduated as originally scheduled. Thus, the postponement of Doe's graduation date was not caused by the 2011 DCL and equitable relief from this Court would not redress it.

Second, Doe cannot establish standing based on the sanctions imposed by UVA—the requirement that he undergo counseling and be barred for life from UVA property and activities, *id.* ¶ 66—because the Amended Complaint contains no factual allegations to show that a judgment against Defendants would redress Doe's injuries by leading UVA to lift the sanctions.

Doe has already "complete[d] the counseling element of his sanction." Am. Compl. ¶ 68. The Court is therefore no more able to relieve Doe of his obligation to undergo counseling than it is to redress the postponement of Doe's graduation. Because the declaratory and injunctive relief Doe seeks cannot redress a past injury, Doe cannot establish standing based on the counseling requirement. *See Arpaio*, 797 F.3d at 19.

Unlike the counseling requirement, UVA's ban on Doe from University property and activities arguably causes Doe an ongoing injury that theoretically could be remedied by some form of equitable relief. Yet Doe seeks equitable relief from the 2011 DCL, not from the UVA ban itself. *See* Am. Compl. ¶ 115. Because it is at best speculative whether any order regarding the 2011 DCL would redress any injury that the UVA ban causes Doe, the ban cannot provide a basis for Doe's standing to challenge the 2011 DCL.

Significantly, the Complaint does not allege that a decision in Doe's favor would render the ban void or legally obligate UVA to lift it. Doe's silence on this point is consistent with decisions in which courts have recognized that declaring a policy invalid and enjoining its future enforcement would not redress past disciplinary decisions based on that policy. In *Bates v. Rumsfeld*, 271 F. Supp. 2d 54 (D.D.C. 2002), for example, this Court held that the plaintiffs, two

– 23 –

service members, lacked standing to seek a declaratory judgment that the government exceeded its authority when it ordered their involuntary inoculation against anthrax because that declaration would not necessarily remedy their alleged injuries – a discharge and a court-martial conviction for refusing the vaccine. *See id.* at 62–64 & n.16; *cf. Takhar v. Kessler*, 76 F.3d 995, 1001 (9th Cir. 1996) (plaintiff's prior conviction for misbranding new animal drugs did not give him standing to seek equitable relief from the relevant FDA policy because the relief sought would not remedy his conviction). Similarly, a decision holding that OCR violated the APA when it issued the 2011 DCL would not somehow imply that UVA acted unlawfully by using a preponderance of the evidence standard in Doe's disciplinary proceedings or that UVA's sanctions are invalid.

Doe's argument, then, must be that a favorable decision would help him persuade UVA to lift the ban voluntarily. *But see Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 442 (D.C. Cir. 1999) (rejecting plaintiff's suggestion that "it should be allowed to seek redress in two steps, first getting a declaratory judgment and then suing the [non-party] manufacturers" because "[r]edressability must be satisfied *now* to establish jurisdiction"); *Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101, 111 (D.D.C. 2012) ("[T]he redressability requirement is not met if the present suit serves only to produce a judgment that could be marshaled against [third parties] in subsequent litigation or that could have a favorable impact upon the [plaintiffs'] future negotiations with those parties."); *Bates*, 271 F. Supp. 2d at 62–64 & n.16. The Complaint, however, contains *no* allegations that UVA is likely to do so.

UVA found that Doe more likely than not committed an act of sexual violence against another student, and determined—after considering the standard of proof under which he was found responsible—that a lifetime ban from UVA property and activities was appropriate. There

is little reason to think that a decision holding that the 2011 DCL violates the APA would lead UVA to welcome Doe back on University property or to choose to include him in University activities. The Court's decision would have no bearing on the likelihood that Doe in fact engaged in sexual misconduct. It would not undermine the finding that Doe more likely than not committed an act of sexual violence against another student. And it would not disturb the decision that Doe should therefore be banned from UVA property and activities—presumably to protect other students and allow the complainant to visit UVA and participate in UVA activities without seeing Doe.

Under these circumstances, Doe does not come even close to clearing the high bar precedent sets for a party attempting to establish standing "[w]hen redress depends on the cooperation of a third party" following a decision in the plaintiff's favor. *U.S. Ecology*, 231 F.3d at 24–25; *cf. Klamath Water Users Ass'n*, 534 F.3d at 736, 739–40 (plaintiffs, retail consumers of electricity, lacked standing to challenge a federal agency's decision not to incorporate existing retail rates in a dam operator's federal license where retail rates were set by state regulators and there was no basis for concluding that the state regulators would set the rates based on the federal agency's decision); *Renal Physicians Ass'n*, 489 F.3d at 1276–78 (plaintiff association of physicians lacked standing to challenge a rule that allegedly caused providers to reduce physicians' pay when it was only speculative that voiding the rule would lead providers to restore their prior rates); *U.S. Ecology*, 231 F.3d at 21, 25–26 (plaintiff seeking to build a low-level radioactive waste facility on land owned by the United States lacked standing to sue to compel the United States to transfer the land to California where redressability hinged on whether California would "accept[] transfer of the disputed land and elect[] to proceed" with the project, but plaintiff "could not make any concrete assertions on these scores").

Because the Complaint offers no basis to find it "likely, as opposed to merely speculative," that a decision in Doe's favor would cause UVA to lift its sanctions, *Defenders of Wildlife*, 504 U.S. at 561, the existence of the sanctions does not support a finding that Doe has standing.

<u>Third</u>, the Complaint alleges that Doe has now been "labeled as someone who has committed sexual misconduct" and that "he will have to explain this finding to future employers, future friends, family members, and anyone else who asks" "[f]or the rest of his life." Am. Compl. ¶ 72. These allegations, too, provide no basis for standing.

Doe does not identify the source of this supposed obligation to disclose and explain UVA's finding against him. The Complaint does not allege that UVA has required Doe to "explain" the adjudicator's "finding" to anyone. In fact, based on UVA's policies and the allegations in the Complaint, it appears unlikely that Doe's transcript bears any indication that he was sanctioned or found responsible for any misconduct.[8] Thus, why Doe would need to explain the finding against him to "future friends," "family members" who are not already aware of it, or "anyone else who asks" is entirely unclear, as is why he could not avoid disclosing the finding against him to "future employers."

---

[8] UVA replaced its 2011 sexual misconduct policy in 2015, and Defendants are uncertain which procedures would have governed the marking of Plaintiff's transcript. Regardless, the policies provide for the marking of an accused student's transcript only if the adjudicator imposes a sanction of suspension or expulsion (both policies) or if the student withdraws from the University while under investigation (the 2015 policy only). *See* UVA, Policy and Procedures for Student Sexual Misconduct Complaints § IV.H.16, at 16 (July 8, 2011), http://eocr.virginia.edu/sites/eop.virginia.edu/files/Student%20Sexual%20Misconduct%20Policy%202011.pdf (2011 policy); UVA, Policy on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence, app. A, §§ VI.A.3.h, VI.C, at 21–22, 24 (July 1, 2015), http://eocr.virginia.edu/sites/eop.virginia.edu/files/Appendix%20A%20Student%20Procedures.pdf (2015 policy).

In any event, if Doe's point is that he may be asked to "explain" why there is a gap on his transcript or resume—why he was awarded his degree in March 2016 instead of in May 2015, *see* Am. Compl. ¶¶ 58, 60, 69—then that purported injury provides no more basis for Doe's standing than his delayed graduation itself. As discussed above, the delay (and therefore any need to "explain" it) is not fairly traceable to the 2011 DCL and cannot be remedied by the equitable relief Doe seeks. *See supra* at 22–23.

If Doe's concern is explaining the mere fact that he was found to have committed sexual misconduct, again, the relief he seeks from Defendants would be no remedy at all. Applying a preponderance of the evidence standard, the University's outside adjudicator found that Doe more likely than not committed an act of sexual violence. No relief this Court could grant in the instant litigation would change that fact. The ship, so to speak, has sailed.

Finally, the Complaint alleges some "possibility that OCR will order UVA to impose additional sanctions" on him under the terms of a 2015 Resolution Agreement between OCR and UVA. Am. Compl. ¶ 73. But "'[a]llegations of *possible* future injury' are not sufficient" to establish injury in fact, *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also Delta Air Lines*, 85 F. Supp. 3d at 261, and the facts alleged in the Complaint do not support the inference that OCR has any present intent to require UVA to impose additional sanctions on Doe. Moreover, the Complaint fails to articulate why any additional sanctions would be "fairly traceable" to the 2011 DCL. *Clapper*, 133 S. Ct. at 1146.

In sum, Doe has failed to identify any injury in fact that is fairly traceable to the 2011 DCL and that would likely be redressed by the declaratory and injunctive relief Doe seeks. Doe therefore lacks standing to challenge the 2011 DCL.

## II. OKLAHOMA WESLEYAN UNIVERSITY'S CHALLENGE TO THE 2011 DEAR COLLEAGUE LETTER IS NOT RIPE FOR JUDICIAL REVIEW

OKWU has similarly failed to establish that this Court has jurisdiction to entertain its challenge to the 2011 DCL. In the absence of any enforcement action against OKWU for violating Title IX or the Department's regulations, as interpreted in the 2011 DCL, OKWU's disagreements with the guidance in the 2011 DCL are not ripe for judicial review.

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Delta Air Lines*, 85 F. Supp. 3d at 269 (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)). Like standing, "'[r]ipeness is a justiciability doctrine' that is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (alteration in original) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003)). The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149). But, as the D.C. Circuit has also explained, "the 'usually unspoken element of the rationale' is this: 'If we do not decide [the claim] now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort. Article III courts should not make decisions unless they have to.'" *Id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1431).

OKWU's challenges to the 2011 DCL are neither constitutionally nor prudentially ripe for judicial review. The Amended Complaint states that OKWU "does not currently apply a

– 28 –

'preponderance of the evidence' standard in sexual misconduct proceedings," Am. Compl. ¶ 80, but there is no allegation of any final, pending, or imminent administrative enforcement action by Defendants much less any pending complaints with OCR relating to OKWU's handling of sexual violence complaints. Nor is it evident that the standard-of-proof and cross-examination issues would be focal points in any future enforcement action against OKWU, in no small part because, as discussed previously, there is no indication that OKWU will investigate and adjudicate *any* complaint of student-on-student sexual violence. *See supra* at 11–16. Delaying judicial review of OKWU's complaints about the 2011 DCL until after an administrative complaint is filed and any administrative enforcement action against OKWU is taken, absent voluntary resolution, would permit development of the factual record concerning OKWU's handling of complaints of student-on-student sexual violence; allow Defendants to bring their administrative expertise to bear; reduce the likelihood of piecemeal litigation; and make it unnecessary to address at least one of OKWU's present challenges to the 2011 DCL. OKWU, meanwhile, would suffer no hardship if judicial review is postponed beyond the five-plus years that OKWU itself has delayed seeking review of the 2011 DCL. Accordingly, OKWU's claims are not ripe for judicial review and should be dismissed for lack of subject matter jurisdiction.

### A.   OKWU Cannot Establish Constitutional Ripeness

The Article III component of ripeness is at least partially "subsumed into the Article III requirement of standing," which as discussed above, "demands that a plaintiff allege . . . an injury-in-fact that is 'imminent' or 'certainly impending,'" *Delta Air Lines*, 85 F. Supp. 3d at 269 (citing *Nat'l Treasury Emps. Union*, 101 F.3d at 1427–28), as well as causation and redressability, *id.* at 260.

Here, the Amended Complaint is so devoid of detail and sketchy in its allegations regarding OKWU's policies and practices for processing complaints of sexual violence that it

fails to show that the 2011 DCL causes OKWU any injury in fact that would be redressed by a favorable decision. The facial deficiencies in the Amended Complaint are only compounded by public statements from OKWU and its president, which suggest that OKWU will not conduct any investigation or adjudication when presented with a complaint of student-on-student sexual violence but will instead defer to local law enforcement. Because the Amended Complaint and these public statements suggest OKWU is out of compliance with Title IX and the Title IX regulations for reasons other than its failure to use a preponderance of the evidence standard to adjudicate complaints of sexual violence, OKWU lacks standing to challenge the 2011 DCL.

The Amended Complaint does not allege any imminent action by Defendants to enforce the 2011 DCL against OKWU. OKWU represents that it "does not currently apply a 'preponderance of the evidence' standard," Am. Compl. ¶ 80, and offers no indication that it has done so in the past. But OCR has taken no action to enforce the 2011 DCL against OKWU in the five-plus years since OCR issued its guidance, and OKWU implicitly concedes that OCR has not even "threaten[ed] it with enforcement action." *Id.* ¶ 81. At best, OKWU "has shown nothing other than a speculative threat of enforcement," which falls short of an imminent injury in fact. *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 334 (D.D.C. 2016), *appeal pending*, 16-5034 (D.C. Cir.).

Moreover, OKWU's factual allegations fail to establish that any eventual enforcement action would be predicated on the 2011 DCL's guidance on the standard of proof and cross-examination. The Amended Complaint states that OKWU "*does not* currently apply a 'preponderance of the evidence' standard in sexual misconduct proceedings," and that "OKWU is not in compliance with the 2011 DCL" for this reason "*inter alia*." Am. Compl. ¶ 80 (emphasis added). But the Amended Complaint otherwise provides no information about the

procedures that OKWU *does* use to investigate and adjudicate complaints of sexual violence, or that it uses any such procedures at all. OKWU alleges that it "would like the freedom to make 'clear and convincing evidence,' . . . the burden of proof for sexual misconduct proceedings on its campus," *id.* ¶ 82, and "to let both the accuser and the accused cross-examine each other in any such proceedings," *id.* ¶ 83, for example, but not that it has established procedures for adjudicating complaints of sexual violence that require applying the clear and convincing evidence standard or permit the parties to personally cross-examine each other. Nor does the Amended Complaint disclose the ways in which OKWU considers itself "not in compliance with the 2011 DCL" aside from its failure to apply a preponderance of the evidence standard. Indeed, it is not clear from the Amended Complaint whether OKWU currently conducts any investigations or adjudications to determine whether accused students have committed acts of sexual violence.

Public statements by OKWU and its president, Dr. Piper, fill in some of the gaps in the Amended Complaint. As set forth more fully above, *supra* at 13–16, OKWU apparently takes the position that OKWU would "compromise a criminal investigation" if it were to independently investigate and adjudicate a complaint of student-on-student sexual violence. August 2016 Radio Interview at 6:26. Therefore, it seems that, rather than investigate and adjudicate complaints itself, OKWU has "always told a student who feels that they've been victimized by a crime, we will assist you in making a claim at the police office" and then "let the police office do its work." *Id.* at 10:10; *see also* May 2016 Web Post ("OKWU has always turned over all claims of criminal behavior to the local police and we will continue to do so. To the extent the DOE requires us to convene a kangaroo court that denies our students their due process and legal protections in investigating and adjudicating an allegation of criminal conduct, we will not do

so."); May 2016 Radio Interview ("[T]his Dear Colleague Letter . . . directs us to conduct a kangaroo court in the case of any investigation of sexual harassment. In other words, trusting the local police to investigate the matter, trusting the local law enforcement and the legal systems to adjudicate the matter is not sufficient. The DOE says you must convene a campus court, and it circumvents and contravenes the local law enforcement. And we have said 'no' . . . .").

If OKWU's failure to "currently apply a 'preponderance of the evidence' standard," Am. Compl. ¶ 80, is part of a broader refusal to independently investigate and adjudicate sexual violence complaints, then OKWU's non-compliance with Title IX and the Department's regulations requiring a prompt and equitable grievance process for Title IX complaints cannot be attributed to the 2011 DCL. The standard of proof in OKWU's non-existent adjudications would be immaterial to OKWU's non-compliance with its Title IX obligations. OKWU's problem would be with the Department's regulations themselves, which OKWU does not challenge. Thus, OKWU lacks standing because it has not established "a causal connection between" any alleged injury and "the challenged action of [Defendants]." *Defenders of Wildlife*, 504 U.S. at 560; *see, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13–14 (D.C. Cir. 2011) (holding that plaintiffs lacked standing to challenge an EPA determination that did not "substantially increase[] the risk of regulation or enforcement relating to particular property" of plaintiffs' members, where they "face[d] only the *possibility* of regulation, as they did before"); *Atl. Urological Assocs. v. Leavitt*, 549 F. Supp. 2d 20, 28 (D.D.C. 2008) (no standing to challenge agency action that did not "alter th[e] new landscape" created by prior agency action).

If OKWU does not refrain entirely from investigating and adjudicating complaints of student-on-student sexual violence, the Amended Complaint leaves unclear how it is violating Title IX and the Department's regulations, as interpreted by OCR, in addition to not using the

preponderance of the evidence standard. Absent clarity on that point, there is no basis to conclude that the 2011 DCL substantially contributed to the risk that the Department might terminate Federal financial assistance to OKWU, or that the relief OKWU seeks would materially reduce that risk.

Because the threadbare allegations in the Amended Complaint—particularly when read in light of the public statements of OKWU and its president—are insufficient to satisfy the requirements for Article III standing, OKWU cannot establish that its challenge to the 2011 DCL is constitutionally ripe.[9]

### B.      OKWU Cannot Establish Prudential Ripeness

"Even if a case is 'constitutionally ripe,' . . . the prudential aspect of ripeness may provide an independent basis for a court not to exercise its jurisdiction.'" *Delta Air Lines*, 85 F. Supp. 3d at 269 (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807–08). In evaluating the prudential ripeness of an APA challenge to agency action, the court applies "a familiar two-pronged balancing test: first, a court must evaluate the 'fitness of the issue for judicial decision'; and second, a court must consider 'the hardship to the parties of withholding [its] consideration.'" *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149). Here, OKWU's challenge to the

---

[9] Defendants also note that, under 20 U.S.C. § 1681(a)(3) and 34 C.F.R. § 106.12, an educational institution that is controlled by a religious organization is exempt from Title IX to the extent that compliance would not be consistent with the religious tenets of such organization. At OKWU's request, OCR has acknowledged that OKWU is exempt from dozens of the Department's Title IX regulations to the extent they prohibit discrimination on the basis of gender identity or abortion and compliance would conflict with the religious tenets of its controlling organization. *See* Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, to Everett Piper, President, OKWU (Dec. 22, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/oklahoma-wesleyan-university-response-12222014.pdf. Any uncertainty about whether OKWU may be exempt from otherwise applicable regulations on sexual violence provides an additional basis for holding that OKWU's challenge to the 2011 DCL is not ripe.

2011 DCL is not fit for immediate judicial review, and postponing review beyond the five years that OKWU has itself delayed in filing suit will not cause OKWU any meaningful hardship.

### 1.      OKWU's challenge to the 2011 DCL is not fit for review

"Among other things, . . . 'the fitness of an issue for judicial [review] depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Delta Air Lines*, 85 F. Supp. 3d at 269 (quoting *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)) (brackets in original). The fitness inquiry is "meant to protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review," as well as the court's interests "in avoiding unnecessary adjudication," "in deciding issues in a concrete setting," and in avoiding "entangling [itself] in abstract disagreements over administrative policies." *Id.* (citations omitted).

Although OKWU's complaints about the 2011 DCL may be "purely legal" in nature, at this point they reflect nothing more than "abstract disagreements over administrative policy." *Id.* As the D.C. Circuit explained in *Devia*:

> Even though the legal issues may be clear, a case may still not be fit for review: [T]he question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task. Federal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing.

492 F.3d at 424–25. OKWU's challenges to the 2011 DCL are not presently fit for review mainly because postponing review would facilitate further development of the issues, would allow the Court and Defendants to avoid piecemeal litigation, and would make it unnecessary for the Court ever to address one or more of OKWU's claims.

Allowing the administrative enforcement process to play itself out in the context of an actual complaint to, and investigation by, OCR would permit development of a factual record

regarding OKWU's procedures for investigating and adjudication complaints of student-on-student sexual violence, as well as the extent to which OKWU adheres to those procedures in practice and the nature of its objections to the 2011 DCL. Defendants could then determine whether and to what extent OKWU is in violation of Title IX and the Department's regulations. As explained above, *supra* at 29–33, it may be that the policies from the 2011 DCL that OKWU seeks to challenge in this litigation are not material to the Department's findings. Thus, "additional factual 'developments are likely to assist the court in deciding the case.'" *Delta Air Lines*, 85 F. Supp. 3d at 270 (quoting *Atl. States Legal Found.*, 325 F.3d at 284–85).

Allowing OKWU to circumvent the administrative process, by contrast, would "deprive the agency of the opportunity to apply its expertise and to correct any mistakes it may have made." *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999). Any administrative enforcement proceeding against OKWU would permit the Department not only to develop the facts of OKWU's case but also to evaluate the policy questions presented by those facts. If a policy articulated in the 2011 DCL is implicated, OKWU can urge the Department to abandon or modify it. Even if the Department does not agree with OKWU, it could still refine the policy and clarify or add to the justifications that OCR has provided for its adoption. *Cf. Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998) (acknowledging the interest in not "hinder[ing]" an agency's "efforts to refine its policies").

Permitting review of OKWU's claims before the agency has finally determined the full extent of OKWU's violations of Title IX and the Department's regulations also would undermine the interests of the Court and the Department in "avoiding inefficient and unnecessary 'piecemeal review.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 30–31 (D.C. Cir. 1984)). The Court could decide the

validity of OCR's interpretation of the Department's regulations to require use of a preponderance of the evidence standard, or its decision to encourage schools not to permit personal cross-examination by the parties, only to have the Department later find—on different grounds—that OKWU is violating Title IX and/or the Department's regulations. A second round of litigation could result. Such a scenario is not far-fetched when OKWU acknowledges that its failure to use a preponderance of the evidence standard is not the only way in which the school is not complying with OCR's understanding of OKWU's Title IX obligations.

Finally, postponing review of OKWU's claims would prevent "unnecessary judicial review." *Am. Petroleum Inst.*, 683 F.3d at 388; *see also McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (Boudin, J.) (noting that, "[i]n the fitness inquiry, . . . prudential concerns focus[] on the policy of judicial restraint from unnecessary decisions"), *quoted in Devia*, 492 F.3d at 424. If the Department were to initiate enforcement proceedings against OKWU and issue a final decision finding that OKWU is violating the Department's regulations by not using a preponderance of the evidence standard, there would be no need for the Court to consider in any subsequent litigation OKWU's claim that the 2011 DCL should have undergone pre-promulgation notice and comment. Because the Department can apply its interpretation of its regulations in enforcement actions without relying on prior guidance documents, *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 201–04 (1947), the Department's application of its preponderance of the evidence policy in an enforcement action against OKWU would render moot OKWU's objection to the procedure used to issue the 2011 DCL and make it unnecessary for the Court to address that claim. In addition, as noted, an enforcement action would give the Department the opportunity to explain more fully the basis for OCR's policies and to respond directly to

OKWU's arguments against them. Such an expanded explanation for the Department's policies would alter the frame for OKWU's arbitrary-and-capricious challenge, if not preclude it entirely.

Delaying review of OKWU's challenges to the 2011 DCL until after any enforcement action against OKWU would serve the judicial and administrative interests that the fitness prong of the ripeness inquiry is designed to protect. OKWU's claims are not fit for immediate review.

### 2.   OKWU will suffer no hardship if judicial review is postponed more than the five years it already has been

Not only is OKWU's challenge to the 2011 DCL unfit for immediate review, but postponing review would cause OKWU no significant hardship. "The 'paradigmatic hardship situation is where a [plaintiff] is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for non-compliance.'" *Food & Water Watch v. EPA*, 5 F. Supp. 3d 62, 80 (D.D.C. 2013) (quoting *Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988)). OKWU does not allege that it has incurred any "costs"—let alone "substantial costs"—as a result of the 2011 DCL in the five years since it was issued. Nor does OKWU allege that it will incur such costs if the Court postpones review of the 2011 DCL beyond this already-late date.

Moreover, the fact that OKWU apparently took no action in response to the 2011 DCL—with no adverse consequences—shows that the 2011 DCL did not put to OKWU "the choice 'between taking immediate action to [its] detriment and risking substantial future penalties for non-compliance.'" *Delta Air Lines*, 85 F. Supp. 3d at 273 (quoting *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995)). Rather than feel pressed to take "immediate action," OKWU evidently felt "free to conduct its business as it sees fit" for over five years. *Devia*, 492 F.3d at 427 (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 810). Under the circumstances, OKWU cannot show that it will suffer hardship if judicial review is further

delayed. *See Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 80 (D.D.C. 2003) (finding no hardship to plaintiff trade associations from delaying review of challenged agency Protocols where "the record contains no evidence that any member of plaintiffs' organizations has to date been subject to adverse federal agency action under the Protocols, over a period of more than four years"), *aff'd on other grounds*, 415 F.3d 8 (D.C. Cir. 2005); *cf. New York v. EPA*, 413 F.3d 3, 20–21 (D.C. Cir. 2005) (finding no hardship from delaying review of agency's three-year-old regulatory interpretation).

Finally, any risk to OKWU's eligibility for federal funding in the absence of immediate judicial review is mitigated by the procedural options that would be available to OKWU in the event that it failed to enter into voluntary compliance, that Defendants initiated enforcement action, and that Defendants found OKWU to be in violation of Title IX or the Title IX regulations. Among other options that might be available, OKWU could seek judicial review of a final agency determination of non-compliance, 20 U.S.C. § 1683; 34 C.F.R. § 100.11. And in the event that the court sustains Defendant's decision, OKWU could "at any time" request full restoration of its eligibility, 34 C.F.R. § 100.10(g)(2), based on a showing that OKWU has satisfied the terms and conditions of the Department's decision or has brought itself into compliance (and provides reasonable assurance that it will fully comply) with applicable requirements, *id.* § 100.10(g)(1).

\*      \*      \*

To summarize, OKWU cannot show that it will suffer an imminent injury fairly traceable to the 2011 DCL and redressable by a favorable decision, that its challenges to the 2011 DCL are fit for review, or that OKWU will suffer hardship if judicial review of the 2011 DCL is postponed beyond the five-plus years that OKWU has itself delayed seeking review. OKWU

therefore cannot establish constitutional or prudential ripeness, and its challenge to the 2011 DCL should be dismissed for lack of subject matter jurisdiction.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and dismiss the Amended Complaint.

DATED:  September 1, 2016                Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JENNIFER D. RICKETTS
Director
Federal Programs Branch

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

 /s/ Matthew J. Berns
MATTHEW J. BERNS
Trial Attorney (D.C. Bar No. 998094)
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW
Washington, D.C. 20530
Telephone:  (202) 616-8016
Email:  matthew.j.berns@usdoj.gov

*Counsel for Defendants*