## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE, and

OKLAHOMA WESLEYAN UNIVERSITY,

      Plaintiffs,

  v.

CATHERINE E. LHAMON, in her official
capacity as Assistant Secretary for Civil Rights,
United States Department of Education, *et al.*,

      Defendants.

Case No. 1:16-cv-01158 (RC)

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Justin Dillon (DC Bar No. 502322)
Christopher C. Muha (DC Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, D.C. 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………..iii

INTRODUCTION……………………………………………………………………..1

BACKGROUND…………………………………………………………...............…3

I.     TITLE IX AND ITS SIGNIFICANCE TO STUDENTS AND
       INSTITUTIONS OF HIGHER EDUCATION…………………………………3

II.    OCR GUIDANCE ON TITLE IX AND ITS IMPLEMENTING
       REGULATIONS……………………………………………………………..3

III.   OCR'S ENFORCEMENT OF THE 2011 DCL…………………………………7

IV.    UVA'S ADJUDICATION OF THE ALLEGATIONS AGAINST
       PLAINTIFF JOHN DOE UNDER THE 2011 DCL…………………………...9

V.     OKWU'S ABILITY TO AFFORD ITS STUDENTS
       FUNDAMENTAL FAIRNESS AFTER THE 2011 DCL………………………12

STANDARD OF REVIEW……………………………………………………...13

ARGUMENT……………………………………………………………………13

I.     THE 2011 DCL'S PREPONDERANCE MANDATE IS
       PROCEDURALLY INVALID BECAUSE IT IS A
       LEGISLATIVE RULE THAT WAS NOT SUBJECTED
       TO NOTICE-AND-COMMENT RULEMAKING……..………………….........13

       A.     The APA's Rulemaking Framework……………………………………15

       B.     The Preponderance Mandate Is Not an Interpretative Rule…...………....17

       C.     The Preponderance Mandate Is Not a Policy Statement………………....27

       D.     The Preponderance Mandate Is Not a Procedural Rule…………………29

       E.     The Preponderance Mandate Is Not Excused From
              Notice-and-Comment Rulemaking for Good Cause……………………30

       F.     The Preponderance Mandate Bears Directly on the Interests
              Furthered By Notice-and-Comment Rulemaking………………………30

II.     THE 2011 DCL'S PREPONDERANCE MANDATE IS
        SUBSTANTIVELY INVALID BECAUSE IT EXCEEDS
        THE EDUCATION DEPARTMENT'S AUTHORITY TO
        IMPLEMENT TITLE IX…………………………………………………………...32

III.    THE 2011 DCL'S PREPONDERANCE MANDATE IS
        ARBITRARY AND CAPRICIOUS…………………………………………………..36

        A.      Defendants Have Failed to Offer Any Reasoned
                Explanation in Support of the Preponderance Mandate…………………37

        B.      Defendants Have Failed to Consider the Burden on
                Small Schools in Trying to Afford Students Fundamental
                Fairness in the Face of a Low Evidentiary Standard…………………….43

CONCLUSION……………………………………………………………………………….44

# TABLE OF AUTHORITIES

<u>Cases</u>

*Albert v. Carovano,*
 824 F.2d 1333 (2d Cir. 1987) ......................................................................... 38

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ....................................................................... 21

*American Hosp. Ass'n v. Bowen,*
 834 F.2d 1037 (D.C. Cir. 1987) ................................................................ 16, 29

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ...................................................................................... 13

*Appalachian Power Co. v. E.P.A.,*
 208 F.3d 1015 (D.C. Cir. 2000) ................................................ 14, 15, 25, 31

*Associated Gas Distributors v. F.E.R.C.,*
 824 F.2d 981 (D.C. Cir. 1987) ....................................................................... 21

*Bowman Transp. Inc. v. Arkansas-Best Freight System,*
 419 U.S. 271 (1974) ...................................................................................... 36

*Burlington Truck Lines v. United States,*
 371 U.S. 156 (1962) ...................................................................................... 36

*\*Catholic Health Initiatives v. Sebelius,*
 617 F.3d 490 (D.C. Cir. 2010) ................................................ 14, 17, 18, 20, 21

*\*Clarian Health W., LLC v. Burwell,*
 No. 14-CV-0339 (KBJ), \_\_\_F. Supp. 3d\_\_\_, 2016 WL 4506969
 (D.D.C. Aug. 26, 2016) ............................................. 16, 17, 22, 29, 44

*Colgrove v. Battin,*
 413 U.S. 149 (1973) ...................................................................................... 39

*Combined Commc'ns Corp. v. U.S. Postal Serv.,*
 891 F.2d 1221 (6th Cir. 1989) ....................................................................... 21

*Community Nutrition Institute v. Young,*
 818 F.2d 943 (D.C. Cir. 1987) ....................................................................... 27

*Consumer Elecs. Ass'n v. F.C.C.,*
 347 F.3d 291 (D.C. Cir. 2003) ....................................................................... 18

*Cty. of Los Angeles v. Shalala,*
 192 F.3d 1005 (D.C. Cir. 1999) ................................................................ 39, 42

*CropLife Am. v. E.P.A.*
 329 F.3d 876 (D.C. Cir. 2003) ................................................................ 24, 25, 28

*Davis v. Monroe County Bd. of Ed.,*
 526 U.S. 629 (1999) ...................................................................................... 40

*Doe v. Rector & Visitors of George Mason Univ.,*
 149 F. Supp. 3d 602 (E.D. Va. 2016) ............................................................ 38

*\*Electronic Privacy Information Center v. U.S. Dep't of Homeland Sec.,*
 653 F.3d 1 (D.C. Cir. 2011) .................................................................... passim

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.,*
 769 F.3d 1127 (D.C. Cir. 2014) ..................................................................... 34

*Gen. Elec. Co. v. EPA,*
 290 F.3d 377 (D.C. Cir. 2002) ....................................................................... 28

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) .................................................................................. 34

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
  23 F.3d 412 (D.C. Cir. 1994)...................................................................... 32

*Hoctor v. USDA,*
  82 F.3d 165 (7th Cir. 1996) ........................................................................ 2

*Individual Reference Servs. Grp., Inc. v. F.T.C.,*
  145 F. Supp. 2d 6 (D.D.C. 2001)............................................................... 21

*Mary V. Harris Foundation v. F.C.C.,*
  776 F.3d 21 (D.C. Cir. 2015)..................................................................... 21

*Massie v. U.S. Dep't of Hous. & Urban Dev.,*
  620 F.3d 340 (3d Cir. 2010) ..................................................................... 21

*McLouth Steel Prods. Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988).........................................................27-28, 29

*\*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014)........................................................... passim

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................36-37

*N.J., Dep't of Envtl. Prot. v. U.S. Envtl. Prot. Agency,*
  626 F.2d 1038 (D.C. Cir. 1980).................................................................. 16

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan,*
  979 F.2d 227 (D.C. Cir. 1992)......................................................... 17, 26, 29

*Santosky v. Kramer,*
  455 U.S. 745 (1982) ................................................................................. 38

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947)............................................................................36-37

*Starishevsky v. Hofstra Univ.,*
  612 N.Y.S.2d 794 (Sup. Ct. 1994) ............................................................ 38

*Transactive Corp. v. United States,*
  91 F.3d 232 (D.C. Cir. 1996)..................................................................... 39

*U.S. Telecom Ass'n v. F.C.C.,*
  400 F.3d 29 (D.C. Cir. 2005)..................................................................... 16

*U.S. v. Florida East Coast Railway Co.,*
  410 U.S. 224 (1973) ................................................................................. 15

*U.S. v. Picciotto,*
  875 F.2d 345 (D.C. Cir. 1989)......................................................... 16, 19, 31

*Williams v. Nat'l Sch. of Health Tech., Inc.,*
  836 F. Supp. 273 (E.D. Pa. 1993).............................................................. 21

<u>Statutes</u>

15 U.S.C. § 1681(b) .................................................................................... 21
20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa).......................................................... 33, 34
20 U.S.C. § 1681 .......................................................................................... 3
20 U.S.C. § 1682 .......................................................................................... 3
20 U.S.C. § 3413(a) ...................................................................................... 3
39 U.S.C. § 3623(c)(1)................................................................................ 21

42 U.S.C. § 4621(b) ................................................................................................ 21
5 U.S.C. § 551(4) .................................................................................................... 15
5 U.S.C. § 551(5) .................................................................................................... 15
5 U.S.C. § 553 ..................................................................................................... 4, 15
5 U.S.C. § 553(b) ............................................................................................... 2, 15
5 U.S.C. § 553(b)(3) ............................................................................................... 17
5 U.S.C. § 553(b)(3)(A) ......................................................................... 2, 13, 16, 29
5 U.S.C. § 553(b)(3)(B) ......................................................................... 2, 13, 16, 30
5 U.S.C. § 706(2)(A) ............................................................................................... 36
5 U.S.C. § 706(2)(C) ............................................................................................... 32
5 U.S.C. § 553(c) ............................................................................................ 2, 15, 16
5 U.S.C. § 556 ......................................................................................................... 15
5 U.S.C. § 557 ......................................................................................................... 15

Rules

Fed. R. App. P. 4(a) ................................................................................................ 34
Fed. R. Civ. P. 56(a) ............................................................................................... 13

Regulations

34 C.F.R. Part 106 .................................................................................................. 33
34 C.F.R. § 106.8(b) ............................................................. 6, 13, 14, 18, 20, 32, 33
34 C.F.R. § 668.46(k)(1)(ii) .................................................................................... 35
34 C.F.R. § 668.46(k)(2)(i) ................................................................................ 33, 34
50 FR 42408, 42409-10 (1985) .............................................................................. 21
62 FR 12045 ...................................................................................................... 12, 25
79 Fed Reg. 62752 .................................................................................................. 33
79 Fed. Reg. 35418 ................................................................................................. 33

Other Authorities

*Taking the Right to Appeal (More or Less) Seriously*,
    95 YALE L.J. 62 (1985) ..................................................................................... 34
*The Sex Bureaucracy*,
    104 CALIF. L. REV. 881 (2016) ..................................................................... 1-2, 23
*Which Agency Interpretations Should Bind Citizens and the Courts?*,
    7 YALE J. ON REG. 1 (1990) ............................................................................... 26

## INTRODUCTION

The public's interest in the government's regulation of the nation's colleges and universities has always been high.  In 2011, when the Education Department promulgated the Dear Colleague Letter at the center of this litigation (the "2011 DCL"), some 42% of all 18- to 24-year olds in the entire country were enrolled in a two- or four-year degree-granting institution.[1]  By the Education Department's estimate, American colleges and universities currently enroll some 20.5 million people[2] and employ as many as four million more.[3]

For at least 14 years before it issued the 2011 DCL, the Education Department's Office for Civil Rights respected the public's interest in its oversight of the nation's colleges and universities.  In 1997, when it sought to amend the regulations governing the handling of sexual misconduct claims at schools receiving federal funding, it did so through notice-and-comment rulemaking.  *See* ECF No. 22-2 (Statement of Undisputed Facts) at ¶¶ 6-9.  Four years later, when it proposed a comparatively minor amendment of those same regulations, it again did so through notice-and-comment rulemaking.  *Id.* ¶¶ 16-18.  Yet in April of 2011—at a time when the percentage of the nation's youth attending college had reached an all-time high[4]— OCR imposed sweeping nationwide changes to schools' obligations when handling allegations of sexual misconduct.[5]  And it did so without notice-and-comment rulemaking.

---

[1]  *See* Table 302.60, National Center for Education Statistics, *available at* http://nces.ed.gov/programs/digest/d15/tables/dt15_302.60.asp?current=yes (last visited Oct. 31, 2016).

[2]  *See* "Fast Facts," National Center for Education Statistics, *available at* http://nces.ed.gov/fastfacts/display.asp?id=372 (last visited Oct. 31, 2016).

[3]  *See* "Enrollment and Employees in Postsecondary Institutions, Fall 2014" at 4, *available a*t http://nces.ed.gov/pubs2016/2016005.pdf) (last visited Oct. 31, 2016).

[4]  *See supra* n.2.

[5]  *See generally* Jacob E. Gersen and Jeannie Suk Gersen, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881, 883-84 (2016) (identifying colleges and universities as "particularly important loci" of a new "sex bureaucracy," a transition from statutory prohibitions on sex discrimination to imposition of affirmative requirements to prevent, investigate, and discipline sexual misconduct).

It didn't consult the schools.  It didn't consult the millions of students enrolled in degree-granting programs that year.  It didn't consult the parents of those students, or the parents of future students.  And it didn't consult the public.  Instead, it invited people to email or write a letter, *after* having already imposed new, nationwide mandates that it called merely "guidance."  *See* Ex. 1 (2011 DCL) at 1 n.1.  That approach, while certainly easier for OCR, turns the notice-and-comment process on its head.

The law requires more than that.  The public's interest in commenting on rules that have sweeping nationwide implications cannot be overstated.  And "[t]he greater the public interest in a rule," Judge Posner wrote some 20 years ago, "the greater reason to allow the public to participate in its formation."  *Hoctor v. USDA*, 82 F.3d 165, 171 (7th Cir. 1996); *see also Electronic Privacy Information Center v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) (hereafter "*EPIC*") ("[R]egardless whether this is a new substantive burden, the change substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rule making.") (internal quotation marks and citation omitted).

The Administrative Procedure Act ("APA") requires substantive agency rulemaking to proceed through its notice-and-comment procedures, *see* 5 U.S.C. §§ 553(b)-(c), unless a rule satisfies one of four statutory exemptions, *see id.* §§ 553(b)(3)(A)-(B), which the preponderance mandate does not.  Not only is it procedurally defective, but the 2011 DCL's preponderance mandate also exceeds the Education Department's statutory authority.  And finally, it is an arbitrary and capricious rule, unsupported by reasoned decision-making.  Plaintiffs thus ask this Court to vacate it.  OCR must continue its fight against sexual assault on our nation's campuses.  But it must do so in dialogue with the millions of students, teachers, employees, parents, and

concerned citizens who have a stake in its outcome.  And it must do so within the bounds of the authority Congress has delegated to it.

## BACKGROUND

### I.   TITLE IX AND ITS SIGNIFICANCE TO STUDENTS AND INSTITUTIONS OF HIGHER EDUCATION

Title IX bars sex discrimination in institutions of higher education receiving federal funding.  It provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.  Thus, as is the case for many other federal statutes, compliance with Title IX is enforced by control over federal funding.  Departments and agencies that provide federal financial assistance to colleges and universities, whether by way of grant, loan, or most types of contracts, are empowered to effect compliance with Title IX "by the termination of or refusal to grant or continue [such] assistance" when "there has been an express finding on the record, after opportunity for a hearing, of a failure to comply with" Title IX.  20 U.S.C. § 1682.

### II.   OCR GUIDANCE ON TITLE IX AND ITS IMPLEMENTING REGULATIONS

The Department of Education is tasked with implementing and enforcing federal statutes pertaining to higher education.  Its Office for Civil Rights ("OCR"), led by the Assistant Secretary for Civil Rights (currently Defendant Catherine Lhamon), is specifically tasked with responsibility for enforcing federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department, including Title IX.  20 U.S.C. § 3413(a).

Three times in the past 20 years, OCR has promulgated substantive rules related to the investigation and adjudication of allegations of sexual misconduct by which colleges and

universities must abide in order to comply with Title IX.  On two of those occasions—in 1997 and 2001—OCR published notice of its proposed rules and provided an opportunity for comment, as required by 5 U.S.C. § 553.  ECF No. 22-2 ¶¶ 6-9 (1997 Guidance); ¶¶ 16-18 (2001 Guidance).  But on the third occasion—with the April 4, 2011, "Dear Colleague Letter" ("2011 DCL")—it did not, even though these most recent substantive rules effected sweeping new changes on campuses across the country.  The 2011 DCL styled itself as a "significant guidance document," Ex. 1 (2011 DCL) at 1 n.1, in accordance with the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, *see* 72 FR 3432, and claimed that it "does not add requirements to applicable law," Ex. 1 (2011 DCL) at 1 n.1.  Yet it acknowledged elsewhere that it "supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence."  In fact, it added numerous requirements to those contained in the 2001 Guidance. *See id.* at 2.

Despite OCR's claim that the 2011 DCL did "not add requirements to applicable law," *id.* at 1 n.1, multiple new provisions announced in the 2011 DCL constituted substantive rulemaking that required the 2011 DCL to be subjected to notice-and-comment rulemaking before its promulgation.  Unlike both the 1997 Guidance and the 2001 Guidance, however, it was not. Instead, OCR asked anyone "interested in commenting on this guidance" to "send an email with your comments to OCR@ed.gov" or mail in a letter.  *Id.*

Among other things, the 2011 DCL expressly required that schools adopt a preponderance of the evidence standard in their investigations of allegations of sexual misconduct: "OCR reviews a school's procedures to determine whether the school is using a

preponderance of the evidence standard to evaluate complaints." *Id.* at 10.  The 2011 DCL gave

schools no leeway in that regard:

> Thus, in order for a school's grievance procedures to be consistent with Title IX
> standards, the school *must* use a preponderance of the evidence standard (*i.e.*, it is
> more likely than not that sexual harassment or violence occurred). The "clear and
> convincing" standard (*i.e.*, it is highly probable or reasonably certain that the
> sexual harassment or violence occurred), currently used by some schools, is a
> higher standard of proof. *Grievance procedures that use this higher standard are*
> *inconsistent with the standard of proof established for violations of the civil rights*
> *laws, and are thus not equitable under Title IX.*  Therefore, preponderance of the
> evidence is the appropriate standard for investigating allegations of sexual
> harassment or violence.

*Id.* at 11 (emphasis added).

The 2011 DCL provided two bases for imposing the preponderance of evidence standard

on schools.  First, it noted that OCR uses that standard (a) "when it resolves complaints against

recipients," *i.e.*, educational institutions, alleging that they have failed to establish a grievance

regime that complies with Title IX, and (b) when it conducts "fund termination administrative

hearings."  *Id.*  But it never explained why using that standard to determine whether schools are

adequately complying with federal statutory and regulatory requirements, and whether they

should have their funding cut if they are not, relates in any way to whether that standard should

be used to determine whether someone committed sexual misconduct on a college campus.

Second, the 2011 DCL noted that the preponderance of the evidence standard is "the

standard of proof established for violations of the civil rights laws."  *Id.*  It never explained,

however, why only this aspect of federal civil rights lawsuits—and not other aspects, such as the

right to discovery, the right to the protections of the rules of evidence, or the right to cross-

examine other parties—had to be transposed into campus sexual misconduct investigations.  *See*

*id.*  The 2011 DCL, in fact, "strongly discourages schools from allowing the parties personally to

question or cross-examine each other during the hearing," even though parties to federal civil rights lawsuits have that right.  *Id.* at 12.

On April 29, 2014, OCR published a document signed by Defendant Lhamon titled "Questions and Answers on Title IX and Sexual Violence" (the "2014 Q&A").  That document, like the 2011 DCL, styled itself a "significant guidance document" that added no new requirements to applicable law.  Ex. 2 at i. n.1.  But the 2014 Q&A confirmed, beyond any doubt, that OCR understood the 2011 DCL to impose mandatory, substantive rules.  The most prominent among them was the requirement that schools use the preponderance of the evidence standard.  In a section titled "Title IX Procedural Requirements," it named preponderance of the evidence as "the evidentiary standard that *must* be used . . . in resolving a complaint[.]"  *Id.* at 13 (emphasis added).  The 2014 Q&A also confirmed what OCR had suggested in the 2011 DCL— that in OCR's view, the required use of the preponderance of the evidence standard is grounded in Title IX's requirement that grievance procedures provide for "prompt and equitable resolution" of allegations pursuant to 34 C.F.R. § 106.8(b).  The 2014 Q&A stated that "any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), *including applying the preponderance of the evidence standard of review*."  *Id.* at 14 (emphasis added).

The 2014 Q&A also spoke clearly as to what the 2011 DCL does *not* require of schools— *i.e.*, what constitute matters left to a school's discretion.  Investigations, for instance, "*may* include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.  Furthermore, neither Title IX nor the [2011] DCL specifies who should conduct the investigation."  *Id.* at 25 (emphasis added).  A school's flexibility in structuring its

investigative process, however, is expressly understood not to include the ability to select an

evidentiary standard:

> While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator.  A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions. Specifically:  . . . **The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings**, including any fact-finding and hearings.

*Id.* at 26 (emphasis added).

## III.   OCR'S ENFORCEMENT OF THE 2011 DCL

OCR has consistently treated the 2011 DCL's preponderance mandate as binding in both

its statements and its enforcement actions.

As the 2011 DCL itself acknowledged, some schools at the time the 2011 DCL was

promulgated were using evidentiary standards other than "preponderance of the evidence,"

which OCR alleged was in conflict with the 2001 Guidance.  *See* Ex. 1 (2011 DCL) at 11 ("The

'clear and convincing' standard . . . , currently used by some schools, is a higher standard of

proof.").  Several major universities, including Auburn University (Ex. 3), Columbia University

(Ex. 4), Cornell University (Ex. 5), Duke University (Ex. 6), Tulane University (Ex. 7), UVA

(Ex. 8), and West Virginia University (Ex. 9) used a "clear and convincing evidence" standard.

Princeton University used a similar "clear and persuasive evidence" standard (Ex. 10), and the

New Jersey Institute of Technology used a "reasonable certainty" standard (Ex. 11).  Consistent

with its dictate that only a preponderance of the evidence standard could allow for the "prompt

and equitable resolution" of sexual misconduct claims, OCR has, after investigation, reached

resolution agreements with schools that did not immediately comply with the 2011 DCL's

preponderance mandate.

For example, in a letter dated October 31, 2013, OCR notified the State University of

New York (SUNY) System that "[t]he grievance procedures used by" Buffalo State "do not

specify whether the arbitrator should use the preponderance of the evidence standard in

investigating allegations of sexual harassment," Ex. 12 at 9, and further that Morrisville State

College "fail[ed] to . . . use the preponderance of the evidence standard to investigate allegations

of sexual harassment," *id.* at 11-12.  It ordered the SUNY System to "[r]evise the SUNY System

grievance procedures to ensure that these comply with the requirements of Title IX; including

using the preponderance of the evidence standard to investigate allegations of sexual

harassment."  *Id.* at 18.

OCR also required Princeton University to change its standard of proof following the

2011 DCL.  *See* Ex. 13.  OCR informed Princeton, in a letter dated November 5, 2014, that its

policy "did not provide for an adequate, reliable and impartial investigation" of sexual

misconduct claims because, among other things, it "did not use the preponderance of the

evidence standard," but instead used the "clear and convincing evidence" standard.  *Id.* at 18.  In

a "Resolution Agreement" accompanying that letter, OCR required Princeton to adopt "the

proper standard of review of allegations of sexual misconduct (preponderance of the evidence)."

Ex. 14 at 8.

And in a letter dated December 30, 2014, OCR informed Harvard Law School (HLS) that

the sexual misconduct policy it continued to use after publication of the 2011 DCL "improperly

used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, in

violation of Title IX."  Ex. 15 at 3.  The letter reaffirmed that "[t]his higher standard of proof was

inconsistent with the preponderance of the evidence standard required by Title IX for

investigating allegations of sexual harassment or violence."  *Id.* at 10.  In the "Resolution

Agreement" made public with the letter, OCR ordered HLS "to submit to OCR," by January 15, 2015, procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include, among other things, "[a]n explicit statement that the preponderance of the evidence standard will be used for investigating allegations of sexual harassment or violence." Ex. 16 at 2-3.

OCR has also ordered at least two other schools to adopt grievance procedures that expressly forbid parties from directly cross-examining each other in sexual misconduct disciplinary hearings, despite the fact that the 2011 DCL states that personal cross-examination is only "strongly discourage[d]." Ex. 1 (2011 DCL) at 12.  In a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that "the parties may not personally question or cross-examine each other during a hearing." Ex. 17 at 3.  Similarly, in a Resolution Agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft Title IX grievance procedures that stated, "If cross-examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other." Ex. 18 at 2.  These actions leave no doubt that the new requirements of the 2011 DCL, including adoption of a preponderance of the evidence standard, are mandatory both in theory and in practice.

## IV.  UVA'S ADJUDICATION OF THE ALLEGATIONS AGAINST PLAINTIFF JOHN DOE UNDER THE 2011 DCL

Prior to the promulgation of the 2011 DCL, UVA used a "clear and convincing evidence" standard in the adjudication of sexual misconduct claims.  *See* Ex. 8 at 7-8.  Under UVA's sexual misconduct procedures at the time, the "clear and convincing evidence" standard was defined as a determination "that the claim is highly probable and has produced a firm belief or conviction

that the allegations in question are true." *Id.* UVA further described the "clear and convincing evidence" standard as "proof that requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id.* Just weeks after the 2011 DCL's promulgation, UVA adopted a "preponderance of the evidence" standard for its sexual misconduct proceedings, consistent with the 2011 DCL's mandate that schools apply that standard. *See* ECF No. 22-3 (Declaration of John Doe) Ex. A at 14. The revised UVA policy specifically noted that OCR "has interpreted Title IX to require schools to evaluate evidence of alleged Sexual Misconduct under a '*preponderance of the evidence*' standard and that is the standard adopted by this Policy." *Id.*

On or about March 6, 2015, a UVA law student, Jane Roe, filed a sexual misconduct complaint against Mr. Doe based on an incident that had allegedly taken place on August 23, 2013. *See* ECF No. 22-3 ¶ 5. Ms. Roe alleged that due to alcohol consumption, she could not effectively consent to the sexual activity that she engaged in with Mr. Doe on that date. *Id.* ¶ 6. Mr. Doe responded that Ms. Roe did not even appear to be intoxicated that night, much less incapacitated. *Id.*

A 3L at the time Ms. Roe filed her complaint, Mr. Doe was slated to graduate in just two months and begin a job in the Washington, D.C., office of a prominent national law firm. *Id.* ¶ 7. The investigation and adjudication of the allegations, however, would last nearly a year. *Id.* ¶ 8. Thus, despite having completed all of his coursework by May of 2015, Mr. Doe's degree was withheld while the investigation progressed, and his offer of employment was suspended pending receipt of his degree. *Id.* ¶ 9.

On January 20, 2016, Ms. Roe's claims were adjudicated during a nine-hour hearing. The adjudicator—a retired justice of the Supreme Court of Pennsylvania—called the matter a

"very close" and "very difficult case." *See id.* Ex. B at 1:15-16; 4:5. She found Mr. Doe

responsible, she said, because the evidence "slightly" tipped in favor of responsibility, *id.* at

3:17-20, and she was "require[d]" by "the Office of Civil Rights and the Department of

Education" to apply "the weakest standard of proof" available—preponderance of the

evidence—which is satisfied whenever the evidence is "tipped very slightly" in favor of

responsibility, *id.* at 1:17-23. The adjudicator also explained that the two other commonly used

evidentiary standards—the "clear and convincing" evidence standard and the "reasonable doubt"

standard—would "tip the scale much more," *id.* at 1:21-23, thereby indicating that, but for

UVA's mandated use of the preponderance standard, Mr. Doe would not have been found

responsible. After explaining why, in her view, the evidence before her "ma[d]e it slightly more

likely than not" that Mr. Doe had not properly obtained "effective consent" from Ms. Roe given

her alleged intoxication, *id.* at 3:17-20, the adjudicator again emphasized, at the end of her

ruling, that the case was a close one, noting that its closeness "will be reflected by me in any

sanction that I impose," *id.* at 4:6-10. After consulting with UVA's Title IX coordinator, the

adjudicator sanctioned Mr. Doe to four months of counseling and a lifetime ban from all UVA

property and activities. *See id.* Ex. C at 4. In a letter dated January 27, 2016, memorializing and

explaining her responsibility finding and sanctioning decision, the adjudicator confirmed that

"[f]irst and foremost" in her rationale for finding Mr. Doe responsible "[was] the requirement

that [she] use the preponderance of the evidence standard." *Id.* at 3.

In March 2016, UVA agreed to allow Mr. Doe to complete the counseling element of his

sanction on an accelerated basis, so that he could graduate and appear before the Virginia State

Bar's June "character and fitness" board if asked. *Id.* ¶ 25. After a hearing in June, that board

approved him to practice law in Virginia.  *Id.* ¶ 27.  Having passed the bar exam a year earlier,

Mr. Doe was finally licensed to practice law on July 15, 2016.  *Id.*

## V.  OKWU'S ABILITY TO AFFORD ITS STUDENTS FUNDAMENTAL FAIRNESS AFTER THE 2011 DCL

Students are not the only ones affected by the 2011 DCL's imposition of a preponderance

of the evidence standard.  Educational institutions, which are directly regulated by the Education

Department (and, accordingly, by OCR), have an interest in selecting evidentiary standards

tailored to their unique characteristics, history, and mission.  Indeed, as the 1997 Guidance

explained, "Procedures adopted by schools will vary considerably in detail, specificity, and

components, reflecting differences in audiences, school sizes and administrative structures, State

or local legal requirements, and past experience."  62 FR 12045.

With only about 1,700 students enrolled, Plaintiff Oklahoma Wesleyan University

("OKWU") is a small school.  *See* ECF No. 22-4 (Declaration of Dr. Everett Piper) at ¶ 3.  It is

also a religious school affiliated with The Wesleyan Church, a Christian denomination with a

"historical commitment and sensitivity to treating all persons fairly and as persons created in the

image of God," a commitment "informed by scripture and the historical tradition of the church."

*Id.* ¶¶ 4-5.  Also setting it apart from other colleges and universities that do not share OKWU's

religious mission and values, OKWU's codes of conduct for students, faculty, staff, and

administration prohibit engaging in premarital or extramarital sex, as well as prohibiting the

drinking of alcohol.  *See id.* Ex. 1 at 49.

Currently, OKWU is not in compliance with the 2011 DCL because it does not apply a

"preponderance of the evidence" standard in sexual misconduct proceedings and does not wish

to do so.  *Id.* ¶ 8-9, 11.  To sufficiently protect the rights of both accused students and their

accusers, it would like the freedom to apply and codify in its codes of conduct the "clear and

convincing evidence" standard for sexual misconduct proceedings on its campus.  *Id.* ¶ 11.  Yet

it is acutely aware of the steps OCR has taken to impose the requirements of the 2011 DCL,

including the use of the preponderance of the evidence standard.  *Id.* ¶ 12.  OKWU fears that it is

just a matter of time before OCR threatens it with enforcement action.  *Id.*

## STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[A]ll justifiable inferences" from the facts must be drawn in favor of the

nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

**I.     THE 2011 DCL'S PREPONDERANCE MANDATE IS PROCEDURALLY INVALID BECAUSE IT IS A LEGISLATIVE RULE THAT WAS NOT SUBJECTED TO NOTICE-AND-COMMENT RULEMAKING.**

The Administrative Procedure Act (APA) requires that agency rules be subjected to

notice-and-comment rulemaking unless they fall into one of four narrow exceptions.  5 U.S.C. §

553(b)(3)(A)-(B).  OCR has not expressly stated which exception(s) apply to the 2011 DCL in

general, or to the preponderance mandate in particular, but it has used language suggesting that

they are either exempt policy statements[6] or interpretative rules.[7]  What OCR has consistently

maintained, however, is that the 2011 DCL, including the preponderance mandate, "does not add

requirements to applicable law."  Ex. 1 (2011 DCL) at 1 n.1.

---

[6]  *See* Ex. 1 at 1 n.1 ("This letter does not add requirements to applicable law, but provides information and examples to inform the recipients about how OCR evaluates whether covered entities are complying with their legal obligations.").

[7]  *See id.* at 10-11 (purporting to derive the preponderance mandate from the "prompt and equitable resolution" provision of 34 C.F.R. § 106.8(b); Ex. 19 (Letter of Catherine E. Lhamon to Sen. James Lankford, February 17, 2016) at 4 (stating that the preponderance mandate flows from "OCR's construction of the Title IX regulation").

The case law, however, does not support that argument.  The preponderance mandate is not an "interpretation" of 34 C.F.R. § 106.8(b), because the term "prompt and equitable resolution" is far too vague to exempt its "interpretation" from notice-and-comment rulemaking, as the D.C. Circuit stated in *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494-95 (D.C. Cir. 2010) ("[A]s Professor Anthony has written, if the relevant statute or regulation 'consists of vague or vacuous terms—such as "fair and equitable," "just and reasonable," "in the public interest," and the like—the process of announcing propositions that specify applications of those terms is not ordinarily one of interpretation, because those terms in themselves do not supply substance from which the propositions can be derived.'") (quoting Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules, and "Spurious" Rules: Lifting the Smog,* 8 Admin. L.J. Am. U. 1, 6 n.21).  And it manifestly is not a policy statement because it binds universities in both language and practice.  *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) ("[T]he entire Guidance, from beginning to end… reads like a ukase.  It commands, it requires, it orders, it dictates.").  In fact, the mandate bears all the hallmarks of a quintessentially legislative rule: It makes substantive changes to a legislative rule, *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014), one that was *itself*—at least twice—amended by notice-and-comment rulemaking, as was an almost identically worded regulation administered by the Department through a different office.  And as explained above, the preponderance mandate so strongly implicates the interests that animate notice-and-comment rulemaking that properly treating it as a legislative rule is all the more important.  *See EPIC*, 653 F.3d at 6 ("regardless [of] whether" an agency rule created a "new substantive burden," it affected the public so deeply that it had to be treated as such).

### A.       The APA's Rulemaking Framework

The APA establishes a system for the enactment and review of agency rules.  A "rule" is defined by the APA to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. § 551(4).  As the definition indicates, it is possible for only part of an agency statement to be a "rule" for APA purposes.  *See Appalachian Power Co.*, 208 F.3d at 1021 ("Petitioners are not challenging the Guidance in its entirety.  Under the Administrative Procedure Act, a 'rule may consist of 'part of an agency statement of general or particular applicability and future effect….'") (quoting 5 U.S.C. § 551(4)).  "Rule making," as used in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule.  5 U.S.C. § 551(5).

Agency rules must result from a rulemaking procedure, either formal or informal.  *Id.* When a statute expressly requires that rules "be made on the record after opportunity for an agency hearing," they must be made through the formal procedures specified in 5 U.S.C. §§ 556 and 557.  *See id.* § 553(c); *U.S. v. Florida East Coast Railway Co.*, 410 U.S. 224, 237-38 (1973) (holding that formal rulemaking is required only when the statute mandates a pre-rule hearing on the record).  All other rules may be made through the informal procedures specified in 5 U.S.C. § 553.  If the statute does not require formal rulemaking, then the rule must be promulgated through the notice-and-comment process unless one of four exceptions (discussed below) apply. *See* 5 U.S.C. § 553(b).  During the notice-and-comment process, a "[g]eneral notice of proposed rule making shall be published in the Federal Register" and shall include, among other things, "the legal authority under which the rule is proposed" and "the terms or substance of the

proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(2)-(3).  After

publishing such notice, agencies "shall give interested persons an opportunity" to submit

"written data, views, or arguments." *Id.* § 553(c).  "After consideration" of the submissions

delivered to it, the agency "shall incorporate in the rules adopted a concise general statement of

their basis and purpose." *Id.*  The notice-and-comment process serves two purposes: "'to

reintroduce public participation'" on issues that have been delegated to a less politically

accountable institution, and to "assure[] that the agency will have before it the facts and

information relevant to a particular administrative problem, as well as suggestions for alternative

solutions." *Clarian Health W., LLC v. Burwell*, No. 14-CV-0339 (KBJ), ___F. Supp. 3d___,

2016 WL 4506969, at *10 (D.D.C. Aug. 26, 2016) (quoting *American Hosp. Ass'n v. Bowen*,

834 F.2d 1037, 1044 (D.C. Cir. 1987)).

Four kinds of rules are exempted from notice-and-comment rulemaking: "interpretative

rules, general statements of policy, [] rules of agency organization, procedure or practice," *id.* §

553(b)(3)(A), and rules which "the agency for good cause finds" that notice-and-comment would

be unnecessary or impractical, *id.* § 553(b)(3)(B).  The APA does not define any of those terms,

but "because the statutory exemptions represent a departure from the default notice-and-

comment requirement, the D.C. Circuit has instructed that 'the various exceptions . . . will be

narrowly construed and only reluctantly countenanced.'" *Clarian Health*, 2016 WL 4506969, at

*12 (quoting *N.J., Dep't of Envtl. Prot. v. U.S. Envtl. Prot. Agency*, 626 F.2d 1038, 1045 (D.C.

Cir. 1980)); *U.S. v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989).  A rule that fails to meet one

of these narrow exceptions is a legislative rule that must be subjected to notice-and-comment

rulemaking.  *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 34 (D.C. Cir. 2005).

It is undisputed that the Education Department did not subject the 2011 DCL to notice-and-comment rulemaking before issuing it. Whether its preponderance mandate was validly enacted, then, turns on whether it satisfies one of these four narrow exceptions. OCR has not identified which of the four exemptions apply, and its label would be of little consequence in any event, *see Clarian*, 2016 WL 4506969 at *9 ("no deference is owed to an agency's characterization of its own rule"). But what can safely be said is that the mandate fails to qualify under any of the exceptions listed in 5 U.S.C. § 553(b)(3).

### B.       The Preponderance Mandate Is Not an Interpretative Rule.

The preponderance mandate cannot be justified as an interpretative rule. "Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track[]' preexisting requirements and explain something the statute or regulation already required," *Mendoza,* 754 F.3d at 1021 (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227, 236–37 (D.C. Cir. 1992)). To satisfy that definition, an interpretative rule must do at least two things. First, the "statutory or regulatory term" that the rule purports to "clarify" must not be so vague that the rule's guidance cannot be derived from the meaning of the term, but instead must be derived from external sources such as policy judgments. *Mendoza,* 754 F.3d at 1021 ("To be interpretative, a rule 'must derive a proposition from an existing document whose meaning compels or logically justifies the proposition.'") (quoting *Catholic Health Initiatives,* 617 F.3d at 494). Second, the rule must not "supplement[] a statute, adopt[] a new position inconsistent with existing regulations, or otherwise effect[] a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021.

The preponderance mandate fails both of those tests.

17

**1.      The Term "Prompt and Equitable Resolution" Is Too Vague to Be Applied Through Interpretation.**

The only statutory or regulatory term OCR has pointed to in order to justify the preponderance mandate as an interpretative rule is 34 C.F.R. § 106.8(b), which states that schools must adopt grievance procedures that provide for the "prompt and equitable resolution" of sexual misconduct complaints.  *See* Ex. 1 (2011 DCL) at 6, 10-11 ("As noted above, the Title IX regulation [§ 106.8(b)] requires schools to provide equitable grievance procedures.").  To qualify as an interpretative rule, however, the preponderance mandate must somehow be "compel[led] or logically justifie[d]" by the meaning of the phrase "prompt and equitable resolution."  *Mendoza*, 754 F.3d at 1021.  Yet "prompt and equitable" is exactly the kind of phrase this Circuit has concluded is too vague to be applied through interpretation, *see Catholic Health Initiatives*, 617 F.3d at 495, and as discussed below, OCR did not derive the preponderance mandate from the actual meaning of that term.  Indeed, it is difficult to imagine how a newly mandated burden of proof could "clarify*" any* statutory or regulatory term, "remind" a party of anything, or "explain" something the party had to do anyway.  *Mendoza*, 754 F.3d at 1021.  It is the very definition of an independent, substantive legal requirement, and its addition to the Title IX regime required notice-and-comment procedures.

**a.      OCR Never Actually Tried to Interpret the Regulation.**

By now, courts and agencies have a well-defined set of tools for engaging in statutory and regulatory interpretation.  The "traditional tools of statutory interpretation" are the "text, structure, purpose, and legislative history" of a document.  *Consumer Elecs. Ass'n v. F.C.C.*, 347 F.3d 291, 297 (D.C. Cir. 2003).  Chief among those is a document's text, *id.* ("We begin, as always, with the plain language of the statute in question."), a fact that takes on added importance in this context, given that "interpretation," for notice-and-comment purposes, occurs

when the meaning of a statutory or regulatory term "compels or logically justifies" an outcome. *Mendoza*, 754 F.3d at 1021.

OCR did not attempt to use any of these tools when it issued the preponderance mandate, and its silence in that regard speaks volumes.  It did not analyze the text of the regulation, examine its structure, inquire into its purpose, or consider its legislative history.  What it did instead is point to reasons *external* to the regulatory term's meaning to explain why it believes the preponderance standard is appropriate.  It noted that preponderance of the evidence is the standard used in civil rights lawsuits, in OCR enforcement actions, and in OCR funding termination hearings.  *See* Ex. 1 (2011 DCL) at 10-11.  *But all of that would be true whether or not the regulation used the phrase "prompt and equitable resolution."*  No matter what the words of the regulation said, it would be true that civil rights lawsuits, OCR enforcement actions, and OCR funding termination hearings use the preponderance standard—which means that what OCR was doing when it explained its reasons for adopting the 2011 DCL was not "interpretation" for APA purposes. OCR had what it believed are good reasons for mandating the preponderance standard, but they were *external to the regulation*, and that manifestly carries the mandate outside the process of "clarify[ing] a statutory or regulatory term," "deriv[ing] a proposition" from the "meaning" of an existing document, or "linguistically" teasing out its meaning.  *See also Picciotto*, 875 F.2d at 347  (stating that the exemptions to notice-and-comment must be construed narrowly).

That OCR purports to derive so broad a range of regulatory guidance from the phrase "prompt and equitable resolution," *see* Ex. 1 (2011 DCL) at 8-14, is further proof that it is doing more than merely "interpreting."  Based on those four vague words alone, OCR also concludes that:

- "it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator," *id.* at 8;

- schools that "delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence . . . must promptly resume and complete its fact-finding for the Title IX investigation" when the police have finished gathering evidence, even when the criminal matter is still pending, *id.* at 10; and

- schools are "strongly discourage[d] [] from allowing the parties personally to question or cross-examine each other during the hearing," *id.* at 12.

Those propositions might be fair.  They might reasonably form part of a system that allows for the prompt and equitable resolution of sexual misconduct complaints.  But they manifestly are *not* interpretations of the linguistic meaning of one and the same regulatory term. It is impossible to draw that level of detail—let alone detail on such unrelated topics—simply by *interpreting* the phrase "prompt and equitable resolution."  *Cf. Catholic Health Initiatives*, 617 F.3d at 496 (holding that the regulatory term "reasonable cost" was too vague to give rise, by interpretation, to "the sort of detailed—and rigid—investment code" challenged there).  Those diverse propositions can only even arguably stem from the same regulatory phrase if that phrase is too broad to be the subject of interpretation.  And that is exactly why OCR never attempted to actually engage in interpretation when it promulgated the 2011 DCL.

> **b.** **This Court's Precedents Demonstrate That "Fair and Equitable Resolution" Is Language Too Broad to Exempt Agency Action from Notice-and-Comment Rulemaking**

Section 106.8(b) is simply too broad to be applied through interpretation in this manner. The D.C. Circuit has actually used a remarkably similar phrase—"fair and equitable"—as an example of the kind of "vague or vacuous term" that ordinarily does not authorize interpretative action exempt from the APA's notice-and-comment requirements:

> But as Professor Anthony has written, if the relevant statute or regulation "consists of vague or vacuous terms—such as 'fair and equitable,' 'just and reasonable,' 'in the public interest,' and the like—the process of announcing

> propositions that specify applications of those terms is not ordinarily one of interpretation, because those terms in themselves do not supply substance from which the propositions can be derived." *Lifting the Smog,* 8 Admin. L.J. Am. U. at 6 n. 21.

*Catholic Health Initiatives*, 617 F.3d at 494–95 (quoting Anthony, 8 Admin. L.J. Am. U. at 6 n.21); *id.* at 496 (holding that the regulatory phrase "reasonable cost" was too vague to give rise to "detailed—and rigid" agency rule by way of interpretation).  A number of statutes and regulations actually use the phrase "fair and equitable" in some form.[8]  In fact, the D.C. Circuit has considered at least three such statutes—two before, and one after *Catholic Health Initiatives*—and in all three instances the "fair and equitable" requirement was implemented through notice-and-comment rulemaking.  *See Mary V. Harris Foundation v. F.C.C.*, 776 F.3d 21, 22 (D.C. Cir. 2015) ("fair, efficient and equitable distribution"); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 148 (D.C. Cir. 1993) ("fairly and equitably"); *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 1007 n.10 (D.C. Cir. 1987) ("fair and equitable" rates).[9]  That is further evidence of what *Catholic Health Initiatives* said—that "fair and equitable" is too vague a statutory or regulatory term to apply through mere interpretation.

In *Paralyzed Veterans of America v. D.C. Arena L.P.*, the court struck down an alleged "interpretation" that was not subjected to notice-and-comment rulemaking: "If the statute or rule to be interpreted is itself very general, using terms like 'equitable' or 'fair,'

---

[8]  *See, e.g.*, *Massie v. U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 340, 357 n.13 (3d Cir. 2010) (considering 42 U.S.C. § 4621(b)'s language establishing "'a uniform policy for the fair and equitable treatment of'" certain persons); *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 16 (D.D.C. 2001) (concerning the requirement of 15 U.S.C. § 1681(b) that certain financial information be collected "in a manner which is fair and equitable to the consumer"); *Williams v. Nat'l Sch. of Health Tech., Inc.*, 836 F. Supp. 273, 278 (E.D. Pa. 1993) (concerning a regulation that required "schools to maintain a 'fair and equitable' refund policy,"), *aff'd*, 37 F.3d 1491 (3d Cir. 1994); *Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1226 (6th Cir. 1989) (noting the requirement in 39 U.S.C. § 3623(c)(1) that there be established a "a fair and equitable mail classification system").

[9]  See 50 FR 42408, 42409-10 (1985) for the notice-and-comment process regarding the "fair and equitable" requirement in *Associated Gas Distributors*.

and the 'interpretation' really provides all the guidance, then the latter will more likely be a substantive regulation."  117 F.3d 579, 588 (D.C. Cir. 1997), *abrogated on other grounds by Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015).  That is precisely the case here:  All of the "guidance" about what constitutes a "prompt and equitable resolution" of sexual misconduct claims, and why, comes from sources *outside the regulation* identified by the 2011 DCL.  *See* Ex. 1 (2011 DCL) at 10-11.  None of it comes from a parsing the phrase "prompt and equitable resolution."

Another judge of this Court, in a very recent case with remarkable similarities to the present one, also addressed the limits of an agency's power to "interpret" vague language.  In *Clarian Health West*, a hospital challenged a 2010 agency guidance document that purported to simply interpret a regulatory phrase that had been duly enacted several years earlier.  2016 WL 4506969 at *5.  The regulation and the guidance concerned the procedures by which the government could seek reimbursement for Medicare "outlier payments" through a process called "reconciliation."  The hospital complained that, while "the 2003 rule only generally authorized the reconciliation process . . .  and did *not* proceed to detail how the reconciliation process would operate in practice," the 2010 guidance added all of that detail but did so without subjecting it to notice-and-comment.  *Id.* at **5-6.  The court concluded that the statutory term on which the guidance relied—"marginal cost of care"—was "quite broad and d[id] not, *on its own*, suggest any particular application" of the statute.  *Id.* at 13 (emphasis added).  Rather, "giving effect to that term require[d] a series of interlocking policy and technical considerations," and therefore constituted a legislative act.  *Id.*  Whether the agency's policy choice ultimately made *substantive* sense didn't matter; the question before the

court was whether the *process* used to reach that decision complied with the APA.  *Id.* at *13 ("[T]he fact that the agency's policy choice is supported and justified does not make its decision merely interpretive (i.e., less substantive).").

The same reasoning applies perfectly to what OCR has done here.  It has attempted, through an informal guidance document, to supply rigid detail to a regulatory regime under the guise of interpreting a phrase that, under D.C. Circuit precedent, is too vague to give rise to that kind of application.  This is not an agency making a necessary choice between two potential meanings of a word or phrase; it is an agency stretching a vague phrase past its breaking point to circumvent notice-and-comment requirements.  Even if its decision were based on supportable reasons (and it is not), that would be irrelevant to the question whether what OCR did was interpret a regulation, or instead make the kind of legislative policy judgment that the APA requires agencies to let the public comment on.

### 2.     The Preponderance Mandate Adds a New Substantive Requirement to the Regulation.

Even if the term "prompt and equitable resolution" weren't too vague to be applied by way of mere interpretation, and even if OCR had attempted to base the preponderance mandate on an actual interpretation of that term, the mandate would still be a legislative rule for a second reason:  It "'effects a substantive regulatory change to the statutory regime.'"  *Mendoza*, 754 F.3d at 1021 (quoting *EPIC*, 653 F.3d at 6-7).[10]  If a rule effects a substantive change in the law or a policy, it is legislative, not interpretative.  *See id.* ("A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy.").  A substantive change occurs not only when new

---

[10]  *See* Gersen and Suk Gersen, *supra* n.5, at 901 (describing the preponderance mandate as an "invention of the purportedly nonbinding 2011 DCL").

legal requirements are added to a statutory or regulatory regime, but also when a policy

*substantially changes the experience of affected parties*.  *See EPIC*, 653 F.3d at 7 ("TSA's policy

substantially changes the experience of airline passengers and is therefore not merely

'interpretative' either of the statute directing the TSA to detect weapons likely to be used by

terrorists or of the general regulation requiring that passengers comply with all TSA screening

procedures.").

The preponderance mandate plainly added a substantive legal requirement to the

regulatory framework that existed before it.  The 2001 Guidance, which was subjected to notice-

and-comment rulemaking, did not require schools to adopt any particular evidentiary standard.

Rather, it simply told schools that, in determining whether a school's grievance procedures were

prompt and equitable, it would consider a handful of specified factors, none of which were

individually mandated, but all of which would be considered together.  Ex. 20 (2001 Guidance)

at 20.  Not only did it not require that schools adopt any particular evidentiary standard, but *it*

*also didn't even identify the evidentiary standard as one of the factors it deemed important in*

*considering whether a school's procedures were prompt and equitable.  Id.*

The 2011 DCL's requirement that schools adopt the preponderance standard in order for

their grievance procedures to be deemed "fair and equitable" constituted a substantive change to

the Title IX regulatory regime under this Circuit's standards.  In *CropLife Am. v. E.P.A.*, the D.C.

Circuit held that an agency rule was substantive, and thus required notice-and-comment

procedures, for reasons that apply with equal force to the preponderance mandate:

> The disputed directive constitutes a binding regulation that is directly aimed at
> and enforceable against petitioners.  It provides that the Agency will not consider
> or rely on any [third-party] human studies in its regulatory decision making.  This
> clear and unequivocal language, which reflects an obvious change in established
> agency practice, creates a binding norm that is finally determinative of the issues
> or rights to which it is addressed.

329 F.3d 876, 881 (D.C. Cir. 2003) (internal citations and quotation marks omitted).  Especially

relevant here is what that "obvious change in established agency practice" consisted of:

> The directive in the Press Release differs markedly from the agency's past
> statements, because the new rule clearly represents the first time that the agency
> has adopted an unequivocal, wholesale ban on the consideration of third-party
> human studies.

*Id.* at 884.  All of those elements are present here**.**  The preponderance mandate:

- is "directly aimed at and enforceable against" Plaintiff OKWU;
- uses "clear and unequivocal" mandatory language; and
- "reflects an obvious change in agency practice"; because it
- "clearly represents the first time that the agency has adopted an unequivocal, wholesale ban on" the use of any other evidentiary standard.[11]

OCR "may not escape . . . notice and comment requirements . . . by labeling [this] major

substantive legal addition to a rule a mere interpretation."  *Appalachian Power Co.*, 208 F.3d at

1024.  Yet that is exactly what it is trying to do here.

The preponderance mandate not only constitutes a formal change to the Title IX

regulatory regime; it also "substantially changes the experience of" regulated entities that did not

previously use the preponderance standard, and the students at those entities, "and is therefore

not merely 'interpretative.'"  *EPIC*, 653 F.3d at 7.  *EPIC* is particularly instructive in that regard.

There, the plaintiffs challenged TSA's decision to begin implementing a statutory directive to

---

[11] *See also Mendoza*, 754 F.3d at 1022 (holding that a rule amounted to a substantive change
because it "supplement[ed] the statute by imposing specific duties on employers seeking
certification under the statute"); *Appalachian Power Co.*, 208 F.3d at 1024 (holding that 19-page
EPA guidance purporting to interpret regulatory term "periodic monitoring" was in fact a
substantive addition to a rule that had to be subjected to notice-and-comment).  *Indeed, the very
language the 2011 DCL used to describe acceptable grievance procedures proves that OCR
recognized it was imposing a change on the range of options available to schools.*  Whereas the
1997 Guidance and 2001 Guidance stated that grievance procedures "will vary *considerably* in
detail, specificity, and components," *see* 62 FR 12045 (1997 Guidance, emphasis added); Ex. 20
at 20 (2001 Guidance, emphasis added), the 2011 DCL states only that they will "vary," omitting
the word "considerably."  Ex. 1 (2011 DCL) at 9.

"deploy[]" technology that "detects nonmetallic, chemical, biological, and radiological weapons" by using advanced imaging technology (which produced an image of each passenger's body) rather than magnetometers. *Id.* at 3. The government argued that in doing so, TSA was merely interpreting that statutory directive, and therefore that its rule in that regard was exempt from notice-and-comment rulemaking. *Id.* at 6-7. Indeed, using advanced imaging technology is obviously consistent with the statute, a point even the plaintiff appeared not to dispute. But because it effected so substantial a change in the experience of affected parties, it was nevertheless found to be a substantive rule. And in that respect, it directly mirrors the preponderance mandate. That mandate might be *consistent* with the regulatory phrase "prompt and equitable resolution," but it is not an *interpretation* of it; the mandate dramatically changes the experience of regulated entities and their students.

*     *     *

The D.C. Circuit has warned of the serious consequences that flow when a court improperly labels an agency rule as an interpretive rule: "If a court mistakenly gives an agency interpretation the force of law, 'an especially odious frustration is visited upon the affected private parties: they are bound by a proposition they had no opportunity to help shape and will have no meaningful opportunity to challenge when it is applied to them.'" *National Family Planning and Reproductive Health Ass'n, Inc.*, 979 F.2d at 240 (quoting Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 YALE J. ON REG. 1, 58 (1990)). The preponderance mandate is not an interpretative rule, and that harm will be—and has been—visited upon countless affected individuals if this Court allows Defendants to continue acting in defiance of the APA.

### C.     The Preponderance Mandate Is Not a Policy Statement.

The 2011 DCL labeled itself as "policy guidance [designed] to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce," *see* Ex. 1 (2011 DCL) at 1 at n.1.  But "an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in away that indicates it is binding."  *EPIC*, 653 F.3d at 7.  Because the preponderance mandate is binding both on its face and as applied by OCR, it is not a policy statement.

### 1.     The Preponderance Mandate Is Binding on Its Face Because It Is Cast in Mandatory Language.

The use of "mandatory, definitive language" is "a powerful, even potentially dispositive, factor suggesting that" a rule is legislative, and not a policy statement.  *Community Nutrition Institute v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987).  The 2011 DCL employs precisely such language with respect to the preponderance mandate:  Schools "must use a preponderance of the evidence standard," it says, before declaring that using the clear and convincing evidence standard is "not equitable under Title IX."  *See* Ex. 1 (2011 DCL) at 10-11.  The 2011 DCL's use of mandatory language in that regard is conspicuous:  It is one of only a few provisions in the entire 2011 DCL cast in mandatory language.  OCR reaffirmed that in the 2014 Q&A: In three different places, the Q&A stated that schools "must" use a preponderance of the evidence standard in resolving complaints of sexual misconduct.  *See* Ex. 2 (2014 Questions & Answers) at 13, 14.

That imperative language is enough to render the preponderance mandate a binding rule, not a policy statement.  The use of the word "must," like "[t]he use of the word 'will[,]' suggests

the rigor of a rule, not the pliancy of a policy." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21 (D.C. Cir. 1988). "It is enough for the agency's statement to 'purport to bind' those subject to it, that is, to be cast in 'mandatory language' so 'the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences.'" *EPIC*, 653 F.3d at 7 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383-84 (D.C. Cir. 2002)); *see also CropLife Am.*, 329 F.3d at 881 (stating that "clear and unequivocal" mandatory language "directly aimed at and enforceable against petitioners" which "reflect[ed] an obvious change in established agency practice" was a binding rule, not a statement of policy).

### 2.    The Preponderance Mandate Is Also Binding in Practice.

The preponderance mandate is not just binding in theory; it is also binding in practice, as OCR has shown repeatedly. As noted above in Section III of the Background, on at least three occasions since 2011, OCR has enforced the mandate against schools that did not previously use it. In fact, just yesterday, OCR found the City University of New York system in violation of Title IX because, among other things, one set of its procedures failed to say that it used the preponderance standard, and that silence "may lead someone not to know what standard to use or to conclude a different standard of proof can be used." Ex. 21 at 11. In none of those letters or resolution agreements is there anything suggesting that the particulars of a school's size, budget, other grievance procedures, or anything else unique to the school were considered before OCR decided to impose the preponderance standard. In each of them, OCR simply stated that the school's previously applied, higher standard was inappropriate or inconsistent with Title IX and ordered the schools to change. Imposing the 2011 DCL as mandatory makes it a legislative rule with the force of law, not merely a non-binding policy statement. *See Gen. Elec. Co.*, 290 F.3d at 385 ("In sum, the commands of the Guidance Document indicate that it has the force of law.

On its face the Guidance Document imposes binding obligations upon applicants to submit applications that conform to the Document. . . .   This is sufficient to render it a legislative rule."); *see also National Family Planning and Reproductive Health Ass'n, Inc.*, 979 F.2d at 239 (holding that "a rule that 'substantially curtails EPA's discretion in delisting decisions and accordingly has present binding effect,' is a legislative rule") (quoting *McLouth Steel Products Corp.*, 838 F.2d at 1322).

### D.      The Preponderance Mandate Is Not a Procedural Rule.

The preponderance mandate also is not a "rule[] of agency organization, procedure or practice"—*i.e.*, a procedural rule. 5 U.S.C. § 553(b)(3)(A).  "Procedural rules are agency provisions that are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties.'"  *Clarian*, 2016 WL 4506969 at *15 (quoting *Mendoza*, 754 F.3d at 1023).  To determine whether a rule qualifies as procedural, courts often inquire into "whether the agency action . . . encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior."  *Id.* (citing *Am. Hosp. Ass'n.*, 834 F.2d at 1047).

The 2011 DCL has nothing to do with OCR's internal operating procedures.  It is outwardly focused, expressly telling schools that they must publish grievance procedures, and that those procedures must state that a preponderance of the evidence standard will be used.  By its terms, the preponderance mandates reaches far beyond internal agency practice and supplants the decision-making process of schools.  The preponderance mandate is meant to, and in fact does, establish rights and responsibilities.  In both theory and practice, it "puts a stamp of approval or disapproval on a given type of behavior"—specifically, adoption of the

preponderance standard instead of some other evidentiary standard.  *Id.*; *see also supra* Section

I.C.2.

E.     **The Preponderance Mandate Is Not Excused From Notice-and-Comment Rulemaking for Good Cause.**

Nor is the preponderance mandate otherwise excused from notice-and-comment

requirements for good cause.  That exception requires an agency to "incorporate[] the finding [of

good cause] and a brief statement of reasons therefore in the rules issued."  5 U.S.C. §

553(b)(3)(B).  The 2011 DCL contains no such finding or statement.

F.     **The Preponderance Mandate Bears Directly on the Interests Furthered By Notice-and-Comment Rulemaking.**

Given how directly the preponderance mandate bears on the interests that animate notice-

and-comment rulemaking, it is all the more important that Defendants be held to the APA's

requirements.  *See EPIC*, 653 F.3d at 6 (noting that TSA's proposed body scanners

"substantively affect[ed] the public to a degree sufficient to implicate the policy interests

animating notice-and-comment rulemaking").  What the *EPIC* court said about airport security

screening applies, with almost no alteration, to OCR's regulation of college life:

> [F]ew if any regulatory procedures impose directly and significantly upon so
> many members of the public.  Not surprisingly, therefore, much public concern
> and media coverage have been focused upon issues of privacy, safety, and
> efficacy, each of which no doubt would have been the subject of many comments
> had the TSA seen fit to solicit comments upon a proposal to use AIT for primary
> screening.

*Id.*  The *EPIC* court looked askance at the route TSA had used to avoid subjecting so important

an issue for public consideration:

> The purpose of the APA would be disserved if an agency with a broad statutory
> command . . . could avoid notice-and-comment rulemaking simply by
> promulgating a comparably broad regulation . . . and then invoking its power to
> interpret that statute and regulation in binding the public to a strict and specific set
> of obligations.

*Id.* at 7.  That sort of evasion is exactly what OCR is trying to accomplish here.  And it is the kind of end-run around basic principles of democratic governance that the D.C. Circuit has lamented more than once:

> The phenomenon we see in this case is familiar.  Congress passes a broadly worded statute.  The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like.  Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations.  One guidance document may yield another and then another and so on. . . .  Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations. . . .  The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

*Appalachian Power Co.*, 208 F.3d at 1020; *see also Mendoza*, 754 F.3d at 1022.

That is precisely what OCR has done.  It has purported to mandate detailed substantive obligations, on a wide range of topics pertaining to sexual misconduct investigations and adjudications, simply by interpreting the phrase "prompt and equitable"—a phrase almost identical to one the D.C. Circuit has held up as paradigmatic of the kind of term that *cannot* exempt agency rulemaking from notice-and-comment procedures.  And in the process, it has denied a deeply affected public—including students, faculty, administrators, alumni, institutions, parents, victim advocates, and civil liberties groups—the right to participate in the rulemaking process.  The 2011 DCL's preponderance mandate must be vacated unless and until Defendants give the public that opportunity. *See, e.g.*, *Picciotto*, 875 F.2d at 346 ("A rule which is subject to the APA's procedural requirements, but was adopted without them, is invalid.").

II.    **THE 2011 DCL'S PREPONDERANCE MANDATE IS SUBSTANTIVELY INVALID BECAUSE IT EXCEEDS THE EDUCATION DEPARTMENT'S AUTHORITY TO IMPLEMENT TITLE IX.**

Even if the preponderance mandate had been validly promulgated, it would still be invalid because it exceeds the Secretary's statutory authority to enforce Title IX.  5 U.S.C. § 706(2)(C).  *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 419 (D.C. Cir. 1994) (noting that an "authoritative interpretation" of a regulation would still be invalid if it exceeded the agency's statutory authority).  Title IX empowers the Education Department to ensure that no person, "on the basis of sex," be excluded from participation in, denied the benefits of, or be subjected to any discrimination under any federally funded educational program or activity.  But evidentiary standards are not assigned based on sex and do not discriminate based on sex.  They are burdens of proof borne by complainants vis-à-vis respondents.  Students of both sexes can be, and are, both complainants and respondents in campus sexual misconduct disciplinary proceedings.

Of course, the Education Department has fleshed out Title IX's bar on sex-based discrimination in its implementing regulations, and OCR rests its nationwide imposition of the preponderance mandate on the regulatory requirement that schools publish grievance procedures that provide for the "prompt and equitable resolution" of sex discrimination complaints.  *See* Ex. 1 (2011 DCL) at 10 (citing 34 C.F.R. § 106.8(b)).  But even assuming those regulations are valid applications of Title IX's ban on sex discrimination, they do not serve to bring an evidentiary standard, or any particular procedures of campus adjudicatory processes, within the ambit of authority delegated to the Education Department to enforce it.  And the best evidence of that comes from the Department itself.

34 C.F.R. Part 106 is not the only source of authority through which the Department regulates campus sexual misconduct disciplinary procedures.  The Violence Against Women Act (VAWA) requires schools to publish disciplinary procedures that "provide a prompt, fair, and impartial investigation and resolution" of campus sexual misconduct claims, 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa), an obligation almost identical to the one found in 34 C.F.R. § 106.8(b). VAWA's implementing regulations carry the same mandate that school disciplinary policies contain "a prompt, fair, and impartial process from the initial investigation to the final result." 34 C.F.R. § 668.46(k)(2)(i)—again, a mandate virtually identical to the one in which the preponderance mandate has been grounded.

When VAWA was being reauthorized in 2013, the Department proposed various amendments to its implementing regulations and put them through notice-and-comment.  *See* 79 Fed. Reg. 35418.  During that process, the Department rejected a request from commenters that the regulations specify that a "prompt, fair, and impartial" disciplinary process must include the right, by either party, to appeal an adverse institutional decision.  Doing so, it said, would exceed its statutory authority:

> Lastly, we disagree with the commenters who recommended that the final regulations should provide the accused or the accuser with the right to appeal the results of an institutional disciplinary proceeding.  *We do not believe we have the statutory authority to require institutions to provide an appeal process.*

79 Fed Reg. 62752, 62775 (emphasis added).

That the Department would believe it lacked the authority "to require institutions to provide an appeal process" under VAWA suggests that it would also lack the authority to impose an evidentiary standard, or any other concrete procedure that might be part of a disciplinary process, under Title IX.  At a minimum, it shows that the Department is taking inconsistent positions with respect to virtually identical regulatory language.  The right to an appeal, like the

use of any given evidentiary standard, is just one procedural safeguard among many designed to

ensure that adjudication processes are fair and reliable.  The difference is that "[t]he right to

appeal at least once without obtaining prior court approval," unlike use of the preponderance

standard, "is nearly universal."  Harlon Leigh Dalton, *Taking the Right to Appeal (More or Less)*

*Seriously*, 95 YALE L.J. 62, 62 (1985).  The right "has become, in a word, sacrosanct."  *Id.*; *see*

*also* Section III., *infra* (discussing other evidentiary standards used in American law).  It is

guaranteed to parties in civil lawsuits, including lawsuits enforcing civil rights.  *See* Fed. R. App.

P. 4(a).  There is no logical basis to conclude that while imposing an appeal right would exceed

the Department's authority to require "prompt . . . and fair" grievance procedures, imposing an

evidentiary standard would not exceed the Department's authority to require "prompt and

equitable" grievance procedures.

How the Department itself has articulated the limits of its authority under VAWA thus

suggests that its authority is similarly limited under Title IX.  That is especially true given that

the VAWA regulation, unlike the Title IX regulation, parrots the statutory text it implements

almost word for word:[12]

| 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) (emphasis added) | 34 C.F.R. § 668.46(k)(2)(i) (emphasis added) |
| --- | --- |
| "Procedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking [] shall include a | "[P]rocedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, or stalking, as defined in paragraph (a) of this section . . . will . . . [p]rovide[] that the proceedings will |

[12]  For that reason, the Department's interpretation of the VAWA regulations would not be
accorded *Auer* deference.  *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
769 F.3d 1127, 1135–36 (D.C. Cir. 2014) ("[W]here 'the underlying regulation does little more
than restate the terms of the statute itself [,]" the agency has left the statute as it found it, adding
nothing material to Congress's language and providing nothing of its own in which to ground an
interpretation to which a court might defer.'") (quoting *Gonzales v. Oregon*, 546 U.S. 243, 257
(2006)).  Granting the Department that kind of deference for its interpretation of an almost
identical regulation here would permit an end run around *Gonzales*.

| clear statement that such proceedings shall provide a *prompt, fair, and impartial investigation and resolution.*" | [i]nclude a *prompt, fair, and impartial process from the initial investigation to the final result.*" |
|---|---|

Thus, following the Department's own logic regarding its VAWA authority, even if the "prompt and equitable" requirement had been written directly into Title IX, the preponderance mandate would still exceed the Education Department's statutory authority, because it exceeds the Department's authority under another statute that contains almost exactly the same wording. Imposing the preponderance mandate exceeds the Department's authority under Title IX all the more, given that the "prompt and equitable" provision on which the mandate is based is one step removed from the actual statute.

The VAWA regulations suggest the limit to which the Education Department can go in implementing Title IX through its "prompt and equitable" regulatory language: They require only that grievance procedures "[d]escribe[] the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking." 34 C.F.R. § 668.46(k)(1)(ii). To the extent that the Department thinks that evidentiary standards higher than preponderance are problematic (regardless of the other procedures with which they co-exist), that requirement provides some remedy: It would ensure that students know the evidentiary standard used by their school and could lobby for change if they didn't like it. It is precisely that kind of public participation, particularly by those most directly affected, that notice-and-comment rulemaking is meant to foster, and that the Education Department can encourage through disclosure requirements like the one above. What it cannot do is mandate from afar the adoption of any particular standard.

## III.   THE 2011 DCL'S PREPONDERANCE MANDATE IS ARBITRARY AND CAPRICIOUS.

Yet even if the preponderance mandate were a validly enacted agency rule, and even if imposing an evidentiary standard on almost every university in the country didn't exceed the Secretary's delegated powers, the mandate should still be declared invalid because OCR has failed to offer a rational basis for imposing it nationwide.  The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  Although "[t]he scope of review under the 'arbitrary and capricious, standard is narrow, and a court is not to substitute its judgment for that of the agency," an agency rule must "[n]evertheless" be invalidated when the agency "fails to examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).  "In reviewing an agency's explanation" of a rule, courts therefore must "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System,* 419 U.S. 271, 285 (1974)).

If an agency, in promulgating a rule, "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the rule "[n]ormally" will be declared "arbitrary and capricious."  *Id.*  As all of that suggests, a challenged agency rule may be upheld only if the reasons offered in its support *by the agency* (and not its lawyers) are adequate to justify it.  *Id.* ("We may not supply a reasoned basis

for the agency's action that the agency itself has not given.") (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947)).

The preponderance mandate is arbitrary and capricious for at least two reasons: Defendants have offered no reasoned explanation for its imposition, and they have failed to consider the impact it has on smaller schools with fewer resources.

### A.    Defendants Have Failed to Offer Any Reasoned Explanation in Support of the Preponderance Mandate.

The 2011 DCL offers three reasons in support of a nationwide preponderance mandate. First, "[t]he Supreme Court has applied a preponderance of the evidence standard in civil litigation involving [sex] discrimination under Title VII of the Civil Rights Act of 1964."  Ex. 1 (2011 DCL) at 11-12.  Second, "OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients"—that is, when determining whether schools receiving federal funding are in compliance with Title IX.  *Id.* at 12.  And third, "OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings," through which OCR has the power to deny schools federal funding.  *Id.*

The first of those justifications is the most important; it is also repeated in the 2011 DCL at the end of its explanation for this nationwide mandate, *see id.*, and was largely the focus of a letter sent by Defendant Lhamon in response to an inquiry from Senator James Lankford, the Chairman of the Senate's Subcommittee on Regulatory Affairs and Federal Management, into the propriety of OCR's imposition of the preponderance standard.  *See* Ex. 19 (Letter of Catherine E. Lhamon to Hon. James Lankford, February 17, 2016).  Defendant Lhamon's letter also noted that, on two occasions before publication of the 2011 DCL, regional offices of OCR had told schools to adopt a preponderance of the evidence standard.  *See id.* at 3 n.17.

None of these justifications show the Education Department to have engaged in actual, reasoned decision-making when it adopted the preponderance mandate.

### 1. It is arbitrary and capricious to impose just one element of federal civil rights suits on school disciplinary proceedings.

OCR's primary justification for the preponderance mandate is that preponderance is the evidentiary standard used in civil rights lawsuits and lawsuits under statutes analogous to Title IX. *See* Ex. 1 (2011 DCL) at 10-11. But it doesn't at all follow that campus disciplinary proceedings, which come with wildly different (and lesser) procedural protections, should adopt that standard. No student, for example, can violate Title IX; it is the schools that are regulated by Title IX and that would be a party in any federal civil rights lawsuit. And many civil proceedings that risk substantial stigma to a party use a "clear and convincing evidence" evidentiary standard. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 757 (1982) (listing examples). Campus sexual misconduct proceedings, of course, carry those same risks.[13] It is no coincidence that UVA and many other schools used a clear and convincing evidence standard before the 2011 DCL. Defendants have entirely failed to explain why civil rights lawsuits are the most proper source for the burden of proof that should govern campus disciplinary proceedings at virtually every college in the country.

But even assuming they are, OCR's justification for the preponderance mandate proves far too much, because it can't explain why other, *equally fundamental* elements of civil rights lawsuits aren't also required in order to make campus grievance procedures equitable:

---

[13] *See, e.g.*, *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 613 (E.D. Va. 2016) ("Here, the undisputed record facts reflect that plaintiff was expelled from GMU on a charge of sexual misconduct. Such a charge plainly calls into question plaintiff's 'good name, reputation, honor, or integrity.'"); *Starishevsky v. Hofstra Univ.*, 612 N.Y.S.2d 794, 801 (Sup. Ct. 1994) (acknowledging "the stigmatizing (unfortunate as this observation may be, it is true) nature of" university sexual misconduct complaints); *cf. Albert v. Carovano*, 824 F.2d 1333, 1338 n.6 (2d Cir. 1987) (finding a protected liberty interest at stake because of the "stigma" attached to disciplinary suspension from college).

- **Grievance procedures that do not afford parties the protections of the Federal Rules of Evidence** are "inconsistent with" the evidentiary rules "established for violations of the civil rights laws," and thus, by OCR's reasoning, are "not equitable under Title IX," yet OCR does not mandate that schools adopt them.

- **Grievance procedures that do not allow accused parties standard discovery tools to collect evidence in their defense** are "inconsistent with" the discovery rules "established for violations of the civil rights laws," and thus, according to OCR, must "not [be] equitable under Title IX," yet OCR has not mandated that schools allow for discovery.

- **Grievance procedures that do not mandate adjudication by a jury of one's peers** are "inconsistent with" the rules "established for violations of the civil rights laws, yet OCR does not mandate that schools adopt them—even though the Supreme Court itself has expressly said the jury's purpose is "to assure a fair and equitable resolution of factual issues" in both "criminal and civil cases." *Colgrove v. Battin*, 413 U.S. 149, 157 (1973).

- **Grievance procedures that do not allow for direct cross-examination** are "inconsistent with" the cross-examination procedures "established for violations of the civil rights laws," yet OCR not only has refused to mandate them, but has "strongly discourage[d]" them in theory, *see* Ex. 1 (2011 DCL) at 12, and effectively outlawed them in practice, *see* Ex. 17 (Resolution Agreement with Rockford University, April 24, 2015) at 3; Ex. 18 (Resolution Agreement with Southern Virginia University) at 2.

- **Finally, grievance procedures that do not guarantee a right to appeal** are "inconsistent with" the appellate rules "established for violations of the civil rights laws," and thus, OCR must conclude, "not equitable under Title IX," yet not only has OCR not attempted to mandate them, but the Education Department believes that it actually lacks any authority to do so. *See* Section II, *supra*.

The Department's decision to treat this single aspect of federal civil rights suits differently from every other element of those suits, without explanation, is arbitrary and capricious. *See Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("'A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.'") (quoting *Transactive Corp. v. United States,* 91 F.3d 232, 237 (D.C. Cir. 1996)).[14]

---

[14] The point is not that direct cross-examination should be allowed.  There are good reasons to question whether and when it should be permitted.  But that has to be balanced against the evidentiary standard used, to make sure the entire set of procedures allows for equitable—that is, fair—resolution of sexual misconduct claims.

Defendants have offered literally no explanation for why the preponderance standard—which in civil rights lawsuits is paired with a host of procedural protections such as the rules of evidence, cross-examination, and discovery—should apply in the campus context with precisely *none* of these protections.  If they had explained why reputational concerns don't suggest that a higher evidentiary standard is appropriate, and if they had explained why evidentiary standards can be viewed apart from all of the other procedures they inevitably coexist with, Defendants might theoretically have offered a reasoned explanation for their action.  But they failed to do that, and it is too late now.

> **2.      Proceedings to determine whether institutional actors have complied with statutory and regulatory requirements bear no legal similarity to school disciplinary tribunals.**

OCR's second justification for the preponderance mandate—that it is the standard used by OCR in its own enforcement and funding termination proceedings—does nothing to explain the mandate, because those proceedings look absolutely nothing like campus disciplinary proceedings.  The question asked by the former is whether a school responded with deliberate indifference to sexual misconduct, *see Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 648-49 (1999), or whether it failed to abide by any of OCR's regulatory requirements.  The focus is at least partially, and often primarily, legal; any factual inquiry centers on what steps the school took (or didn't take) to comply with statutory or regulatory requirements.  Campus disciplinary hearings, by contrast, ask a very different question—Did Student A commit sexual misconduct against Student B?—and they center on classic factual determinations, such as the consistency of testimony and the credibility of witnesses.  Moreover, given the nature of sexual activity, there are often no witnesses to the alleged misconduct other than the people involved in it.  Finally, the consequences for schools that are disciplined by OCR are vastly different from the consequences

suffered by a student found responsible for sexual assault.  That OCR chooses to use the

preponderance standard in entirely unrelated proceedings that examine entirely different conduct

in an entirely different context has no bearing on whether its decision to impose that standard on

campus sexual misconduct proceedings is reasonable.

> **3.** **The fact that regional offices twice in 16 years told schools to adopt a preponderance mandate is not evidence that a nationwide mandate predates the 2011 DCL.**

Defendants attached to their motion to dismiss two letters—the same two identified by

Defendant Lhamon for Senator Lankford—sent to two different schools before the 2011 DCL

was promulgated, informing them that the preponderance standard had to be used in order to

comply with the regulatory requirement that grievance procedures provide for the "prompt and

equitable resolution" of complaints.  *See* ECF No. 19-4.  But neither letter explains why that is

so.  The letter to Evergreen State College from Gary D. Jackson, a Regional Civil Rights

Director based in Washington State, at the conclusion of an investigation in 1995, states simply,

"The Title IX regulation requires that the resolution process provided for in a recipient's

grievance procedures be equitable or fair or just.  The evidentiary standard of proof applied to

Title IX actions is that of a 'preponderance of the evidence.'"  *Id.* at 12.  It provides no

explanation why that is so.  The same is true in the letter sent to Georgetown University out of

OCR's D.C. office by Sheralyn Goldbecker, a Team Leader in that office:  It states only that "the

preponderance of the evidence" is "the appropriate standard under Title IX for sex discrimination

complaints."  *Id.* at 22.  Both letters, in other words, state only the authors' conclusions about the

appropriate standards, not their premises.  But it is the premises that an agency must supply in

order to show that its actions are, in fact, the product of reasoned decision-making.

Moreover, it is simply false to suggest that these two letters prove that the nationwide preponderance mandate predated the 2011 DCL.  They are simply letters from two regional offices, and nothing more.  Another pre-2011 regional office letter, for example, directly contradicts a core theme of the 2011 DCL.  In an August 30, 2005, letter to Buffalo State College, the director of OCR's New York Office informed the school of the results of its investigation into whether the school had violated Title IX by failing to investigate a complainant's allegation that another student sexually assaulted her.  Ex. 22 at 1.  The Office found no violation.  It reasoned, in part, "The College was under *no obligation to conduct an independent investigation* of the allegation of sexual assault, as it involved a possible violation of the penal law, the determination of which is the exclusive province of the police and the district attorney."  *Id.* at 3 (emphasis added).  Contrast this with the following passage from the 2011 DCL: "As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its *independent Title IX obligation to investigate the conduct*."  Ex. 1 (2011 DCL) at 4 (emphasis added).  In short, these letters from regional OCR offices are just that—letters from regional OCR offices.[15]  They do not support Defendants' actions here.

Because Defendants offer no reasoned explanation for imposing the preponderance mandate on virtually every college in the country, regardless of its individual circumstances, it must be invalidated.  *Cty. of Los Angeles*, 192 F.3d at 1021 ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action.") (internal quotation marks omitted).

---

[15]  Indeed, in a Dear Colleague Letter issued by OCR on January 25, 2006, OCR itself acknowledged that "OCR resolution letters" like the ones cited in the 2001 Guidance "are fact-specific statements of the investigative findings and dispositions in individual cases *and are not formal statements of OCR policy*."  *See* Stephanie Monroe, Ass't Sec'y for Civil Rights, Dear Colleague Letter (Jan. 25, 2006) (attached as Ex. 23) (emphasis added).

**B.      Defendants Have Failed to Consider the Burden on Small Schools in Trying to Afford Students Fundamental Fairness in the Face of a Low Evidentiary Standard.**

The 2011 DCL gives no indication that it considered the effect its preponderance mandate might have on small schools, or indeed on any subset of the nation's colleges and universities.  It reasoned (if at all) only on the categorical level, imposing its mandate on all schools based solely on the nature of the proceeding and its purported similarity to civil rights lawsuits.  But as explained above, no evidentiary standard exists in isolation.  If civil rights lawsuits provide for a "prompt and equitable resolution" of civil rights claims, that is because they both allow plaintiffs a fair chance to make their case and defendants a fair chance to defend themselves.  The system is equitable because of the way its discovery tools, rules of evidence, cross-examination practices, and evidentiary standards all work together.  A school looking at that system might reasonably conclude that it could not provide a "prompt and equitable resolution" of claims unless it afforded its students all of those protections together.

Providing anything close to that, however, would prove to be too expensive and too unworkable at many of the nation's small schools, and even perhaps at bigger ones that are not so well-funded.  What's more, OCR has "strongly discourage[d]" in theory, *see* Ex. 1 (2011 DCL) at 12, and effectively outlawed in practice, *see* Ex. 17 (Resolution Agreement with Rockford University, April 24, 2015) at 3; Ex. 18 (Resolution Agreement with Southern Virginia University) at 2, all schools' use of the kind of cross-examination allowed in civil rights lawsuits. A small school might reasonably conclude that the only way to adequately protect against false convictions is to use a higher evidentiary standard, since the school will not be able, either as a practical or legal matter, to afford its accused students with a full opportunity to defend themselves.

OCR's one-size-fits-all approach gave no consideration to the plight of small schools like OKWU, and in fact invites litigation by forcing schools to carry out inequitable sexual misconduct proceedings.  Had it subjected the mandate to notice-and-comment rulemaking, it may well have learned the effect its mandate would have on small schools, and acted differently. *Cf. Clarian*, 2016 WL 4506969 at *19 (noting that purpose of notice-and-comment rulemaking is to "reintroduce public participation and fairness to affected parties" and "to assure that the agency will have before it facts and information relevant to a particular administrative problem") (internal quotation marks omitted).  Its failure, in any event, to consider this problem means that the mandate it did enact must be invalidated.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion for Summary Judgment be granted.

Respectfully submitted,

_____/s/_____
Justin Dillon (DC Bar No. 502322)
Christopher C. Muha (DC Bar No. 987116)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, D.C. 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiffs*