**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE and
OKLAHOMA WESLEYAN UNIVERSITY,

        Plaintiffs,

    v.

CATHERINE E. LHAMON, in her official
capacity as Assistant Secretary for Civil Rights,
United States Department of Education, *et al.*,

        Defendants.

Case No. 1:16-cv-01158 (RC)

---

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JENNIFER D. RICKETTS
Director
Federal Programs Branch

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

MATTHEW J. BERNS
Trial Attorney (D.C. Bar No. 998094)
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW
Washington, D.C. 20530
Telephone:  (202) 616-8016
Email:  matthew.j.berns@usdoj.gov

December 16, 2016        *Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.    PLAINTIFFS HAVE NARROWED THEIR CASE TO CHALLENGE ONLY
      THE PREPONDERANCE OF THE EVIDENCE STANDARD PART OF
      THE 2011 DCL ................................................................................................. 2

II.   JOHN DOE'S CLAIMS SHOULD BE DISMISSED ...................................... 3

      A.   Doe's Ban from UVA Property and Activities Will Not Likely Be
           Redressed by a Favorable Decision ......................................................... 3

           1.   Doe's speculation about how UVA might respond to this Court's
                decision is insufficient to establish redressability ......................... 3

           2.   Doe's allegations that the 2011 DCL caused UVA to sanction
                him does not establish that a favorable decision would redress
                that injury ...................................................................................... 6

      B.   Doe's Alleged Reputational Injuries Do Not Support His Standing To Sue ........ 10

III.  OKLAHOMA WESLEYAN UNIVERSITY'S CLAIMS SHOULD BE
      DISMISSED ..................................................................................................... 13

      A.   OKWU Lacks Standing, Making Its Claims Constitutionally Unripe .................. 14

      B.   OKWU's Claims Are Prudentially Unripe ................................................. 19

           1.   Postponing review would not cause OKWU significant hardship ............ 19

           2.   OKWU's claims are not fit for immediate review ................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES[*]

**CASES**                                                                       **Page(s)**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ........................................................... 15, 16, 22

*Allen v. Wright*,
   468 U.S. 737 (1984) ...................................................................... 6

*Am. Petroleum Inst. v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) ................................................... 23

*Am. Petroleum Inst. v. EPA*,
   906 F.2d 729 (D.C. Cir. 1990) ................................................... 19

*Americans for Safe Access v. DEA*,
   706 F.3d 438 (D.C. Cir. 2013) ..................................................... 8

*AT&T Corp. v. FCC*,
   349 F.3d 692 (D.C. Cir. 2003) ................................................... 21

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) ..................................................... 20

*Bates v. Rumsfeld*,
   271 F. Supp. 2d 54 (D.D.C. 2002) ............................................... 5

*Block v. Meese*,
   793 F.2d 1303 (D.C. Cir. 1986) ................................................... 9

*Branton v. FCC*,
   993 F.2d 906 (D.C. Cir. 1993) ..................................................... 6

*City of Houston v. Dep't of Housing & Urban Dev.*,
   24 F.3d 1421 (D.C. Cir. 1994) ................................................... 21

*Clean Air Implementation Project v. EPA*,
   150 F.3d 1200 (D.C. Cir. 1998) ................................................. 22

*COMSAT Corp. v. FCC*,
   77 F.3d 1419 (D.C. Cir. 1996) ............................................... 19, 25

*Devia v. Nuclear Regulatory Comm'n*,
   492 F.3d 421 (D.C. Cir. 2007) ................................................... 25

---

[*] Asterisks indicate those cases or authorities on which counsel chiefly relies.

*Fla. Power & Light Co. v. EPA,*
   145 F.3d 1414 (D.C. Cir. 1998) ................................................... 21

*Flint Hills Res. Alaska, LLC v. FERC,*
   627 F.3d 881 (D.C. Cir. 2010) ..................................................... 24

*Gul v. Obama,*
   652 F.3d 12 (D.C. Cir. 2011) ................................................. 10, 11

*Haitian Refugee Ctr. v. Gracey,*
   809 F.2d 794 (D.C. Cir. 1987) ..................................................... 15

*Houlton Citizens' Coal. v. Town of Houlton,*
   175 F.3d 178 (1st Cir. 1999) .......................................................... 9

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...................................................................... 15

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .................................................................. 4, 17

*Martin Tractor Co. v. FEC,*
   460 F. Supp. 1017 (D.D.C. 1978) ............................................... 21

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State,*
   153 F. Supp. 3d 319 (D.D.C. 2016) ............................................ 16

* *McBryde v. Comm. to Review Circuit Council Conduct,*
   264 F.3d 52 (D.C. Cir. 2001) ................................................. 10, 13

*McInnis-Misenor v. Maine Med. Ctr.,*
   319 F.3d 63 (1st Cir. 2003) .......................................................... 25

*McManus* v. *District of Columbia,*
   530 F. Supp. 2d 46 (D.D.C. 2007) .............................................. 10

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel,*
   792 F.2d 1172 (D.C. Cir. 1986) ................................................... 12

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
   440 F.3d 459 (D.C. Cir. 2006) ..................................................... 20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003) ...................................................................... 23

*Nat'l Parks Conservation Ass'n v. Manson,*
   414 F.3d 1 (D.C. Cir. 2005) ............................................................ 9

*Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*,
    263 F. Supp. 2d 82 (D.D.C. 2003) ...................................................... 4

\* *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) ................................................ 1, 4, 6, 7

*NLRB Union v. FLRA*,
    834 F.2d 191 (D.C. Cir. 1987) ..................................................... 22, 23

*NRDC v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ..................................................... 19, 23

*O'Gilvie v. Corp. for Nat. Community Serv.*,
    802 F. Supp. 2d 77 (D.D.C. 2011) .................................................. 11

*Office of Commc'n of United Church of Christ v. FCC*,
    826 F.2d 101 (D.C. Cir. 1987) ......................................................... 20

*Paracha v. Obama*,
    No. 1:04-cv-02022, 2016 WL 3365369 (D.D.C. June 16, 2016) ............. 13

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ...................................................... 13

*Pfizer, Inc. v. Shalala*,
    182 F.3d 975 (D.C. Cir. 1999) ......................................................... 24

*Pitt News v. Fisher*,
    215 F.3d 354 (3d Cir. 2000) ............................................................. 9

\* *Renal Physicians Ass'n v. HHS*,
    489 F.3d 1267 (D.C. Cir. 2007) ............................................. 1, 4, 5, 6, 7

*Sabre, Inc. v. Dep't of Transp.*
    429 F.3d 1113 (D.C. Cir. 2005) ................................................ 16, 17, 20

*S.C. Elec & Gas Co. v. ICC*,
    734 F.2d 1541 (D.C. Cir. 1984) ...................................................... 15, 20

\* *Scenic America, Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) ............................................................. 7, 8

*Spencer v. Kemna*,
    523 U.S. 1 (1998) ........................................................................... 11

*Star Scientific, Inc. v. Beales*
    278 F.3d 339 (4th Cir. 2002) ............................................................. 9

*State Farm Mutual Auto. Ins. Co. v. Dole*,
    802 F.2d 474 (D.C. Cir. 1986) ........................................................................ 17, 20

*Susan B. Anthony List v. Dierhaus*,
    134 S. Ct. 2334 (2014) ................................................................................... 16, 17

*Texas v. United States*,
    523 U.S. 296 (1998) ....................................................................................... 17, 20

* *Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967) .......................................................................... 16, 17, 21, 23

*Tozzi v. HHS*,
    271 F.3d 301 (D.C. Cir. 2001) ................................................................................. 9

*Transcon. Gas Pipe Line Corp. v. FERC*,
    866 F.2d 477 (D.C.Cir.1989) ................................................................................. 21

*Travis v. HHS*,
    No. 01-cv-2392, 2005 WL 589025 (D.D.C. Mar. 10, 2005) .................................. 11

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ........................................................................................... 20

*Urban Health Care Coal. v. Sebelius*,
    853 F. Supp. 2d 101 (D.D.C. 2012) ........................................................................ 5

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
    173 F.3d 438 (D.C. Cir. 1999) ................................................................................. 5

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................. 4

**STATUTES, AND RULES**

20 U.S.C. § 1681(a)(3) .................................................................................................. 19

42 U.S.C. § 11045(c) .................................................................................................... 20

49 U.S.C. § 46301(a) .................................................................................................... 20

34 C.F.R. § 106.12 ........................................................................................................ 19

40 C.F.R. § 372.18 ........................................................................................................ 20

**MISCELLANEOUS**

Br. of Appellant, *Star Scientific, Inc. v. Beales*,
    278 F.3d 339 (4th Cir. 2002), 2001 WL 34386555 ................................................................... 9

OCR Complaint Processing Procedures (Feb. 2015) ................................................................ 22

OCR, Securing Equal Educational Opportunity: Fiscal Year 2016 (Dec. 2016) ......................... 22

## INTRODUCTION

Plaintiffs' opposition brief, ECF No. 21 ("Opp."), fails to establish that the Court has jurisdiction over their challenges to the 2011 Dear Colleague Letter ("2011 DCL") in which the Department of Education, Office for Civil Rights ("OCR") explained how Title IX and the Department's Title IX regulations apply to sexual violence in federally funded education programs and activities.

Plaintiffs' opposition brief narrows the issues in dispute in three ways:

1. Plaintiffs have now limited the scope of their case by abandoning any challenge to any part of the 2011 DCL other than its guidance on the standard of proof to be applied when schools investigate or adjudicate complaints of student-on-student sexual violence.

2. Plaintiff John Doe now focuses on two injuries that he argues constitute injuries in fact sufficient to support his standing to sue: (1) his ban from University of Virginia ("UVA") property and activities and (2) his "reputational injury" from being "labeled as someone who has committed sexual misconduct." Opp. 7.

3. Plaintiff Oklahoma Wesleyan University ("OKWU") does not dispute that it currently will not conduct any investigation or adjudication when presented with a complaint of student-on-student sexual violence.

Doe lacks standing. He cannot satisfy Article III's redressability element with speculation that, if he prevails, it "stands to reason" that UVA "might be willing" to reconsider its decision in his case. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.* ("*NWCA*"), 366 F.3d 930, 939 (D.C. Cir. 2004). Doe contends that there is a strong causal link between the 2011 DCL, UVA's use of the preponderance of the evidence standard, and UVA's decision in his case. But "causation does not inevitably imply redressability." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). Doe's allegations regarding causation do not excuse him from "mak[ing] factual allegations showing that the relief [he] seeks will be likely to redress [his] injury." *Id.* at 1276.

Doe's alternative argument that an order invalidating OCR's guidance would redress his asserted reputational injuries—even if UVA adheres to its decision in his case—is meritless. That

some people know about UVA's decision is not enough to support his standing to challenge the 2011 DCL if UVA's decision remains intact. Doe argues that a court order in his favor would permit him to tell people that he was found responsible "based on a legal error" (or something similar), but such statements would misrepresent the implications of the Court's decision.

OKWU's challenge to the standard-of-proof guidance does not satisfy constitutional ripeness and standing requirements because OKWU does not allege that it currently investigates or adjudicates *any* complaints of student-on-student sexual violence (using *any* standard of proof) or that it has *any* concrete plans to do so. Under the circumstances, guidance on the standard of proof to be applied when schools *do* conduct such proceedings causes OKWU no Article III injury that could be redressed by a favorable decision.

OKWU's challenge is also prudentially unripe. OKWU cannot demonstrate that delaying review would cause it significant hardship for some of the same reasons that it cannot establish constitutional ripeness. In addition, OKWU does not identify substantial costs that it would incur from using the preponderance of the evidence standard, as opposed to a different standard of proof, if it were to begin investigating complaints of student-on-student sexual violence, and OKWU has not shown that the potential consequences of using a different standard of proof include the kind of criminal or civil penalties that might warrant pre-enforcement review. At the same time, the institutional interests of the judiciary and the agency would be well served by postponing review.

## **ARGUMENT**

**I.    PLAINTIFFS HAVE NARROWED THEIR CASE TO CHALLENGE ONLY THE PREPONDERANCE OF THE EVIDENCE STANDARD PART OF THE 2011 DCL**

Plaintiffs have narrowed the scope of their challenge to the 2011 DCL following Defendants' motion to dismiss. The Amended Complaint sought relief "not limited to" the 2011 DCL's standard-of-proof guidance, Am. Compl. ¶ 115(b), ECF No. 16, and specifically took issue

with its guidance on cross-examination, *id.* ¶¶ 37, 52–54, 83, 85, 108. Although Plaintiffs' brief in opposition to the motion to dismiss contains a stray reference to a "challenge to two specific provisions" of the 2011 DCL, Opp. 22, Plaintiffs limit their arguments to the standard-of-proof guidance and, in another filing, assert that they "never sought . . . to have the cross-examination provision of the 2011 DCL invalidated." Pls.' Opp. to Defs.' Mot. to Stay Summ. J. Briefing at 6, ECF No. 24. The abandonment of any challenge to any part of the 2011 DCL other than the standard-of-proof guidance makes it unnecessary for the Court to consider whether Plaintiffs could properly challenge other parts of the 2011 DCL.

## II.     JOHN DOE'S CLAIMS SHOULD BE DISMISSED

### A.     Doe's Ban from UVA Property and Activities Will Not Likely Be Redressed by a Favorable Decision

Doe's principal theory of standing fails for want of redressability. Whether or not UVA would have applied a different standard of proof in Doe's case absent the 2011 DCL, it is entirely speculative, rather than likely, that a decision invalidating the standard-of-proof guidance now would make UVA substantially likely to modify its decision in his case. Mem. in Supp. of Defs.' Mot. to Dismiss at 23–26, ECF No. 19-1 ("Mem.").[1]

#### 1.     Doe's speculation about how UVA might respond to this Court's decision is insufficient to establish redressability

"[T]o establish redressability at the pleading stage, [the D.C. Circuit] require[s] more than a bald allegation; [it] require[s] that the facts alleged be sufficient to demonstrate a substantial

---

[1] Doe has filed a redacted copy the written decision of UVA's external adjudicator. *See* Final Outcome Letter (Jan. 27, 2016), ECF No. 22-3. The adjudicator explained that Doe would be banned from UVA property and alumni activities "in light of the impact of [his] action on the Complainant." *Id.* at 5. "The Complainant should not have to be limited in her ability to attend any law school alumni event or University event for fear of encountering [Doe]." *Id.* The letter states that the decision is final and non-appealable. *Id.*

likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians*, 489 F.3d at 1275 (citing *NWCA*, 366 F.3d at 942–44). Where, as here, redressability hinges on how a third party will respond to the Court's decision, standing "is ordinarily *substantially more difficult to establish*." *Id.* at 1273 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).

Doe does not contend that this Court's decision would render UVA's decision in his case invalid, require UVA to reevaluate his case, or obligate UVA to lift its sanctions. *See* Mem. 23–24; Opp. 10. Instead, Doe argues that it "*stands to reason*" that UVA "*might* be willing to reevaluate [his] case" using its pre-2011 standard, or "*might* be willing to toss out the finding on the current record, or at least end the ongoing sanctions against him." Opp. 11 (emphases added). In short, Doe "rel[ies] on little more than the remote possibility, unsubstantiated by allegations of fact, that [his] situation . . . might improve were the court to afford relief." *Warth v. Seldin*, 422 U.S. 490, 507 (1975). It is not Defendants' burden to negate such unadorned speculation.

Addressing similar speculation from the plaintiffs in *NWCA*, the D.C. Circuit explained that it is "not close" to sufficient to establish redressability:

> Appellants do not suggest that any particular school necessarily would forego elimination of a wrestling team or reinstate a previously disbanded program in the absence of these interpretive rules, except to say that Marquette University "might bring back its wrestling program if the legal requirements changed." . . . At oral argument, counsel for appellants candidly said that, if his clients prevail, appellants think they may have "better odds" of retaining their desired wrestling programs. Counsel's candor was admirable, but a quest for ill-defined "better odds" is not close to what is required to satisfy the redressability prong of Article III.

366 F.3d at 939; *see also Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 263 F. Supp. 2d 82, 112 (D.D.C. 2003) (rejecting as impermissibly speculative plaintiffs' assertion that they "have every reason to believe" a school would change its policy if they won).

Doe's point (Opp. 19–20) that the Dear Colleague Letter at issue in *NWCA* described *three* ways that schools could comply with the Title IX requirement to provide equal athletic opportunity, while the 2011 DCL identifies only *one* permissible standard of proof, does not make Doe's redressability allegations any less speculative than the similar allegations in *NWCA*.

*NWCA* is consistent with a larger body of case law supporting dismissal at the pleading stage when a plaintiff's theory of redressability is that a favorable judgment might improve his position in future litigation or negotiations with a third party. *See* Mem. 23–25 (citing, *inter alia*, *Renal Physicians Ass'n*, 489 F.3d 1267; *Univ. Med. Ctr. of S. Nev. v. Shalala* ("*UMCSN*"), 173 F.3d 438 (D.C. Cir. 1999); *Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101, 111 (D.D.C. 2012); *Bates v. Rumsfeld*, 271 F. Supp. 2d 54 (D.D.C. 2002)). Doe cannot properly distinguish *Bates* and *UMCSN* on the ground that they involved challenges to "government *inaction*, not government *action*." Opp. 18; *see id.* at 18–19. Nothing in the opinions turned on that distinction. The plaintiffs in *Bates*, service members punished for violating orders to undergo involuntary vaccinations, sought declaratory judgments that would have enabled them to argue before military tribunals that their orders were contrary to law. *See* 271 F. Supp. 2d 57–59 & nn.3–4. They lacked standing because they could not show that a favorable judgment would lead the military to reverse its decisions. *See id.* at 62 n.16, 63–64. In *UMCSN*, the plaintiff hospital lacked standing because its theory of redressability depended on its ability to persuade non-party drug manufacturers to give it retroactive discounts although it did not claim a legal right to recover the funds. *See* 173 F.3d at 441–42. And Doe fails to address *Urban Health Care Coalition*, in which the court rejected as speculative the plaintiff hospitals' assertion that a judgment invalidating the statute would improve the hospitals' position in future contract negotiations. 853 F. Supp. 2d at 113.

Doe's challenge to the 2011 DCL similarly fails because he offers nothing but unadorned speculation that UVA "might" revisit its decision if he wins. *See NWCA*, 366 F.3d at 944.

### 2.    Doe's allegations that the 2011 DCL caused UVA to sanction him does not establish that a favorable decision would redress that injury

The balance of Doe's argument is that he can establish redressability by alleging a sufficiently strong causal link between the standard-of-proof guidance and UVA's decision to ban him from UVA property and activities. *See* Opp. 12–21. According to Doe, the guidance "mandated" that UVA use the preponderance of the evidence standard, and UVA's use of that standard injured him, so "[r]emoving the mandate" would "produce[] a 'significant increase in the likelihood' that [UVA] will take steps that will redress the injury." *Id.* at 12.

But "it is not enough simply to plead this causative link. [*NWCA*] makes clear that, even at the pleading stage, a party must make factual allegations showing that the relief it seeks will be likely to redress its injury." *Renal Physicians*, 489 F.3d at 1276. "Causation and redressability are separate requirements," *Branton v. FCC*, 993 F.2d 906, 910 (D.C. Cir. 1993), and "it is important to keep the inquiries separate," *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984). One reason why "causation does not inevitably imply redressability" is that "[t]here might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces." *Renal Physicians*, 489 F.3d at 1278.

In holding that the *NWCA* plaintiffs could not establish the requisite likelihood that invalidating OCR's guidance would lead schools to maintain or reinstate their men's wrestling teams, for example, the court noted that the schools would remain subject to the statute and regulations that the guidance interpreted and still might feel compelled to eliminate or cap these teams in order to comply. 366 F.3d at 939–40. "Moreover, other reasons unrelated to the

challenged legal requirements may continue to motivate the schools to take such actions." *Id.* at 940; *see, e.g.*, *id.* (citing one school's view that this was "morally . . . the right thing to do").

In *Renal Physicians*, it was "'speculative,' rather than 'likely,' that invalidating the safe harbor [would] somehow cause [clinics] to pay more" than the reduced wages they offered after the safe harbor's adoption, since it was "at least as plausible that, having established the market will easily bear the lower wage, the clinic will maintain the lower wage." 489 F.3d at 1277.

*Scenic America, Inc. v. U.S. Department of Transportation*, 836 F.3d 42 (D.C. Cir. 2016), decided between the filing of the parties' briefs, was resolved on similar grounds. The plaintiff challenged Guidance from the Federal Highway Administration ("FHWA") which interpreted a statute to permit States to approve certain digital billboards. *Id.* at 45–46. The Guidance had caused Texas and FHWA's Texas Division Office to reverse their policies of prohibiting these billboards, *id.* at 46–47, which caused the plaintiff to spend more to fight their construction, *id.* at 50. But the plaintiff could offer "nothing more than 'unadorned speculation'" that "Texas will revert to its pre-Guidance position" if the plaintiff prevailed on its notice-and-comment challenge to the Guidance, and "[s]everal other possibilities seem[ed] just as likely." *Id.* at 52; *see id.* at 52–53.

As in these cases, UVA's adoption of the preponderance of the evidence standard is held in place by forces other than the 2011 DCL. Like the schools in *NWCA*, UVA must continue to comply with Title IX and the Department's Title IX regulations regardless of the outcome here. Because UVA knows that OCR considers the preponderance of the evidence standard to be the only standard consistent with the regulations, UVA is unlikely to revisit its policy, particularly when two of Doe's claims (Counts I and III) would not preclude OCR from continuing to interpret

the regulations as it does now. *See* Mem. 21 n.7.[2] UVA also may maintain its current policy for reasons other than Title IX compliance, in light of practical concerns like pressure from student and faculty advocates. *See id.*; *cf. Scenic America*, 836 F.3d at 52–53; *NWCA*, 366 F.3d at 940.

Even if UVA were to revert to a clear and convincing evidence standard, moreover, that would not redress Doe's injuries. To do that, UVA would need to go further and revisit his case, in which UVA found that Doe more likely than not committed an act of sexual violence and imposed sanctions tailored to that finding. Doe's speculation that UVA "might be willing" to do so is insufficient to support standing. The facts underlying Doe's case would remain the same. No decision from this Court will make Doe any less culpable, the ban any less well tailored to his conduct, or the woman he was found to have assaulted any less aggrieved and deserving of UVA's concern. *See* Mem. 24–25; *supra* at 3 n.1. UVA's final, non-appealable decision is likely being "held in place" by these factors rather than the 2011 DCL. *Renal Physicians*, 489 F.3d at 1278.

Doe identifies no case where a court has found redressability in similar circumstances. In *Americans for Safe Access v. DEA*, the scheduling of marijuana was the only justification for the Department of Veterans Affairs non-referral policy that was causing the petitioner to incur out-of-pocket costs, an injury that would have been redressed by repeal of the policy without more. 706

---

[2] A ruling for Plaintiffs on Count II, by contrast, would imply that OCR could not, in a future enforcement action or rulemaking, re-adopt its interpretation of the Department's regulations to require use of a preponderance of the evidence standard in all circumstances, although even such a ruling would not necessarily prohibit OCR from considering a recipient's chosen standard of proof as part of a totality-of-the-circumstances analysis to determine compliance with the regulation. Such a decision might theoretically have a greater marginal impact on schools' policy choices than a decision based on Count I or III, but its impact would remain too speculative. In this regard, a ruling on Count II would not constitute a "repudiation" of the preponderance of the evidence standard under *Scenic America*, which permitted the plaintiff to pursue a claim (distinct from its notice-and-comment claim, *supra* at 7) that would have required not only vacatur of the challenged Guidance but also the removal or modification of existing billboards authorized under the Guidance. 836 F.3d at 55.

F.3d 438, 445–49. UVA, by contrast, has reasons other than the 2011 DCL to maintain its current policy, and changing that policy would not itself redress Doe's injuries.

Setting aside the federal agency action at issue in *National Parks Conservation Association v. Manson* would have "significantly affect[ed]" "open and pending" proceedings before a state agency—because, *inter alia*, the state agency would have been required by law to provide additional justifications for a decision adverse to the plaintiffs' interests and contrary to the federal government's findings—thereby making it significantly less likely that the state agency's decision would harm the plaintiffs. 414 F.3d 1, 7 (D.C. Cir. 2005); *see id.* at 6–7. Here, the decision in Doe's case is final and non-appealable, *supra* at 3 n.1, and Doe has not identified any proceeding involving him in which UVA would be required to take this Court's decision into account.

Finally, Doe relies on four cases involving plaintiffs who sought to sell goods (*Tozzi v. HHS*, 271 F.3d 301 (D.C. Cir. 2001); *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)) or services (*Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000); *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999)) and challenged government actions that suppressed or prohibited their sales. Judicial relief would have allowed them to offer their goods or services, unencumbered, to old and new customers alike. The non-party potential customers in these cases were, quite obviously, in a different position than UVA is here.[3]

---

[3] Doe is mistaken that redressability in *Star Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002), turned on the likelihood that a State might respond to an order invalidating a settlement agreement by repealing the statute that injured the plaintiff. The plaintiff argued that invalidating the agreement would render the statute inoperative without any action by the State. *See* Br. of Appellant, *Star Scientific, Inc. v. Beales*, 278 F.3d 339 (4th Cir. 2002), 2001 WL 34386555 (the "injury (the statutory payments) is fairly traceable to the MSA (which required the statute's enactment) and would be redressed by a determination that the MSA violates the Compact Clause (which would render meaningless the Qualifying Statute that depends on the MSA)").

###### B.     Doe's Alleged Reputational Injuries Do Not Support His Standing To Sue

Defendants' opening brief explained (Mem. 26–27) that it was entirely unclear how Doe's allegations that he has been "labeled as someone who has committed sexual misconduct" and that "he will have to explain this finding to future employers, future friends, family members, and anyone else who asks" "[f]or the rest of his life," Am. Compl. ¶ 72, might support standing.

In response, Doe seeks to expand on the Amended Complaint's allegations[4] and argues that an order invalidating the standard-of-proof guidance likely would redress his asserted reputational injuries even if UVA adheres to its decision in his case. *See* Opp. at 7–9, 21–22. Doe's reputational-injury theory falters on multiple grounds: injury in fact; causation; redressability.

Injury in fact. "[W]hen injury to reputation is alleged as a secondary effect of an otherwise moot action, [courts require] some tangible concrete effect . . . susceptible to judicial correction" before they will assert jurisdiction. *Gul v. Obama*, 652 F.3d 12, 20 (D.C. Cir. 2011) (quoting *McBryde v. Comm. to Review Circuit Council Conduct*, 264 F.3d 52, 57 (D.C. Cir. 2001)); *see, e.g.*, *id.* (former detainee at Guantanamo Bay could not pursue his petition for a writ of habeas corpus after his release notwithstanding allegations of reputational injury from being labeled an enemy combatant). The reasons for that requirement apply with the same force when a plaintiff (like Doe) alleges reputational injury as a secondary effect of an action (UVAs' non-public decision) that will not be reversed as a result of a favorable decision (which Doe's argument assumes). And even if Doe could properly introduce new factual allegations in the opposition brief, *but see, e.g.*, *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007), none

---

[4] *Compare, e.g.*, Opp. 8, 21 (Doe's "'conviction' . . . required a special appearance before the Virginia State Bar's board of character and fitness" which now "knows" of UVA's decision), *and id.* at 8 ("his employer . . . knows" of UVA's findings), *with* Am. Compl. ¶¶ 68, 70 (alleging that Doe "appeared before the Virginia State Bar's character and fitness board," without identifying the reason or what was discussed), *and id.* ¶ 72 (not alleging current employment).

of Doe's allegations reveal that third parties' knowledge of UVA's decision is having the requisite "tangible concrete effect." *Gul*, 652 F.3d at 20.

Doe baldly asserts that UVA's finding "is having obvious and concrete effects on his career," Opp. at 8, and "will undoubtedly have similar effects in his future," *id.* at 21. Such conclusory and speculative statements need not be treated as true and cannot defeat a motion to dismiss. *See O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 82 (D.D.C. 2011) (disregarding as "entirely conclusory" a plaintiff's allegations that he is suffering "'very real reputational, vocational and economic injuries'" from his debarment).

Likewise insufficient is Doe's assertion that "[a] variety of people know" that he has been "labeled as someone who has committed sexual misconduct." Opp. at 7–8; *see* Am. Compl. ¶ 72; *cf. Spencer v. Kemna*, 523 U.S. 1, 16 n.8 (1998) (rejecting, in dicta, the dissent's "assert[ion] that 'a finding that an individual has committed a serious felony' renders the 'interest in vindicating . . . reputation . . . constitutionally [s]ufficient' to avoid mootness"); *Gul*, 652 F.3d at 20 (being labeled an "enemy combatant" was insufficient to satisfy Article III). That the Virginia State Bar and Doe's current employer "know" of UVA's decision does not indicate that their knowledge has any ongoing "'tangible concrete effect,'" *Gul*, 652 F.3d at 20, since he secured his job and admission to the Bar regardless. And it would be speculative to conclude that UVA's decision will have any greater effect on future bar or job applications.[5]

---

[5] *Cf. O'Gilvie*, 802 F. Supp. 2d at 82 (current employer's knowledge of plaintiff's debarment did not give rise to cognizable reputational injury unless "his employment at the current job was interrupted or adversely affected"); *Travis v. HHS*, No. 01-cv-2392, 2005 WL 589025, at *3 (D.D.C. Mar. 10, 2005) (finding no standing "[a]lthough individuals and non-profit organizations may be required to disclose past sanctions and such disclosures may factor negatively in hiring or grant decisions," because "it remains unclear whether such disclosure has been or portends to be the deciding factor or – even a significant factor – in a negative determination").

Causation. The opposition brief only underscores that any reputational injury to Doe is not fairly traceable to the standard-of-proof guidance. Its section on causation does not so much as mention Doe's alleged reputational injuries. *See* Opp. 9–10. Doe asserts that the 2011 DCL caused UVA to adopt a preponderance of the evidence standard and that Doe would not have been found responsible for sexual violence had UVA not done so. *Id.* But Doe ignores the links in the causal chain between UVA's finding and any reputational harm to him. The finding is apparently non-public; Doe claims that the finding harms his reputation when he discloses it to people who inquire; and he acknowledges that inquiries arise not because of the result of the proceeding but because the proceeding took place at all. *See* Mem. 26 n.8; Opp. 7–9 & n.5. In these circumstances, Doe's theory of causation is too attenuated to support standing. *See Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied.").

Redressability. Doe also fails to allege facts demonstrating redressability. *See* Mem. 27.

Doe claims that a favorable decision would permit him to say that "UVA found him responsible . . . using a burden of proof that a court later struck down," Opp. 22; "that his process was based on legal error," *id.*; "that UVA had found him responsible under an invalid rule," *id.* at 12; and that his "'conviction' at UVA was premised on an invalid law," *id.* at 21.

Each of those statements would be misleading, to say the least. Doe does not ask the Court to "strike down" or declare "invalid" use of the preponderance of the evidence standard by UVA (or by the substantial majority of top colleges and universities that were using the standard before the 2011 DCL, *see* Mem. 21 n.7). He does not seek a determination that UVA committed "legal

error" in applying that standard in his case. And he does not argue that UVA's substantive prohibition on non-consensual sexual intercourse is invalid. *See* Final Outcome Letter at 2.

A ruling for Doe would address the procedural and/or substantive validity of the 2011 DCL's standard-of-proof guidance. It would not address the validity of any school policy that incorporates the preponderance of the evidence standard or any proceeding in which that standard was applied. And, most significantly, it would not negate UVA's finding that Doe more likely than not committed an act of sexual violence. *See* Opp. 22. That finding is the alleged root of any harm to Doe's reputation, and there is no reason to think anyone would view UVA's finding differently based on a declaration regarding the 2011 DCL, especially when UVA adheres to its decision.

In this regard, Doe's case is similar to *McBryde*, in which the D.C. Circuit "[could] not see how" a declaration that a Judicial Council had acted *ultra vires* in suspending a district judge for misconduct "would rehabilitate his reputation" when it would not affect the underlying findings. 264 F.3d at 54–55, 57–58; *see also Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991) (declaring that a since-withdrawn letter violated the plaintiff's First Amendment rights would not likely redress any reputational injury not already remedied by the withdrawal); *Paracha v. Obama*, No. 1:04-cv-02022, 2016 WL 3365369, at *2 (D.D.C. June 16, 2016) (declaring that statutes relating to Guantanamo detainees are bills of attainder would not likely redress a detainee's asserted reputational injury when it would not alter "the underlying facts of his detention or the Executive Branch's designation of [him] as an enemy combatant"), *appeal filed*, No. 16-5248 (Aug. 30, 2016). Likewise, a ruling on the standard-of-proof guidance that does not lead UVA to revisit its decision in Doe's case will not likely redress any injury to his reputation.

## III.      OKLAHOMA WESLEYAN UNIVERSITY'S CLAIMS SHOULD BE DISMISSED

OKWU's challenge to the 2011 DCL's standard-of-proof guidance is subject to dismissal on both constitutional and prudential grounds. *See* Mem. 28–39.

### A.      OKWU Lacks Standing, Making Its Claims Constitutionally Unripe

A school that will not conduct any investigation or adjudication when presented with a complaint of student-on-student sexual violence has no stake in the validity of guidance on the procedures to be applied when schools do conduct such investigations or adjudications. Whatever risk a school assumes when it decides that it will not investigate or adjudicate complaints of sexual violence—contrary to Title IX and the Department's regulations—the guidance does not materially increase that risk, and invalidation of the guidance would not materially reduce it. That is the central point of Defendants' argument that OKWU has not established constitutional standing (and therefore ripeness). OKWU fails to answer it.

The Amended Complaint alleges that OKWU "does not currently apply a 'preponderance of the evidence' standard in sexual misconduct proceedings," Am. Compl. ¶ 80, and "would like the freedom to make 'clear and convincing evidence,' rather than 'preponderance of the evidence,' the burden of proof for sexual misconduct proceedings on its campus," *id.* ¶ 82. It does *not* allege that OKWU currently uses the clear and convincing evidence standard (or any other standard) to investigate or adjudicate complaints of student-on-student sexual violence or that OKWU has any concrete plans to do so. *See* Mem. 11–13, 29–33.

The reason for the Amended Complaint's omissions and circumlocution may be found in multiple public statements by OKWU and its president, Dr. Everett Piper. These statements reveal that OKWU does not and will not investigate or adjudicate any complaints of sexual violence to determine whether sexual violence has occurred. *See* Mem. 13–16, 29–33.[6]

The opposition brief neither disputes Defendants' reading of the Amended Complaint nor addresses OKWU's and Dr. Piper's statements. This non-response is fatal to OKWU's claims.

---

[6] A stipulation from OKWU relating to these statements is attached hereto as Exhibit 4.

Injury in fact.  OKWU argues that its challenge to the standard-of-proof guidance is no different from any other pre-enforcement challenge to a substantive rule that as a practical matter requires a party to alter its conduct immediately. *See* Opp. at 22–28. According to OKWU, the "injury in such cases is both the command itself and its practical consequences." *Id.* at 25.

OKWU cites no case holding that the mere issuance of a rule ("the command itself") constitutes an Article III injury without regard to its "practical consequences" for the plaintiff. Article III permits pre-enforcement challenges to agency rules only when "the mere existence of those rules exerts an immediate and palpable effect upon private rights." *S.C. Elec. & Gas. Co. v. ICC*, 734 F.2d 1541, 1546 (D.C. Cir. 1984). "The test of ripeness is not whether a rule has actually been adopted and is seriously meant to be enforced; but whether the threat of its enforcement reasonably affects the conduct of [the party seeking to challenge it], here and now." *Id.* And it is incumbent upon that party to "set forth . . . such effect." *Id.*

The cases cited by OKWU that address constitutional standing and ripeness[7] illustrate the kinds of "practical consequences" that satisfy Article III's "case or controversy" requirement. None supports OKWU's ability to challenge the standard-of-proof guidance when OKWU does not investigate or adjudicate complaints of sexual violence and has no concrete plans to.

In *Abbott Laboratories v. Gardner*, a group of prescription drug manufacturers brought a pre-enforcement challenge to a regulation requiring that labels and advertisements for prescription drugs include the established (or generic) name of the particular drug every time its trade (or brand)

---

[7] OKWU quotes from a number of cases that address prudential ripeness and/or whether a party has satisfied the statutory requirements to sue under the APA. These cases are of little relevance to the constitutional question. *See Lewis v. Casey*, 518 U.S. 343, 353 n.2 (1996) ("[S]tanding was neither challenged nor discussed in that case, and we have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect."); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 800 (D.C. Cir. 1987). Defendants address them, as warranted, in Part II.B.

name is used anywhere in such material. 387 U.S. 136, 138–39 (1967). The manufacturers had standing not merely because "the regulation [was] directed at them in particular" but because compliance would "require[] them to make significant changes in their everyday business practices" and failure to do so would leave them "quite clearly exposed to the imposition of strong sanctions." *Id.* at 154. Thus, *Abbott Laboratories* was a case "where the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).

There was, of course, no suggestion in *Abbott Laboratories* that a drug manufacturer would have standing to challenge the "every time" regulation if that manufacturer distributed its products without the aid of labels or advertisements (or, alternatively, used labels or advertisements that identified drugs only by their established names). That manufacturer would not have felt the regulation's impact "immediately . . . in conducting [its] day-to-day affairs." *Id.*

For the same reasons, the standard-of-proof guidance has no immediate impact on OKWU's day-to-day affairs. There is no contention that OKWU investigates or adjudicates complaints of student-on-student sexual violence, let alone that it conducts such proceedings using a standard other than "preponderance of the evidence." OKWU fails to explain why, in this context, OCR might take enforcement action against it for applying the wrong standard of proof, as opposed to violating a requirement not at issue here. *Cf Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 333 (D.D.C. 2016) (finding no standing where the plaintiff "failed to concretely allege that it has, or will in the future, engage" in activities that would violate the challenged rules, and could only speculate that the rules would be enforced against it).

*Susan B. Anthony List v. Driehaus* and *Sabre, Inc. v. Department of Transportation* illustrate that a party may have standing when it has concrete plans to engage in a course of conduct

proscribed by a statute or regulation and there is a credible threat that pursuing that course will result in significant criminal or civil penalties. *See Susan B. Anthony List*, 134 S. Ct. 2334, 2343 (2014) (plaintiffs "pleaded specific statements they intend[ed] to make in future election cycles"); *Sabre*, 429 F.3d 1113, 1118 (D.C. Cir. 2005) (petitioner "confirm[ed] the present existence of marketing plans, which it could otherwise implement presumably at considerable profit"). But OKWU alleges no concrete plans to investigate or adjudicate complaints of sexual violence using a standard other than preponderance of the evidence.[8]

OKWU's abstract desire for "the freedom to make 'clear and convincing evidence,' rather than 'preponderance of the evidence,' the burden of proof for sexual misconduct proceedings on its campus," Am. Compl. ¶ 82, is not itself a sufficiently concrete interest to support its standing, when OKWU does not actually conduct any investigations or adjudications of complaints of sexual violence and has no concrete plans to do so. *Cf. Texas v. United States*, 523 U.S. 296, 302 (1998) (noting that "the 'threat to personal freedom' that exists whenever an agency regulation is promulgated" is "inadequate to support suit unless the person's primary conduct is affected" (citing *Toilet Goods*, 387 U.S. at 164)).

Causation. Moreover, no injury to OKWU is fairly traceable to the standard-of-proof guidance. *See* Mem. 32–33. A school assumes some measure of risk when it decides not to

---

[8] Without concrete plans, the possibility that OKWU might someday investigate or adjudicate a complaint of sexual violence—and OKWU does not even allege that possibility—would be too speculative to establish an injury in fact. *See Defenders of Wildlife*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require."); *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 482 (D.C. Cir. 1986) (dismissing as "speculative" and "not an indication of immediate or concrete hardship" New York's argument that it could challenge a federal regulation because "*if* New York soon determines that its [mandatory seat belt law] needs to be strengthened, the State *will* face a serious dilemma" under the regulation).

investigate or adjudicate complaints of sexual violence. The standard-of-proof guidance could not materially increase that risk, however, because it makes no sense to ask whether a school that conducts no proceedings at all uses an inappropriate standard of proof. The decision to conduct no proceedings moots any issue of the standard of proof. Accordingly, there is no basis for OKWU's contention (Opp. 28) that the standard-of-proof guidance substantially increases whatever risk OKWU assumes when it refuses to investigate or adjudicate complaints of sexual violence.

Redressability.  For related reasons, OKWU cannot demonstrate redressability. *See* Mem. 32–33. Vacatur of the standard-of-proof guidance would not reduce whatever risks OKWU currently runs as a school that declines to conduct *any* proceedings to investigate or adjudicate student-on-student sexual violence complaints.

*     *     *

OKWU argues that its non-compliance with "*other parts* of the 2011 DCL, and perhaps even with validly enacted Title IX regulations," is "irrelevant." Opp. 27. OKWU offers no authority in support of this view but presents a hypothetical involving a law that "require[s] all companies to both use green paper and provide health insurance." *Id.* According to OKWU, "the fact that a company would prefer to use red paper but challenged only the insurance requirement in court would do nothing to defeat standing." *Id.*

This argument is a red herring that obscures the particulars of OKWU's situation. Unlike the green paper and health insurance requirements in OKWU's hypothetical, the question of whether OKWU investigates and adjudicates complaints of sexual violence, or has any concrete plans to do so, is inextricably intertwined with, and logically prior to, any question about the standard of proof. In terms of OKWU's hypothetical, the issue is not whether a company with a fondness for red paper can challenge the health insurance requirement but whether a company that

does not and will not use any paper at all can challenge the "greenness" requirement. As Defendants have demonstrated, that company would lack standing. So does OKWU.[9]

### B.     OKWU's Claims Are Prudentially Unripe

OKWU's challenge to the standard-of-proof guidance is also prudentially unripe. Mem. 33–39. OKWU will suffer no significant hardship if judicial review is postponed beyond the five years that OKWU itself has delayed filing suit, *id.* at 37–39, and because a delay would protect the interests of the courts and the agency, OKWU's claims are not fit for review, *id.* at 34–37.[10]

### 1.     Postponing review would not cause OKWU significant hardship

OKWU claims further delay would cause it hardship for two reasons. Neither has merit.

<u>First</u>, OKWU argues that it faces the "'paradigmatic hardship situation' of being 'put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for non-compliance." Opp. 37 (*NRDC v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988)). As just discussed, OKWU's decision not to investigate or adjudicate any complaints of sexual violence means that the standard-of-proof guidance poses no dilemma for OKWU at all. That point aside, there is no basis for concluding that OKWU's use of a

---

[9] The Amended Complaint's emphasis on OKWU's identity as a religious school, Am. Compl. ¶¶ 76–79, 84, led Defendants to note that any uncertainty about whether OKWU is exempt from otherwise applicable regulations on sexual violence on account of its religious tenets provides an additional basis for holding that OKWU's challenge is unripe. Mem. 33 n.9. The opposition brief does not address this point. In a separate filing, OKWU says that it "has not claimed that the mandate directly violates a core tenet of its faith or raised a Free Exercise claim." ECF No. 24, at 5. But a school may be exempt from a Title IX requirement that does not "*directly* violate[] a *core* tenet of its faith" *Id.* (emphases added); *see* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12. Thus, OKWU has not shut the door on the possibility that it might assert its exemption at a later date— a possibility that should be taken into account in assessing ripeness.

[10] Because the fitness of OKWU's claims for immediate judicial review is at least "in doubt," *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739 n.13 (D.C. Cir. 1990), or "uncertain," *COMSAT Corp. v. FCC*, 77 F.3d 1419, 1422 (D.C. Cir. 1996), OKWU's invitation for the Court to skip the hardship analysis is misplaced. *See* Opp. 29–30, 37.

preponderance of the evidence standard would cause it to incur substantial costs beyond the costs that it would incur if it used a different standard of proof, and if it were to apply a different standard, it would not risk the kind of heavy criminal or civil sanctions that might justify immediate review.

As for compliance costs, OKWU does not assert that the choice of a standard of proof comes with any economic costs at all. *Cf. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016) (Clean Water Act compliance might take years and hundreds of thousands of dollars); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs* ("*NAHB*"), 440 F.3d 459 (D.C. Cir. 2006) (same statute). OKWU instead asserts that using the preponderance of the evidence standard would "deprive its students of the right to a fundamentally fair disciplinary proceeding." Opp. 24. But the hardship analysis does not consider effects on non-parties. *See Office of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 109–10 (D.C. Cir. 1987); *State Farm*, 802 F.2d at 482–83; *S.C. Elec. & Gas*, 734 F.2d at 1545. And OKWU's belief that the guidance is "unlawful and harmful" and "conflicts with OKWU's position on how best to run its campus," Opp. 30, 38, is insufficiently concrete to establish hardship. *Cf. Texas*, 523 U.S. at 302 (finding no hardship from a "threat to federalism"); *State Farm*, 802 F.2d at 482 n.17 (holding that States' interest in not "passing [mandatory seat belt laws] that are less stringent than [the States] would otherwise prefer" was insufficient to establish "hardship of sufficient concreteness").

Moreover, OKWU could use a standard of proof other than preponderance of the evidence to investigate and adjudicate complaints of sexual violence without risking criminal or mounting civil penalties[11] while it awaits the potential enforcement action it fears. To be sure, violation of

---

[11] Violations of the Clean Water Act provisions at issue in *Hawkes* and *NAHB* would expose the plaintiffs in those cases to "civil penalties of up to $37,500 for each day they violated the Act, to say nothing of potential criminal liability." *Hawkes*, 136 S. Ct. at 1815. Violation of the requirement at issue in *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000),

the Department's regulations could ultimately result in OKWU's loss of eligibility for federal

funding, which OKWU alleges that it receives in the form of financial aid provided to its students.

*See* Opp. 23, 38; Am. Compl. ¶ 5. But that is not the kind of civil penalty that was at issue in any

case OKWU cites. And OKWU fails to acknowledge that the Department would be statutorily

required to seek voluntary compliance before initiating an administrative enforcement action, that

OKWU could seek judicial review if it were aggrieved by a final agency determination of non-

compliance, and that OKWU could request restoration of its eligibility "at any time" even if the

courts reject its claims. *See* Mem. 6–7, 38. In light of this regulatory backdrop, "no irremediable

adverse consequences flow from requiring a later challenge." *Toilet Goods*, 387 U.S. at 164.[12]

Aside from loss of federal financial aid to its students, OKWU points to "the risk that OCR

will subject it to an expensive investigation" and "the practical harm of a costly enforcement

action." Opp. 23, 38. But "the burden of participating in further administrative and judicial

proceedings" does "not constitute sufficient hardship for the purposes of ripeness." *Fla. Power &

Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998); *see also AT&T Corp. v. FCC*, 349 F.3d

---

could result in civil penalties of up to $25,000 each day for each violation, 42 U.S.C. § 11045(c); 40 C.F.R. § 372.18, as could violation of the provision at issue in *Sabre*, 429 F.3d at 1118; 49 U.S.C. § 46301(a).

[12] *See, e.g.*, *id.* at 165 (refusing pre-enforcement review of a rule enforced by suspension of certification services to cosmetics manufacturers, even though distribution of uncertified products was prohibited, where a determination of non-compliance could "be promptly challenged through an administrative procedure, which in turn is reviewable in a court" (footnote omitted)); *City of Houston v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1432 (D.C. Cir. 1994) (finding no hardship where "the only harm to [the plaintiff] if its claim proved meritorious would be the temporary loss of the use of some portion of its [federal block grant]"); *Transcon. Gas Pipe Line Corp. v. FERC*, 866 F.2d 477, 481 (D.C.Cir.1989) (finding no hardship because there was no indication that petitioner's interests would be "inadequately protected by judicial review following an adverse determination."); *Martin Tractor Co. v. FEC*, 460 F. Supp. 1017, 1021 (D.D.C. 1978) (refusing pre-enforcement review where "the enforcement procedure which is yet to be invoked contemplates mandatory conciliation before legal action may be taken"), *aff'd*, 627 F.2d 375 (D.C. Cir. 1980).

692, 702 (D.C. Cir. 2003); *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205–06 (D.C. Cir. 1998).

That the 2011 DCL's standard-of-proof guidance has not truly put OKWU in a "paradigmatic hardship situation," Opp. 37, is confirmed by the fact that OKWU apparently has taken no steps to comply for over five years, while suffering no adverse consequences as a result. OKWU states that "OCR enforcement activities have exploded" beginning in 2013, *id.* at 30; *see id.* at 3–4, but fails to explain why it still waited three more years to bring suit if the standard-of-proof guidance really "require[d] an immediate and significant change in [OKWU's] conduct of [its] affairs with serious penalties attached to noncompliance." *Abbott Labs.*, 387 U.S. at 153.[13]

<u>Second</u>, OKWU's alternative theory is that OKWU will suffer hardship if judicial review is postponed merely because OKWU has already delayed its suit for so long. According to OKWU, it must challenge the guidance "now or never," Opp. 2, 22, 30, 39, because the statute of limitations will bar "any future legal challenge" to the 2011 DCL after April 4, 2017. *Id.* at 38.

OKWU identifies no case in which any court has permitted a pre-enforcement challenge to an agency rule because the statute of limitations was about to expire, and for good reason:  OKWU is wrong that the passage of six years from the issuance of a rule will immunize it from all later challenges, including in the context of an enforcement action. *See generally NLRB Union v. FLRA*, 834 F.2d 191, 195–97 (D.C. Cir. 1987) (reviewing the ways in which a party may challenge a rule after the statute of limitations for a pre-enforcement challenge has run). The passage of time since

---

[13] OCR generally opens investigations in response to complaints of discrimination by recipients. *See* OCR Complaint Processing Procedures (Feb. 2015), www.ed.gov/ocr/docs/complaints-how.pdf. The increase in investigations involving sexual violence reflects the increase in complaints. *See* OCR, Securing Equal Educational Opportunity: Fiscal Year 2016, at 7–8 & fig.5 (Dec. 2016), www.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2016.pdf.

the 2011 DCL does not cause any hardship warranting immediate review. *Cf. NRDC*, 859 F.2d at

172 ("The only hardship suggested by petitioners—the existence of the regulations since 1984—

is patently inadequate.").[14]

### 2.     OKWU's claims are not fit for immediate review

OKWU contends that the standard-of-proof guidance is final agency action, Opp. 36–37,

and that OKWU's claims are purely legal, *id.* at 30–31, but that is not enough to establish fitness.

*See, e.g.*, *Toilet Goods*, 387 U.S. at 162–64; *Nat'l Parks Hosp. Ass'n v. Dep't of Interior*, 538 U.S.

803, 812 (2003).

OKWU does not dispute that courts and agencies' interests in avoiding piecemeal litigation

may make a pre-enforcement challenge unfit for pre-enforcement review. *See* Mem. 35–36

(quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012)); Opp. 34–35. OKWU's

response—that "the odds of piecemeal litigation are nil" because "the deadline to challenge the

2011 DCL expires in just five months," Opp. 35—is wrong, as just discussed.

The argument is also misplaced. It is clear that a decision on the validity of the standard-

of-proof guidance will not address an indeterminate number of other Title IX compliance issues at

OKWU. *See* Opp. 27 (not disputing that OKWU "takes issue with *other* parts of the 2011 DCL,

and perhaps even with validly enacted Title IX regulations"); *id.* ("admi[tting] that it is not in

compliance with some of the other parts of the 2011 DCL"). OKWU fails to explain how these

issues might be resolved without further administrative action. Moreover, one of the other

compliance issues involves whether OKWU ever will investigate or adjudicate complaints of

---

[14] Although the expiration of a statute of limitations may preclude later *procedural* challenges to a rule in certain contexts, *NLRB Union*, 834 F.2d at 196, OKWU's notice-and-comment argument would be unavailable in an enforcement action whether or not the statute of limitations had run. That is so because it would be procedurally proper for the Department to adopt the interpretation that is reflected in the 2011 DCL for the first time in an enforcement action whether or not the 2011 DCL ever had been issued. *See* Mem. 36; Opp. 35.

sexual violence—a threshold question that, as discussed, must be answered before any question about the standard of proof can be asked. OKWU offers no sound reason why the institutional interests of the judiciary and the agency would be well served by authorizing a pre-enforcement challenge that aims to pick off one non-dispositive issue in advance, when a single administrative proceeding followed by a single round of judicial review, as appropriate, could permit a comprehensive resolution. *See Flint Hills Res. Alaska, LLC v. FERC*, 627 F.3d 881, 890 (D.C. Cir. 2010) (finding a challenge not fit for review where "any ultimate order of refunds seems likely to encounter a host of additional issues . . ., all of which are better resolved in one case rather than piecemeal"); *see also Pfizer, Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999).[15]

OKWU dismisses Defendants' arguments that postponing review would permit the agency to reconsider its policy choices in a more concrete context, give it an opportunity to clarify or add to its reasons for adopting its policies, and make it unnecessary to consider certain of OKWU's arguments. *See* Mem. 35–37. OKWU asserts that the same points could be made in every pre-enforcement challenge to a guidance document. *See* Opp. 34–36. In most cases, however, the plaintiff does not concede that its pre-enforcement challenge will leave an undetermined number of other compliance issues unresolved. Because OKWU's various Title IX compliance issues

---

[15] OKWU finds "tension" between what it mischaracterizes as Defendants' arguments that "1) the threat of enforcement against OKWU is so remote that its claims are not ripe, and 2) that this Court should delay review because the threat of enforcement is 'not far-fetched.'" Opp. 35 (quoting Mem. 36). There is no tension. What is "remote" is the possibility that an enforcement action against a school which conducts no investigations or adjudications in response to complaints of sexual violence would be premised on any guidance in the 2011 DCL addressing the rules to be applied when schools do conduct such proceedings; in such a case, the issue would be the school's failure to conduct any investigation or adjudication at all. Mem. 30–31. What is "not far-fetched" is the idea that any decision in this case will leave unresolved one or more other issues regarding OKWU's compliance with its Title IX obligations, which "could" be the subject of future administrative and/or judicial proceedings. *Id.* at 35–36.

could not be resolved without further administrative action in any event, the other institutional considerations Defendants have raised carry added force here.

Finally, postponing review would permit development of a factual record on at least one critical point. That is whether, notwithstanding its silence in the Amended Complaint and opposition brief, OKWU does in fact investigate and adjudicate complaints of sexual violence. If it does not and will not, then addressing its challenge to the standard-of-proof guidance is entirely unnecessary. "Under these circumstances, [OKWU's] contention [Opp. 33–34] that its issue is a 'purely legal one' and therefore fit for judicial review, is beside the point. Unless [the Court] can determine that [its] opinion would have a concrete impact on a live dispute between the parties, [it] would be issuing an advisory opinion." *COMSAT*, 77 F.3d at 1422, 1423; *see also Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424–25 (D.C. Cir. 2007) ("[T]he question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task. Federal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." (quoting *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003))). OKWU's failure to allege that it will investigate or adjudicate any complaints of sexual violence is grounds both for dismissal on constitutional grounds, *supra* Part III.A, and for finding its claims unfit for immediate review.

## CONCLUSION

Defendants respectfully request that the Court grant their motion.

DATED:  December 16, 2016                  Respectfully submitted,

                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney
                                           General

                                           CHANNING D. PHILLIPS
                                           United States Attorney

                                           JENNIFER D. RICKETTS
                                           Director
                                           Federal Programs Branch

                                           SHEILA M. LIEBER
                                           Deputy Director
                                           Federal Programs Branch

                                            /s/ Matthew J. Berns
                                           MATTHEW J. BERNS
                                           Trial Attorney (D.C. Bar No. 998094)
                                           Federal Programs Branch
                                           U.S. Department of Justice, Civil Division
                                           20 Massachusetts Avenue
                                           NW

                                           Washington, D.C. 20530
                                           Telephone:  (202) 616-8016
                                           Email:  matthew.j.berns@usdoj.gov

                                           *Counsel for Defendants*